UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____
                                    )
                                    )          CHAPTER 11
In re:                              )
                                    )
SUMMIT METALS, INC.,                )          CASE NO. 98-2870 (KJC)
                                    )
            Debtor.                 )
                                    )
_____)

## NOTICE OF APPEAL

Ambrose M. Richardson, III, a creditor, hereby appeals under 28 U.S.C. §158(a) from the

Order of the Bankruptcy Judge insofar as it denied appellant's administrative claim entered in

this proceeding on the 4th day of December, 2007.

The names of all parties to the Order appealed from, and the names and addresses of their

respective attorneys, are set forth on the attached schedule.

**AMBROSE M. RICHARDSON**
Ambrose M. Richardson, III
Creditor of Chariot Group/Summit
40 Wall Street
New York, NY 10005
(212) 530-4771; Fax: (212) 267-2030

December 13, 2007

Joan B. Wills, Esq.
Klehr Harrison et al.
919 Market St., Suite 1000
Wilmington, DE 19801

Kevin Mangan, Esq.
Womble Carlyle et al.
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

Joseph J. Bodnar, Esq.
Law Offices of Joseph J. Bodnar
2101 North Harrison Street, Suite 1501
Wilmington, DE 198902

Adam B. Landis, Esq.
Landis Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Todd C. Schiltz, Esq.
Wolf, Block et al.
1100 N. Market Street, Sui9te 1001
Wilmington, DE 19801

Adam Prussin, Esq.
Pomerantz Haudek et al.
100 Park Avenue,, 26th Floor
New York, NY 10017

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    : Chapter 11
                                          :
**SUMMIT METALS, INC.,**                  : Case No. 98-2870-KJC
                                          :
                    Debtor.               :
                                          :

## ORDER

**AND NOW**, this 4th day of December, 2007, upon consideration of Amended Application of Ambrose M. Richardson, Esq. for Compensation as Post-Petition Creditor and as Creditor Providing Substantial Benefit to the Estate Pursuant to §§ 503(b)(1)(A)(i), 503(b)(3)(B),(C),(D) and (F) and 503(b)(4)(Docket No. 587) ("Richardson Application"), objections thereto, after evidentiary hearing thereon and consistent with the foregoing Opinion, it is hereby

**ORDERED** and **DECREED** that the Richardson Application is **GRANTED**, in part and **DENIED**, in part. Richardson is awarded an allowed administrative expense in the amount of $2,533.65.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Copies to:

48

Joanne Bianco Wills, Esquire
Klehr Harrison Harvey Branzburg & Ellers
919 N. Market Street, Suite 1000
Wilmington, DE 19801

Steven K. Kortanek, Esquire
Kevin J. Mangan, Esquire
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

Joseph J. Bodnar, Esquire
Law Offices of Joseph J. Bodnar
2101 North Harrison Street, Suite 101
Wilmington, DE 19802

Adam G. Landis, Esquire
Rebecca L. Butcher, Esquire
Landis Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801

"J" Jackson Shrum, Esquire
Harvey, Pennington Ltd.
913 Market Street, 7th Floor
Wilmington, DE 19801

Ambrose M. Richardson, Esquire
A. M. Richardson, P.C.
40 Wall Street, 35th Floor
New York, NY 10005

Barry M. Klayman, Esquire
Todd Charles Schiltz, Esquire
Wolf, Block, Schorr & Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801

H. Adam Prussin, Esquire
Pomerantz Haudek Block Grossman & Gross
100 Park Avenue, 26th Floor
New York, NY 10017-5516

49

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>**SUMMIT METALS, INC.,**<br><br>Debtor. | :  Chapter 11<br>:<br>:  Case No. 98-2870-KJC<br>:<br>:<br>:<br>: |

## O P I N I O N[1]

## BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

JEPSCO, Ltd. ("Jepsco") and Ambrose M. Richardson, Esq. ("Richardson") have filed

applications seeking the allowance of fees and expenses as administrative expenses pursuant to

section 503(b) of the Bankruptcy Code. The Chapter 11 Trustee, the United States Trustee, and

the Official Committee of Unsecured Creditors (the "Committee") (collectively, the "Objecting

Parties") have objected. The Court held evidentiary hearings on February 23, March 16, and

April 4, 2006 and accepted post-hearing briefs from the parties.

For the reasons set forth below, the Court will deny Jepsco's request and grant in part and

deny in part Richardson's request.

## BACKGROUND

A.    The Summit Metals Bankruptcy and the Events Preceding

A brief explanation of the events leading to and surrounding the filing of this chapter

---

[1]    This Opinion constitutes the findings of fact and conclusions of law required by FED. R.
BANKR. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).
This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(B).

11 proceeding (the "Case")[2] is helpful to the resolution of the instant dispute.

### 1.    The New York Proceedings

During the period from 1991 to 1995, Richard E. Gray, the sole director and majority

shareholder of The Chariot Group, Inc. ("Chariot") caused Chariot to pay approximately $7.7

million in fees to its indirect majority shareholder, Chariot Holdings Ltd. ("Chariot Holdings"),

and to VDC Recovery Corporation, a Gray-controlled entity. During this time, Gray also caused

Chariot to write-off loans it had made to Chariot Holdings and to Gray. These events led to the

August 1995 filing of a New York shareholder lawsuit against Gray (the "First NY Shareholder

Lawsuit").

After the commencement of the First NY Shareholder Lawsuit, Gray attempted to sell

Chariot's operating subsidiaries -- Energy Savings Products, Inc. ("ESP"), in which Chariot held

a 92% interest, and B.F. Rich Co., Inc. ("B.F. Rich"), ESP's wholly-owned subsidiary. Gray was

successful in June 1995, causing Chariot to sell its interest in ESP to Homestar Acquisition

Corporation ("Homestar Acquisition"), a company wholly owned by Gray. In exchange for

ESP's stock, Gray arranged for Chariot to receive a $15 million note (the "Note") from Hallowell

Industries, Inc. ("Hallowell"), another entity owned and controlled by Gray. Following the sale

of ESP to Homestar Acquisition, Gray merged Homestar Acquisition into ESP. The Note

remains unpaid.

In August 1995, Gray merged Summit Metals, Inc. ("Summit" or the "Debtor") with

---

[2]    These background facts have been derived substantially from then District Judge
Jordan's Post-Trial Findings of Fact and Conclusions of Law resolving Summit Metals, Inc. v. Gray (In
re Summit Metals, Inc.), No. 00-387 (D. Del. Aug. 6, 2004), submitted as Exhibit 22. Judge Jordan has
since been elevated to the Court of Appeals for the Third Circuit.

Chariot, transferred the remaining Chariot operations to Chariot Management, Inc., another entity affiliated with Gray, and shut down Chariot operations. The events surrounding the Summit/Chariot merger led to the filing of a second shareholder lawsuit (the "Second NY Shareholder Lawsuit," together, with the First NY Shareholder Lawsuit, the "NY Shareholder Lawsuits").

In October 1996, the plaintiffs in the NY Shareholder Lawsuits successfully obtained preliminary injunctive relief with respect to the: (i) alleged looting of Chariot by Gray; (ii) sale of Chariot's interest in ESP to Homestar Acquisition; and (iii) merger of Chariot into Summit (the "Preliminary Injunction Proceeding"). As a result, Gray was enjoined from transferring any of ESP's assets to himself or any other entity that he owned or controlled (the "Preliminary Injunction"). In October 1998, Gray was found to have violated the Preliminary Injunction by misappropriating $4.3 million from ESP and was held in civil contempt (the "Contempt Proceeding"). An order was entered in January 1999 providing Gray an opportunity to purge the judgement of contempt by returning the $4.3 million. However, Gray refused to do so. He was committed to prison from November 2001 until November 2003, at which time he stipulated to deposit the stock of the Debtor, ESP, Rivco (as defined below), and Jenkins (as defined below) into escrow pending the resolution of the DE Adversary Proceeding (as defined below).

### 2.     The Delaware Proceedings

On December 30, 1998, the Debtor commenced this Case, seeking protection under chapter 11 of the Bankruptcy Code. The filing of the petition stayed the NY Shareholder Lawsuits. The Committee was formed by the United States Trustee on March 4, 1999. Richardson, the former partner of Gray and officer of Chariot and its subsidiaries, was appointed

3

as its Chairman. On October 1, 2004, the Court appointed Francis A. Monaco, Jr. as the Chapter 11 Trustee.

On October 29, 1999, the Committee filed a complaint on behalf of the Debtor to recover property from Gray and his affiliated entities, including ESP (the "DE Adversary Proceeding"). The Complaint alleged that Gray breached his fiduciary duties owed to the Debtor and Chariot by engaging in unfair and fraudulent self-dealing transactions, which included the looting of Chariot from 1991 to 1995 and the sale of Chariot's interest in ESP for the unpaid Note. The Complaint also alleged that, following the shut-down of Chariot's operations, Gray took two corporate opportunities of the Debtor when he acquired ownership in Riverside Millwork Co., Inc. ("Rivco") and Jenkins Manufacturing, Inc. ("Jenkins") with the Debtor's money. On August 6, 2004, the District Court for the District of Delaware found for the Debtor, awarding a $40 million judgment against Gray and directing Gray and his affiliated entities to transfer their interests in Rivco and Jenkins to the Debtor. In 2005, the Debtor sold its interests in Rivco and Jenkins -- the estate's only marketable assets -- for approximately $18 million.

3.    Miscellaneous Relevant Proceedings

In 1997, creditors commenced an involuntary bankruptcy proceeding against Homestar Industries, Inc. ("Homestar"), another entity owned by Gray, in the Eastern District of Missouri (the "MO Bankruptcy Proceeding"). A chapter 7 trustee was subsequently appointed, who recovered approximately $600,000 in insurance proceeds misappropriated by Gray from Homestar (the "MO Adversary Proceeding"). While in prison for contempt, Gray pled guilty to bankruptcy and tax fraud relating to the MO Bankruptcy Proceeding (the "MO Criminal Proceeding"). Additional unrelated criminal investigations into Gray's activities also occurred in

4

Connecticut and New York.

In 2000, while the DE Adversary Proceeding was pending, creditors of ESP commenced an involuntary bankruptcy proceeding against it in the Middle District of Tennessee (the "TN Bankruptcy Proceeding"). Following the commencement of the TN Adversary Proceeding (as defined below), the Committee dismissed ESP as a defendant from the DE Adversary Proceeding. The Committee then filed a proof of claim on behalf of the Debtor in the TN Bankruptcy Proceeding. To resolve ESP's objection to the Debtor's proof of claim, the Committee agreed to relinquish the Debtor's claim against ESP in exchange for 92% of ESP's outstanding equity post-bankruptcy and any of ESP's rights or causes of action against Gray or his affiliated entities, including any Rivco and Jenkins corporate opportunity claims.

In 2001, Richardson commenced a lawsuit in New Hampshire against Gray and his affiliated entities on the Debtor's behalf, alleging claims identical to those alleged in the DE Adversary Proceeding (the "NH Proceeding"). The NH Proceeding was stayed shortly thereafter.

4.    Proceedings Against Richardson

Four separate proceedings filed against Richardson are relevant here. First, prior to the filing of this Case, Gray and Summit sued Richardson in New York, alleging that Richardson violated his fiduciary duties as an officer of Chariot (the "Richardson Fiduciary Duty Proceeding"). Ultimately, the Richardson Fiduciary Duty Proceeding was dismissed and Summit was held responsible to indemnify Richardson for his fees and expenses.

In 1998, a portion of Richardson's fees and expenses incurred in the Richardson Fiduciary Proceeding was reimbursed by Summit. It was this reimbursement that was the subject of the second proceeding against Richardson. In May 1999, following the commencement of this

5

Case, the Debtor filed an adversary proceeding against Richardson seeking the avoidance and recovery of the reimbursement as an alleged preference (the "Richardson Preference Proceeding").

The third proceeding against Richardson was commenced in August 1999 by the Debtor and alleged racketeering, conspiracy, tortious interference with a contract and economic relations, prima facie tort, abuse of process, breach of fiduciary duty, and vexatious litigation (the "Richardson Racketeering Proceeding"). The life span of the Richardson Racketeering Proceeding was short as it was dismissed after ten days.

The fourth and final proceeding against Richardson was commenced by ESP after the filing of the TN Bankruptcy Proceeding. ESP filed suit against the Committee, Richardson, and their individual lawyers and law firms, alleging that the DE Adversary Proceeding violated the automatic stay (the "TN Adversary Proceeding"). ESP also sought punitive damages from Richardson, arguing that his failure to prosecute certain objections he raised in the TN Bankruptcy Proceeding amounted to egregious conduct.

B.    Procedural History

On February 11, 2005, Jepsco filed its application (the "Application" or "Jepsco Application") seeking the allowance of fees and expenses totaling $78,366.78 as an administrative expense under section 330 of the Bankruptcy Code. Jepsco subsequently amended its Application (the "Amended Application" or Jepsco Amended Application") on April 26, 2005 to seek the allowance of its fees and expenses under section 503(b)(3)(D) for its "substantial contribution" to the Case. The Objecting Parties have argued, inter alia, that: (i) Jepsco lacks standing under section 503(b)(3)(D); (ii) Jepsco did not substantially contribute to

6

the Debtor's estate or creditors; and (iii) even if Jepsco substantially contributed, Jepsco is ineligible to seek its fees as an administrative expense.

On February 15, 2005, Richardson filed his application (the "Application" or "Richardson Application") seeking the allowance of fees and expenses totaling $877,752.59 as an administrative expense under sections 507(a)(1) and 503(b). Richardson subsequently amended his Application (the "Amended Application" or "Richardson Amended Application") on March 13, 2006, reducing his request to $869,631.50 and relying only upon sections 503(b)(1)(A),[3] 503(b)(3)(B), (C), (D), and (F), and 503(b)(4). On April 3, 2006, Richardson supplemented (the "Supplement") his Amended Application with more detailed invoices and further amended his request to remove section 503(b)(3)(B) as a supporting provision.[4] The Objecting Parties have argued, inter alia, that: (i) Richardson is unable to collect his expenses under section 503(b)(1)(A) because they did not arise from a post-petition transaction with the Debtor or provide an actual benefit to the Debtor's estate; (ii) Richardson cannot collect expenses under section 503(b)(3)(C) because the criminal matters in which he assisted do not relate to the Case, the Debtor's business or its property; (iii) Richardson cannot recover his expenses under section

---

[3]     In his Amended Application, Richardson cites section 503(b)(1)(A)(i). Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), section 503(b)(1)(A) was renumbered section 503(b)(1)(A)(i). Section 507(a)(1) has also been renumbered as Section 507(a)(2). Because this Case was filed before the effective date of BAPCPA, the Court will refer to the pertinent sections as they were designated at the time the Case was filed.

[4]     It is unclear whether Richardson removed section 503(b)(3)(F) as well. According to Richardson's testimony on April 4, 2006, he no longer wished to rely upon section 503(b)(3)(F). (Hr'g Tr. 122:13-123:13, Apr. 4, 2006.) Moreover, the Supplement lumps his time spent on Committee matters into his section 503(b)(1)(A) claim. (Supplement 5.) However, Richardson's Post-Trial Brief proffers a section 503(b)(3)(F) argument. (Richardson Post-Hr'g Br. 16-18.) Because of this ambiguity and because the Objecting Parties have addressed section 503(b)(3)(F) in their papers, the Court will examine whether the reimbursement of Richardson's expenses under section 503(b)(3)(F) is appropriate.

503(b)(3)(D) because his efforts failed to make a substantial contribution to the Debtor's estate or creditors; (iv) by the plain language of the statute, Richardson is unable to recover his fees under sections 503(b)(3)(C), (D), and (F); and finally, (v) Richardson cannot recover his fees under section 503(b)(4) because his status as an attorney does not entitle him to recover his professional rate, his efforts were duplicative, his fees are unreasonable, and his invoices are vague and ambiguous.

## DISCUSSION

In deciding whether to grant the relief sought in the Jepsco Amended Application, the Court is called upon to determine: (i) whether Jepsco is eligible to pursue an administrative expense claim under section 503(b)(3)(D); (ii) if so, whether Jepsco substantially contributed to the Debtor's chapter 11 case; and (iii) whether Jepsco can recover its fees under sections 503(b)(3)(D) or 503(b)(4).

In deciding whether to grant the relief sought in the Richardson Amended Application, the Court is called upon to determine: (i) whether Richardson's expenses qualify for reimbursement under sections 503(b)(1)(A) and 503(b)(3)(C), (D) or (F); and (ii) whether Richardson's fees qualify for reimbursement under section 503(b)(4).

I.    Jepsco Amended Application

A.    Jepsco is eligible to pursue administrative allowance of expenses but not fees

In its Amended Application, Jepsco relies upon section 503(b)(3)(D) to seek an administrative expense recovery of $76,344 in fees and $2,022.78 in expenses. Under 11 U.S.C. § 503(b)(3)(D), the Court may allow as administrative expenses,

the actual, necessary expenses, other than compensation and

8

> reimbursement specified in [section 503(b)(4)], incurred by . . . a
> creditor, an indentured trustee, an equity security holder, or a
> committee representing creditors or equity security holders other
> than a committee appointed under section 1102 of this title, in
> making a substantial contribution in a case under chapter 9 or 11 of
> this title . . . .

The Objecting Parties argue that Jepsco is ineligible to recover its fees and expenses under this provision because (i) Jepsco is not "a creditor, an indentured trustee, an equity security holder or a committee representing creditors or equity security holders[;]" and (ii) section 503(b)(3)(D) does not permit the recovery of compensation.

In defending its eligibility under section 503(b)(3)(D), Jepsco argues that the approximate $1 million claim held in this Case by James T. Kelly ("Kelly"), Jepsco's president, chief executive officer, sole director, and sole employee, qualifies it as a creditor of the Debtor. According to Kelly, he used Jepsco as his alter ego and often operated Jepsco under his name. (Hr'g Tr. 37:20-38:1, Feb. 23, 2006.)  Essentially, Jepsco asserts that Jepsco and Kelly are the same entity.

The Court will consider the Jepsco Amended Application under section 503(b)(3)(D). The evidence submitted indicates that the totality of fees and expenses requested in the Jepsco Amended Application were generated solely by Kelly.  At first, Kelly drafted the Jepsco Application improperly and without the assistance of counsel. (Hr'g Tr. 39:22-24, Feb. 23, 2006.)  Thereafter, with the help of counsel, Kelly sought to adopt the Application for himself. The Court finds no reason to refuse such a request and will reach the merits of the Jepsco Amended Application.[5]

---

[5]     The Court will use "Kelly" and "Jepsco" interchangeably herein.

Although the Court concludes that Kelly may adopt the Jepsco Amended Application for himself, Kelly is eligible to pursue only an award of expenses -- not fees -- under section 503(b)(3)(D). The plain language of section 503(b)(3)(D) is clear that an applicant who substantially contributes to a debtor's estate and creditors may be awarded only actual and necessary <u>expenses</u>. For an award of compensation, applicants must rely on section 503(b)(4), which allows as an administrative expense,

> reasonable compensation for professional services rendered by an <u>attorney or an accountant</u> of an entity whose expense is allowable under [section 503(b)(3)], based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant . . . .

11 U.S.C. § 503(b)(4) (emphasis added). In the instant case, the Objecting Parties have argued that section 503(b)(4) cannot apply because Kelly is neither an accountant nor a lawyer. The Court agrees. Kelly operates and provides the services of a "management consulting firm." (Hr'g Tr. 36:8, Feb. 23, 2006.) Therefore, because Kelly cannot meet the standard for eligibility under section 503(b)(4), the Court must deny Jepsco's request for allowance of $76,344 in fees.

### B.    Jepsco did not substantially contribute to the Debtor's estate or creditors

Under section 503(b)(3)(D), Kelly can recover his remaining $2,022.78 in expenses if he proves by a preponderance of the evidence that he incurred the expenses as a result of activities which substantially contributed to the Debtor's estate or creditors. <u>See, e.g.</u>, <u>In re Buckhead Am. Corp.</u>, 161 B.R. 11, 15 (Bankr. D. Del. 1993) ("Because creditors are presumed to act primarily in their own interest and not for the benefit of the estate as a whole, they have the burden of

proving . . . that they made the requisite substantial contribution."). The Bankruptcy Code does not define "substantial contribution." However, courts have determined that an applicant's activities substantially contribute if they "'resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.'" Lebron v. Mechem Fin. Inc., 27 F.3d 937, 944 (3d Cir. 1994) (quoting Haskins v. United States (In re Lister), 846 F.2d 55, 57 (10th Cir. 1988)). The activities must "facilitate progress in the case, rather than . . . retard or interrupt." In re Gurley, 235 B.R. 626, 636 (Bankr. W.D. Tenn. 1999).

Courts have examined several factors to determine whether applicants' efforts have substantially contributed, including: "whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct benefit upon the estate; and whether services were duplicative of services performed by others." Id.; accord Buckhead, 161 B.R. at 15; In re FRG, Inc., 124 B.R. 653, 658 (Bankr. E.D. Pa. 1991); In re Alert Holdings Inc., 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993). Additionally, courts have considered the motivation of the applicant, holding that applicants who act "primarily to serve their own interests and . . . [who would have acted] absent an expectation of reimbursement from the estate" cannot be compensated under section 503(b)(3)(D). Lebron, 27 F.3d at 944 (emphasis added). If the benefit received by the estate was incidental "arising from activities the applicant has pursued in protecting his or her own interests[,]" courts have found an applicant's contribution insubstantial. Id.

It is undisputed that Kelly participated voluntarily, not only in this Case and the DE Adversary Proceeding, but also in several of the miscellaneous yet relevant proceedings. More specifically, Kelly provided deposition testimony to aid the DE Adversary Proceeding, testified

in this Case to fight against consolidation, reviewed and assembled files in anticipation of the DE Adversary Proceeding, and attended approximately ten meetings with the Committee in preparation for the DE Adversary Proceeding. Moreover, Kelly met with ESP's general counsel to review business records, met with BF Rich's attorneys and Rivco and Jenkins shareholders to discuss monetary demands from Gray, met with U.S. Attorneys in Missouri, Connecticut, and New York as well as the Federal Bureau of Investigation (the "FBI") and the Internal Revenue Service (the "IRS"), and testified at the Contempt Proceeding and the TN Bankruptcy Proceeding's sale hearing. (Jepsco App. 6-8.)

Kelly asserts that his efforts substantially contributed to this Case because: (i) his efforts "prevented Gray from pilfering money from what ultimately would be part of the Summit estate, [he] organized documents and exhibits, and helped send Gray to jail so this [C]ase could proceed" (Jepsco Post-Hr'g Br. 5); (ii) the DE Adversary Proceeding, in which he participated, "conferred substantially all, if not all, of the assets on the Debtor's estate" (Jepsco Post-Hr'g Br. 5); and (iii) he "lessened the burden on the [d]ebtors' professionals and expedited a smooth transition through the bankruptcy process" (Jepsco Post-Hr'g Br. 9 (alteration in original) (citation omitted)).

The Objecting Parties disagree with Kelly's assessment of his efforts' effect on the Debtor's estate and creditors. First, the Objecting Parties argue that any contribution conferred upon this Case was merely incidental, because Kelly's primary motive in assisting the parties was to acquire Rivco and Jenkins from the Committee. Second, the Objecting Parties contend that Kelly's assistance in the TN Bankruptcy Proceeding, the various criminal investigations, the Contempt Proceeding, and the BF Rich, Jenkins and Rivco matters did not relate to this Case

12

and, therefore, no benefit was conferred. Finally, the Objecting Parties assert the success of the DE Adversary Proceeding resulted from the Committee's efforts and that Kelly's testimony could have been compelled through the Federal Rules of Civil Procedure.

The Court agrees with the Objecting Parties and concludes that Kelly's activities did not make a substantial contribution to this Case. First, the record fails to establish how Kelly's activities in the criminal investigations, the TN Bankruptcy Proceeding, and the BF Rich matter-- or even how those matters themselves -- conferred a direct benefit on the Debtor's estate and creditors. Kelly testified that the criminal investigations led to the indictment of Gray in Missouri and Connecticut, may have reduced the IRS's claim in this Case, and placed the IRS in a position to seize Gray's assets. (Hr'g Tr. 281:18-283:1, Apr. 4, 2006.) Kelly also testified that ESP, along with its subsidiary, BF Rich, "were part of the umbrella of Summit Metals" (Hr'g Tr. 41:13-15, Feb. 23, 2006), thereby implying that any contribution to the TN Bankruptcy Proceeding and BF Rich matter contributed to this Case. However, there is no evidence proving that Kelly's efforts in the TN Bankruptcy Proceeding, the BF Rich matter, and the criminal investigations increased the assets of this Case or prevented them from diminishing. See In re Granite Partners, L.P., 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) ("[I]nsubstantial services include those that do not actually increase the size of the estate . . . ."); Marcus Montgomery Wolfson & Burten P.C. v. AM Int'l (In re AM Int'l, Inc.), 203 B.R. 898, 904 (D. Del. 1996) (finding that the applicants substantially contributed because their negotiations allowed the creditors committee to receive full payment on their claims). Kelly's actions may have helped the TN Bankruptcy Proceeding by stopping the flow of money from BF Rich to Gray and helping the IRS pursue claims against Gray but none of Kelly's actions have been proven to have

13

increased or maintained the assets of the Debtor. Kelly himself admits this. (See generally Hr'g Tr. 253:1-300:2, Apr. 4, 2006.) Moreover, there is no indication that, absent Kelly's efforts, a different outcome would have been produced in this Case. See, e.g., Lebron, 27 F.3d at 946 (holding that the applicant's contributions were substantial because they were "critical" to both the court and the trustee); Granite, 213 B.R. at 449 ("Here, the applicants' objections to the disclosure statement did not alter the character of the document, and did not, therefore, rise to the level of a substantial contribution."); In re Columbia Gas Sys., Inc., 224 B.R. 540, 552 (Bankr. D. Del. 1998) ("Exxon's activities were not of the type that if absent, progress towards reorganization of [the Debtor] would have been substantially diminished.").

Second, although Kelly's request of and participation in meetings of the Jenkins and Rivco shareholders may have stopped monetary payments to Gray, which ultimately may have decreased Jenkins' and Rivco's sale value, the record shows that Kelly's motivation for participating in the meetings stemmed from his minority shareholder positions in Rivco and Jenkins. (Hr'g Tr. 50:24-51:2, Feb. 23, 2006 ("[B]oth Ailward and I were shareholders of Jenkins and Rivco, and so we though it was a pretty good idea to find out whether or not these companies were being denuded by Gray . . . .").) According to Kelly, his primary concern was to prevent Rivco and Jenkins from "paying money out that had been prohibited by a restraining order." (Hr'g Tr. 286:1-3, Apr. 4, 2006.) Therefore, because Kelly requested and participated in the meetings for the purpose of protecting Rivco and Jenkins, any benefit accruing to this Case as a result of these efforts was merely incidental. See, e.g., Mfrs. Hanover Trust Co. v. Bartsh (In re Flight Transp. Corp. Sec. Litig.), 874 F.2d 576, 583 (8th Cir. 1989) (finding lack of substantial contribution where indenture trustee's services, which included monitoring of and intervention in

14

security and bankruptcy litigation, filing proofs of claims, and communicating and advising its clients, were designed primarily to benefit its clients); In re Lister, 846 F.2d at 57 (denying reimbursement for the applicant's pre-petition efforts to collect a judgment when he "was unaware of the pendency of bankruptcy proceedings[,]" and thus, were solely for his own interest); Columbia Gas, 224 B.R. at 549 (noting, as a factor in its decision to withhold reimbursement, the applicant's "strong economic self-interest" in the global settlement); FRG, 124 B.R. at 659 (holding that potential purchasers of the debtors' assets did not substantially contribute to the estate by participating in the bidding process because their actions were "primarily on behalf of their own interests").

Finally, although the Contempt Proceeding and the DE Adversary Proceeding substantially contributed to this Case by ultimately providing for the recovery and sale of the Jenkins and Rivco stock, the Court cannot find that Kelly's testimony and fact-finding assistance in those proceedings substantially contributed. While it is true that Kelly's participation in the DE Adversary Proceeding was extensive, totaling approximately eighty hours, "extensive participation in a case, without more, is insufficient to compel compensation." Gurley, 235 B.R. at 636. Kelly relies on In re Essential Therapeutics, Inc., 308 B.R. 170 (Bankr. D. Del. 2004), arguing that his extensive participation "'lessened the burden on the [d]ebtors' professionals and expedited a smooth transition through the bankruptcy process.'" (Jepsco Post-Hr'g Br. 9 (alteration in original) (quoting Essential, 308 B.R. at 176).) Kelly's reliance on Essential is misplaced. In Essential, the applicants assisted the estate by taking over a portion of the debtors' counsel's responsibilities. For example, the applicants drafted key plan provisions, participated in hearings, and prepared necessary corporate documents. The Essential Court held that

15

"[w]ithout this assistance, the [d]ebtors' counsel would have had to devote significant time and resources to perform these services . . . . As a result, the Debtors were able to cut costs by focusing their efforts on their areas of expertise and allowing the [applicants] to assist where appropriate . . . ." Essential, 308 B.R. at 176. Here, unlike the applicants in Essential, Kelly's testimony and fact-finding assistance did not relieve the Committee of any of its duties or enable the Committee to focus its attention elsewhere. Essential is inapplicable here.

The success of the Contempt Proceeding and the DE Adversary Proceeding did not result solely from Kelly's efforts, but rather, from the participation of many, including the Objecting Parties, the plaintiffs of the NY Shareholder Lawsuits, and their respective attorneys.[6] See, e.g., In re Worldwide Direct, Inc., 334 B.R. 112, 125 (Bankr. D. Del. 2005) (concluding that applicant's participation in a sale did not substantially contribute because there was "no evidence what amount was due solely (or even primarily) to [the applicant's] efforts . . . . [and the applicant] acknowledges that it was one of many parties participating in the negotiations"); Columbia Gas, 224 B.R. at 549 (noting, as one of the court's reasons for denying reimbursement, that the settlement, which provided $550 to $600 million in estate value, required the participation of many).

Finally, the Court is unwilling to award reimbursement under section 503(b)(3)(D) for an applicant's time and effort in testifying. The Court agrees with the reasoning set forth in In re

---

[6]    In support of Jepsco's request, Richardson testified that there would not have been a DE Adversary Proceeding without the participation of Kelly. (Hr'g Tr. 252:11-12, Apr. 4, 2006.) As courts have held, "Corroborating testimony by a disinterested [emphasis added] party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a 'substantial contribution.'" In re U.S. Lines, Inc., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989). The Court may also use its "own first-hand observance of the services provided" in addition to any corroborating testimony to find a substantial contribution. Id.

16

Gherman, 105 B.R. 714, 717 (Bankr. S.D. Fla. 1989): "Virtually all litigation is dependent to some degree upon the testimony and, therefore, the time and effort, of lay witnesses. A witness subject to a court's subpoena power, who voluntarily furnishes evidence, is simply performing a civic duty." Reimbursing a lay witness who provides testimony for the prevailing party would encourage lay witnesses to demand reimbursement from a debtor regardless of the substance or significance of the testimony, thereby adding an unwelcome incentive to the process.

Therefore, because the Court has determined that Kelly's efforts throughout the TN Bankruptcy Proceeding, the BF Rich, Rivco, and Jenkins matters, the various criminal investigations, the DE Adversary Proceeding, and the Contempt Proceeding did not substantially contribute to this Case, Jepsco's request for an allowance of $2,022.78 in administrative expenses will be denied.

## C.    Jepsco failed to meet its burden of proving that its expenses are actual and necessary

Even if this Court concludes that Kelly's efforts substantially contributed to the Debtor's estate and creditors, the Court cannot award Kelly his expenses because he has failed to meet his burden of proving that they are actual and necessary. Under section 503(b)(3)(D), a finding of substantial contribution is only the first step. After such a finding, the Court must determine whether an applicant's expenses were actual and necessary. The applicant must provide sufficient details of each expense incurred for which reimbursement is sought. See generally In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 584 (Bankr. D. Utah 1985) (noting that required details include the date, type, and amount of each expense). Local Rule 2016-2 provides

17

guidance to applicants. It requires that an applicant requesting payment of an administrative

expense under section 503(b)(3) must provide the Court with "an expense summary by category

for the entire period of the request. Examples of such categories are computer-assisted legal

research, photocopying, outgoing facsimile transmissions, airfare, meals and lodging." Del.

Bankr. L.R. 2016-2(e). Additionally, each expense within each category must be itemized, with

"the date the expense was incurred, the charge and the individual incurring the expense, if

available." Id.

In the Jepsco Application, which provides the only expense detail submitted to the Court,

Kelly's activities from February 2001 until February 2004 are listed with some detail, but his

expenses are merely totaled and listed under each activity. For example, Kelly's submission for

February 2001 states: "Meeting in Counsel's office regarding transfer of records (HR)
Expense: $32."

(Jepsco App. 6.) The Application does not provide any explanation of the expenses except for

the January 2004 expense described as "hotel 2 nights and late check out." (Jepsco App. 8.)

Moreover, the testimony of both Richardson and Kelly provides no additional insight.

Consequently, without any supporting detail, the Court is unable to award Kelly's requested

expenses. See, e.g., Jensen-Farley, 47 B.R. at 584 ("Undocumented expenses will not be

allowed."); Worldwide Direct, 334 B.R. at 120 (holding that "a request for an administrative

claim under section 503(b) requires the same level of documentation and substantiation as a

request for compensation under section 330"); In re F.A. Potts & Co., Inc., 114 B.R. 92, 94-95

(Bankr. E.D. Pa. 1990) (denying the reimbursement of "administrative costs" for the applicant's

failure to specify its components).

18

II.    Richardson Amended Application

A.    Section 503(b)(1)(A)

Richardson relies upon section 503(b)(1)(A) to seek an administrative expense recovery of $618,995.87[7] in fees and $82,358.20 in expenses. Part of Richardson's claim is comprised of the Richardson Fiduciary Duty Proceeding indemnification award and his subsequent collection costs. The collection costs include Richardson's fees and expenses incurred for efforts in this Case, the DE Adversary Proceeding, the MO Bankruptcy Proceeding, the MO Adversary Proceeding, the MO Criminal Proceeding, the TN Bankruptcy Proceeding, the TN Adversary Proceeding, the NH Proceeding, the Richardson Preference Proceeding, the Richardson Racketeering Proceeding, the Contempt Proceeding, and the Preliminary Injunction Proceeding, taken to recover assets for the estate so that he could collect his indemnification award (the "Collection Costs"). According to Richardson, he is entitled to an award of the Collection Costs because of Chariot's corporate by-laws, providing indemnification "to the fullest extent now or hereafter permitted by law" (Richardson Post-Hr'g Br. 3), and the Delaware Supreme Court's decision in Stifel Financial Corp. v. Cochran, 809 A.2d 555 (Del. 2002), permitting the indemnification of expenses incurred by a corporate officer in successfully prosecuting an indemnification suit under 8 Del. C. § 145(a)[8] (Richardson Post-Hr'g Br. 3-4).

---

[7]    Of the $618,995.87 requested under section 503(b)(1)(A), $561,380.81 is also sought under sections 503(b)(3)(D) and 503(b)(4).

[8]    Richardson also relies upon In re Women First Healthcare, Inc., 332 B.R. 115 (Bankr. D. Del. 2005), and Reading Co. v. Brown, 391 U.S. 471 (1986), to argue that he may recover his indemnification claim under section 503(b)(1)(A) without a showing of substantial contribution because his claim was incurred while defending an action brought by the Debtor, as successor in interest to Chariot. (Richardson Post-Hr'g Br. 5-6.) Those cases stand for the proposition that a tort committed by a debtor can give rise to an administrative claim. In the instant case, Richardson's reliance on Women First and Reading is misplaced as he has not accused the Debtor of committing a tort.

In response to Richardson's request, the Objecting Parties argue that an indemnification award of Collection Costs is improper because: (i) Richardson failed to introduce into evidence the Chariot bylaws; (ii) the Stifel decision does not entitle Richardson to receive indemnification for the Collection Costs; and (iii) the Collection Costs are unreasonable. Additionally, even if the Court awards Richardson the Collection Costs, the Objecting Parties assert that Richardson's entire indemnification claim under section 503(b)(1)(A) is improper because it did not arise out of a post-petition transaction between the Debtor and because Richardson's actions did not directly and substantially benefit the estate.

It is unnecessary for the Court to decide whether Richardson is entitled to an award of his Collection Costs. Even if the Court awarded them, Richardson's indemnification claim is not entitled to administrative status. Under 11 U.S.C. § 503(b)(1)(A), the Court may allow as administrative expenses, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, commissions for services rendered after the commencement of the case." For a request to be allowed under section 503(b)(1)(A), the applicant must prove that "'the debt [arises] from a transaction with the debtor-in-possession . . . [and] the consideration supporting the claimant's right to payment [is] beneficial to the debtor-in-possession in the operation of the business.'" Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976) (first alterations in original)); accord In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del. 2005); In re Pinnacle Brands, Inc., 259 B.R. 46, 51 (Bankr. D. Del. 2001); In re Mid-American Waste Sys., Inc., 228 B.R. 816, 821 (Bankr. D. Del. 1999); In re Phila. Mortgage Trust, 117 B.R. 820, 827 (Bankr.

20

E.D. Pa. 1990).

In this Case, Richardson's section 503(b)(1)(A) indemnification claim fails because it did not arise from a transaction with the Debtor. Rather, it arose from the Richardson Fiduciary Duty Proceeding, which was filed pre-petition and stemmed from Richardson's pre-petition conduct as an officer of Chariot. Consistently, courts have held that an indemnification claim based upon pre-petition services or conduct is not a cost or expense for "services rendered after the commencement of a case." 11 U.S.C. § 503(b)(1)(A). Instead, it is a form of prepetition compensation for services that is not entitled to administrative expense priority. See, e.g., Pinnacle, 259 B.R. at 51-52 (denying administrative status to applicant's indemnification claim arising from a contract executed pre-petition); Mid-American, 228 B.R. at 821-22 (refusing to award administrative expense status for indemnification claims arising from securities litigation, which arose pre-petition out of the applicants' pre-petition conduct); In re Overland Park Fin. Corp., 240 B.R. 402, 405-06 (Bankr. D. Kan. 1999) (refusing to grant administrative expense priority to former officer/director's indemnification claim for expenses incurred in a lawsuit based upon his pre-petition actions); Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 188 B.R. 347, 359 (Bankr. S.D.N.Y. 1995) (holding that because the agreement at issue was executed pre-petition, any contractual right to indemnification arising therefrom would be a pre-petition unsecured claim); In re Highland Group, Inc., 136 B.R. 475, 481 (Bankr. N.D. Ohio 1992) (same); Phila. Mortgage, 117 B.R. at 828-30 (finding that claims based upon pre-petition conduct cannot be afforded administrative expense priority because claims must arise post-petition); In re Amfesco Indus., Inc., 81 B.R. 777, 784 (Bankr. E.D.N.Y. 1988) (same); cf. In re Heck's Props., Inc., 151 B.R. 739, 767-68 (S.D. W. Va. 1992) (awarding administrative cost

21

priority to officers' and directors' indemnification claims that arose from a lawsuit based upon their post-petition conduct and services).

The remainder of Richardson's section 503(b)(1)(A) claim is comprised of his time and expenses spent on Committee matters. According to Richardson, his time and expenses devoted to Committee matters -- and also to collecting his indemnification award -- are entitled to priority under section 503(b)(1)(A) because his efforts enabled the recovery of assets for the estate. (Supplement 5-6.) "One of the main policies underlying section 503(b)(1)(A) is to provide an incentive for creditors and others to continue or commence doing business with an insolvent entity." 4 COLLIER ON BANKRUPTCY ¶ 503.06[2] (Alan N. Resnick et al. eds., 15th ed. rev. 2006); see also Mammoth Mart, 536 F.2d at 954 ("[I]f a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor, [the Code] provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate."). Thus, a section 503(b)(1)(A) applicant must demonstrate that "the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." O'Brien Envtl., 181 F.3d at 533 (citations omitted) (emphasis added). Examples of costs and expenses often awarded priority under section 503(b)(1)(A) are "outlays for repairs, upkeep, freight, [and] insuring the value of the property . . . . [as well as] for storage of property, for rent and for other goods and services incidental to protecting, conserving, maintaining and rehabilitating the estate . . . ." 4 COLLIER ON BANKRUPTCY at ¶ 503.06[1]. In the instant case, although Richardson argues extensively that he conferred an actual benefit to the

estate, he failed to establish that his costs and expenses were necessary to preserve the value of estate assets. Therefore, Richardson has failed to meet the burden required under section 503(b)(1)(A). Richardson's request for an administrative expense priority claim under section 503(b)(1)(A) will be denied.

B.    Section 503(b)(4)

Richardson seeks reimbursement of fees totaling $711,326.65 under section 503(b)(4).[9] As set forth above, section 503(b)(4) allows for the reimbursement of "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expenses is allowable under [section 503(b)(3)] . . . ." As indicated by the plain language of the statute, the issue of whether fees can be awarded as administrative expenses under section 503(b)(4) typically is not decided until after the Court allows an administrative expense recovery under section 503(b)(3). Nevertheless, the Court will address section 503(b)(4) first, but concludes that Richardson's request must be denied.

Richardson, an attorney admitted to practice in the state of New York, has submitted his fee request under section 503(b)(4) and seeks reimbursement of his and his employees' legal services in the NY Shareholder Lawsuits, the Contempt Proceeding, the Preliminary Injunction Proceeding, this Case, the DE Adversary Proceeding, the MO Bankruptcy Proceeding, the MO Adversary Proceeding, the MO Criminal Proceeding, the TN Bankruptcy Proceeding, the TN

---

[9]    Richardson requests reimbursement of his fees under sections 503(b)(1)(A), 503(b)(3)(C), (D), and (F), and 503(b)(4). However, reimbursement of fees can be awarded only under sections 503(b)(1)(A) and 503(b)(4). See 11 U.S.C. § 503(b)(3) ("[T]here shall be allowed as administrative expenses . . . the actual and necessary expenses, other than compensation and reimbursement . . . ."). As explained in Discussion supra Part II.A., Richardson's request for fees under section 503(b)(1)(A) is denied. The remainder of his requested fees will be analyzed under section 503(b)(4).

Adversary Proceeding, the NH Proceeding, the Richardson Fiduciary Duty Proceeding, the Richardson Preference Proceeding, and the Richardson Racketeering Proceeding. Services included drafting, reviewing and filing pleadings, undertaking discovery, providing advice, performing research, and developing legal theories. (Richardson Post-Hr'g Br. 16.) Richardson's time has been billed at the rate of $250-275 per hour, his associate's time at $150 per hour, and his paralegal's time at $75 per hour. (Richardson Am. App. 8.)

The Objecting Parties have argued that Richardson was not employed as an attorney for any party and, therefore, is seeking improperly an hourly wage for services he provided while representing himself. In support of this argument, the Objecting Parties rely on In re Gimelson, Nos. 04-3216, 00-11773F, 2004 WL 2713059 (E.D. Pa. Nov. 23, 2004), and In re Pappas, 277 B.R. 171 (Bankr. E.D.N.Y. 2002), both of which are helpful to the Court's present inquiry.

In Gimelson and Pappas, attorneys sought reimbursement of their time devoted to assisting trustees in the recovery of assets. Both courts denied the requests. The Pappas Court reasoned: "The mere fact that the creditor happens to be an attorney who bills $250 per hour does not change the inquiry. Section 503(b) provides that 'actual' 'expenses' may be afforded administrative expense status. Marshall's billable time, although valuable, was not an 'actual expense' to Marshall." 277 B.R. at 177. The Gimelson Court agreed with the Bankruptcy Court, which held, "Section 503(b)(4) does not include the time spent by a creditor who represents himself and has not incurred any attorney's fees, but affords an administrative priority to reimburse a creditor for compensation paid for professional services provided by an attorney for an entity." 2004 WL 2713059, at *22.

The Court agrees with the reasoning of Pappas and Gimelson. The fact that Richardson is

an attorney does not change the relevant inquiry of eligibility under section 503(b)(4). Only "an attorney or an accountant of an entity whose expense is allowable under [section 503(b)(3)]" is eligible for reimbursement of the "actual and necessary expenses incurred by such an attorney or accountant . . . ." 11 U.S.C. § 503(b)(4) (emphasis added). Here, although Richardson's actions may have been motivated , at least in part, by the prospect of helping other case participants, Richardson was not employed as an attorney for those participants and thus, could have been acting only in his personal capacity. Therefore, because Richardson, "as an attorney representing himself, does not seek reimbursement of professional fees that he incurred, but seeks compensation for his own time expended[,]" Richardson is ineligible to seek reimbursement of his fees under section 503(b)(4). Gimelson, 2004 WL 2713059, at *21. Richardson's request for reimbursement of $711,326.65 in fees under section 503(b)(4) is denied.

    C.    Section 503(b)(3)(C)

Richardson next argues that he is entitled to an administrative expense recovery of $1,830.59 under section 503(b)(3)(C)[10] for his expenses[11] incurred while assisting state and federal officials in developing and prosecuting bankruptcy and tax fraud claims against Gray. More specifically, Richardson asserts that he worked with the FBI and U.S. Attorneys prosecuting the MO Criminal Proceeding by answering questions, establishing the falsity of Gray's statements under oath at the MO Bankruptcy Proceeding's meeting of creditors, identifying supporting evidence, and providing "extensive background information . . . relating to

---

[10]    Of the $1,830.59 requested under section 503(b)(3)(C), $1,827.59 is also sought under section 503(b)(3)(D).

[11]    The Court will not address Richardson's fee request under this section for the reasons stated above. See Discussion supra Part II.B.

the New York proceedings and the overall big picture." (Richardson Am. App. 27.) The Objecting Parties argue that the MO Criminal Proceeding does not relate to the Debtor's case, business, or property but rather, stems from Gray's misappropriation of Homestar's insurance proceedings and false testimony in the MO Bankruptcy Proceeding's meeting of creditors.

The Court cannot allow Richardson's request under section 503(b)(3)(C). Under 11 U.S.C. § 503(b)(3)(C), the Court may allow as administrative expenses, "the actual, necessary expenses, other than compensation and reimbursement specified under [section 503(b)(4)], incurred by . . . a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor . . . ." Unlike sections 503(b)(1)(A) and 503(b)(3)(B) and (D), section 503(b)(3)(C) does not require that the expenses incurred by the creditor provide a benefit to the estate. However, the applicant bears the burden of satisfying a two-prong test. First, the applicant must show a direct relationship between the expenses sought and the prosecution of the criminal activity. See Lebron, 27 F.3d at 943 n.1 (holding that section 503(b)(3)(C) was unavailable to an applicant because his efforts, although ultimately leading to a criminal prosecution of the debtor, were not incurred in the course of a criminal proceeding); In re Petit, 291 B.R. 582, 591 (Bankr. D. Me. 2003) (refusing an award under section 503(b)(3)(C) because there was no showing that the applicant's expenses incurred in providing information to the court, which led to the investigation and prosecution of the debtor, were incurred in connection with a criminal investigation). Second, the applicant must prove that the prosecution of the criminal offense relates to a debtor's case, business, or property. See, e.g., In re Holder, 207 B.R. 574, 576 (Bankr. M.D. Tenn. 1997) (prosecuting the debtor for the improper representations and omissions on his statements and schedules).

26

In the instant case, Richardson fulfilled his burden under the first prong but did not do so under the second. The record establishes that Richardson's expenses were incurred in connection with the prosecution of the MO Criminal Proceeding. Richardson's activities assisted the FBI and U.S. Attorneys in formulating an indictment and provided evidence against Gray. See In re Fall, 93 B.R. 1003, 1012 (Bankr. D. Or. 1988) ("The phrase 'in connection' could encompass a wide variety of activities. Its use suggests a legislative intent that a creditor whose activities can be shown to have contributed in any direct way to the results which led to prosecution of a criminal offense . . . ."). However, the record is unclear how the MO Criminal Proceeding -- or even how the MO Bankruptcy Proceeding or the MO Adversary Proceeding -- relates to this Case, the Debtor's property or its business. There is no evidence that the Debtor had an interest in the insurance proceeds misappropriated by Gray or that it had any interest in the MO Bankruptcy Proceeding. Moreover, there is no evidence establishing how the Debtor's business related to the MO Criminal Proceeding or to Homestar. Richardson argues that the Homestar trustee may have asserted a claim to Jenkins but did not because of the successful outcome of the MO Adversary Proceeding. (Hr'g Tr. 30:15-25, Mar. 16, 2006.) This argument is unpersuasive in light of the lack of evidence supporting such a claim. Because Richardson has failed to meet his burden of proof, this Court must deny his request for an administrative expense under section 503(b)(3)(C).

D.      Section 503(b)(3)(D)

Turning next to Richardson's most lengthy argument, the Court must decide whether Richardson's request for an administrative expense recovery of $107,282.41 in expenses under

27

section 503(b)(3)(D) is proper.[12] Richardson has set forth eighteen specific examples of how his efforts in thirteen different proceedings substantially contributed to this estate and its creditors. The Objecting Parties contend that an award under section 503(b)(3)(D) is inappropriate because: (i) Richardson's efforts provided no actual and direct benefit to the Case; (ii) if a contribution was made, it was the result of numerous retained professionals; (iii) Richardson's primary motivation in acting was to benefit himself or to fulfill the fiduciary duties owed to Committee members; and (iv) many of Richardson's efforts were duplicative of retained professionals in the Case. Below, the Court addresses separately Richardson's efforts in each one of the thirteen proceedings and determines that an allowed administrative expense totaling $2,533.65 is appropriate.

### 1. NY Shareholder Lawsuits

According to Richardson, his participation in the NY Shareholder Lawsuits, more specifically, his efforts regarding the Preliminary Injunction Proceeding and Contempt Proceeding, substantially contributed to the Debtor's estate and creditors by "establish[ing] the facts and theories of the Debtor's looting and fraudulent transfer claims" (Richardson Post-Hr'g Br. 8) asserted in the DE Adversary Proceeding and by ultimately causing Gray's incarceration, which led to the escrow of Jenkins and Rivco stock and prevented further actions adverse to the Debtor (Richardson Post-Hr'g Br. 8). Additionally, Richardson has argued that his efforts in the Preliminary Injunction Proceeding provided evidence for the DE Adversary Proceeding. More

---

[12]     Of the $107,282.41 requested under section 503(b)(3)(D), $81,816.65 is also sought under section 503(b)(1)(A) and $1,827.59 under section 503(b)(3)(C), but these expenses are disallowed for the reasons discussed previously. The Court will not address Richardson's fee request under § 503(b)(3)(D) for the reasons stated above. See Discussion supra Part II.B.

specifically, Richardson gathered evidence, recruited witnesses, drafted pleadings, and

supervised attorneys. (Hr'g Tr. 23:4-7, Mar. 16, 2006.)  With respect to the Contempt

Proceeding, Richardson worked to unseal the record of the Contempt Proceeding, prevented its

rescaling, discovered and evaluated evidence, and worked with H. Adam Prussin ("Prussin"), the

attorney for the NY Shareholder Lawsuit plaintiffs and special counsel to the Committee.

(Richardson Post-Hr'g Br. 8; Hr'g Tr. 24:4-22, Mar. 16, 2006.)

In this Case, the Preliminary Injunction Proceeding and the Contempt Proceeding

substantially contributed to the estate. Those proceedings established facts and theories asserted

in the DE Adversary Proceeding, and thereby "lessened the burden on the Debtor['s]

professionals[,]" reduced fees and expenses, and eased the professionals' preparation. Essential,

308 B.R. at 176. Moreover, the proceedings led to the escrow of Rivco and Jenkins stock,

ensuring its preservation for the Debtor's estate and its creditors. However, the Court cannot

conclude that it was Richardson's efforts which directly caused these benefits.[13] The benefits

produced from the Preliminary Injunction Proceeding and the Contempt Proceeding resulted

from the participation of many, especially Prussin. (Richardson Am. App. 19 ("Richardson . . .

worked with H. Adam Prussin to discredit Gray's arguments of not owning his affiliates and

having purged his contempt."); Hr'g Tr. 43:4-7, Mar. 16, 2006 ("[I]n connection with the

contempt proceeding and even with respect to the adversary proceeding, it [Richardson's effort]

was supportive of Mr. Prussin who was . . . the barrister in this case . . . .").)  Richardson claims

---

[13]     Some of Richardson's efforts occurred pre-petition. Pre-petition expenses are
recoverable under section 503(b)(3)(D) only if the applicant can "establish that the pre-petition efforts
resulted in a substantial contribution to the estate post-petition." Essential, 308 B.R. at 175 (emphasis
added).

to have "supplied the evidence to show that . . . Gray had sufficient resources to purge the contempt" (Richardson Am. App. 19), "established the facts and theories of the Debtor's looting and fraudulent transfer claims against Gray" (Richardson Am. App. 5), and been "substantially responsible for [the] injunction" (Hr'g Tr. 23:7, Mar. 16, 2006). Without any additional evidence to support such assertions or the Court's first-hand observance of Richardson's role in the Contempt Proceeding and the Preliminary Injunction Proceeding, the Court cannot conclude that his efforts substantially contributed to the Case. See, e.g., In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R. 246, 249-50 (Bankr. D. Colo. 1990) ("Something more than mere conclusory self-serving statements regarding one's involvement in a case which allegedly resulted in a 'substantial contribution' must be presented to the Court before compensation can be allowed . . . . '[A] court's own first-hand observance of the services provided may be a sufficient basis . . . .'" (quoting In re U.S. Lines, Inc., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989)).

Moreover, the Court cannot agree that Richardson's efforts to unseal the Contempt Proceeding's record directly benefitted this estate and creditors. In 1999, Richardson's efforts permitted public access to the court file and the records. (See Richardson Post-Hr'g Br. Ex. A (J. Cozier Order dated Dec. 9, 1999).) However, this effort was duplicated by the Committee. The parties involved with the NY Shareholder Lawsuits entered into a Stipulation and Protective Order, which forbade them from using the materials produced in connection with those proceedings in additional litigation. (Ex. 24 (Stipulation & Protective Order dated July 1, 1997).) In 2001, the Committee fought successfully to obtain and use the confidential materials in the DE Adversary Proceeding. (Ex. 516 (Hr'g Tr., Oct. 21, 2002).) Richardson has failed to produce

30

any evidence except for conclusory statements to indicate that the record he worked to unseal included materials not already included in those obtained by the Committee. (See Richardson Post-Hr'g Br. 11). Moreover, even though the Contempt Proceedings' evidentiary record may have been unsealed, the Court is unclear whether the parties to the DE Adversary Proceeding could have used them without first seeking additional court approval. (See Ex. 24 ¶ 7 ("Any Confidential Material which is admitted into evidence shall not lose its protection under this Stipulation and Protective Order unless ordered by the Court.").) As such, the Court must conclude that it was the Committee's efforts, not Richardson's efforts, which directly benefitted the estate and its creditors.

### 2.    MO Bankruptcy Proceeding, MO Adversary Proceeding, MO Criminal Proceeding (collectively, the "MO Proceedings")

In the MO Bankruptcy Proceeding, Richardson exchanged information with the chapter 7 trustee, evaluated evidence, and identified instances of Gray's false testimony at the meeting of creditors. These efforts, according to Richardson, led to the success of the MO Adversary Proceeding, which recovered $600,000 for the Homestar estate, and the MO Criminal Proceeding, which led to Gray's guilty plea of bankruptcy and tax fraud. (Richardson Am. App. 26-27.) According to Richardson, the success of the MO Adversary Proceeding stopped the chapter 7 trustee from asserting a claim to Jenkins. (Hr'g Tr. 30:15-20, Mar. 16, 2006.) Also, Richardson argues that Gray's guilty plea discredited Gray in the DE Adversary Proceeding. (Hr'g Tr. 30:24-25, Mar. 16, 2006.)

The Court cannot conclude that Richardson's efforts in the MO Proceedings substantially contributed to the Debtor's estate and creditors. For the Court to find a substantial contribution,

31

"the applicant must show a 'causal connection' between the service and the contribution." Granite, 213 B.R. at 447 (citation omitted). Here, no such connection has been shown. First, as the Court previously indicated, it is unclear how the MO Proceedings provided a direct benefit to the estate and its creditors. See Discussion supra Part II.C. Second, even if the Court found a direct benefit, it is unclear how Richardson' efforts substantially contributed. There has been no evidence submitted to indicate that the chapter 7 trustee in the MO Bankruptcy Proceeding had a claim to Jenkins and deferred asserting that claim because of the MO Adversary Proceeding's success. Moreover, there is no evidence that the MO Proceedings increased the assets within Debtor's estate or prevented them from diminishing. Finally, although Gray may have been discredited by the MO Criminal Proceeding, the likelihood of the success of the DE Adversary Proceeding would have remained unchanged in its absence. The transactions underlying the DE Adversary Proceeding had already occurred and Gray was already imprisoned for violating the Preliminary Injunction.

### 3.    TN Bankruptcy Proceeding

Richardson's participation in the TN Bankruptcy Proceeding took many forms. First, he unsuccessfully attempted to transfer the case to Delaware and to oppose the sale of BF Rich. According to Richardson, these efforts served to educate the parties regarding Gray's prior history and ultimately stopped the sale of BF Rich. (Richardson Am. App. 24.) A party's efforts, while unsuccessful, may substantially contribute to an estate and its creditors. See, e.g., Hall Fin. Group, Inc. v. DP Partners, Ltd. (In re DP Partners, Ltd.), 106 F.3d 667, 670 (5th Cir. 1997) (explaining how creditor's unsuccessful proposed plan set off a bidding war, resulting in a final amended plan that provided $3 million more for the creditors); Granite, 213 B.R. at 449

32

(considering whether applicants' unsuccessful objections altered the character of the proposed disclosure statement to add value or facilitate a successful reorganization). However, in this case, Richardson merely argues that his unsuccessful efforts substantially contributed to the <u>TN Bankruptcy Proceeding</u>. He offers no suggestion or proof as to how they substantially contributed to the <u>Debtor's</u> estate or creditors.

Second, Richardson opposed Gray's proposed plan of reorganization. According to Richardson, the proposed plan "would have deprived the Debtor of everything" because it subordinated the claims of ESP's stockholders to those of BF Rich, foreclosing the Debtor's chances of receiving a distribution. (Richardson Post-Hr'g Br. 9.) The Court cannot conclude that these efforts substantially contributed to the Debtor's estate and creditors. The Committee, in resolving the proof of claim dispute, relinquished the Debtor's claim against ESP. As a result, ESP's plan of reorganization and its proposed distribution schedule bore no effect on the Debtor's estate and creditors.

Third, Richardson submitted, defended, and pursued claims on behalf of the Debtor, which resulted "in the Debtor's [sic] obtaining the rights to [Rivco and Jenkins.]" (Richardson Post-Hr'g Br. 9.) More specifically, Richardson, while acting in his personal capacity, filed a separate claim in the TN Bankruptcy Proceeding and "prosecuted [both the Committee's claim and his claim] on behalf of the Committee . . . ." (Hr'g Tr. 33:22-23, Mar. 16, 2006.) According to Richardson, the settlement of the Debtor's claim resulted in the assignment of ESP's corporate opportunity claims against Gray to the Debtor -- "the basis of the Debtor's legal claim to [Rivco and Jenkins]." (Richardson Am. App. 25.) Richardson's argument fails. With regard to Richardson's submission of his own proof of claim, it was duplicative of the Committee's effort

and no evidence has been submitted to demonstrate a resulting benefit to the estate or creditors.

See, e.g., Essential, 308 B.R. at 175 (denying reimbursement where applicant's services were duplicative of the Debtor's professionals); Buckhead, 161 B.R. at 17 (holding that, because the debtor was responsible for the sale of assets, any services provided by the committee in the asset sales "were duplicative rather than actual and necessary"). As to the settlement of the Debtor's proof of claim, it did not result in the Debtor's ownership of Rivco and Jenkins. As the Committee and Chapter 11 Trustee correctly emphasized, Judge Jordan's opinion in the DE Adversary Proceeding found that "the acquisition of Rivco and Jenkins were corporate opportunities that belonged to Summit" -- not ESP. (Ex. 509 ¶ 94.)

### 4.    TN Adversary Proceeding

According to Richardson, his defense of the TN Adversary Proceeding successfully resisted an "attempt to enjoin the adversary proceeding against Gray in Delaware." (Richardson Am. App. 25.) At the outset, it is important to note that the outcome of the TN Adversary Proceeding benefitted the Debtor's estate and creditors only by allowing the DE Adversary Proceeding to continue. However, the Court cannot conclude that Richardson's efforts substantially contributed to that outcome. First, the success of the TN Adversary Proceeding was a result of numerous participants, including the Committee and its counsel. Second, because Richardson did not specify in detail his efforts taken in the TN Adversary Proceeding, it is impossible for this Court to determine whether Richardson's efforts were duplicative of those performed by the Committee. Third, and finally, like the Richardson Fiduciary Duty Proceeding, the Richardson Preference Proceeding, and the Richardson Racketeering Proceeding discussed below, the benefit conferred upon the estate as a result of Richardson's efforts was merely

34

incidental. By his own testimony, Richardson admits that the actions he undertook in connection

with the TN Adversary Proceeding were to prove he was not liable for any wrongdoing. (Hr'g

Tr. 164:23-165:2, Apr. 4, 2006.) In fact, a portion of the expenses for which he is seeking

reimbursement constitute the fees of his own counsel, Baker, Donelson, Bearman, Caldwell &

Berkowitz, PC. The Court cannot allow reimbursement of Richardson for expenses incurred as a

result of services rendered for his own benefit, rather than for the estate and its creditors. See,

e.g., Lister, 846 F.2d at 57 (opining, as support for the Court's denial of a section 503(b)(3)(D)

claim, that the applicant's pre-petition efforts were undertaken solely for the purpose of

collecting a judgment); Phila. Mortgage, 117 B.R. at 831 ("The only activities which took place

post-petition were Sarp's efforts to defend himself . . . . The expenditures appear to have been

clearly made for Sarp's own benefit, and any benefit to the Debtor's estate appears to have been,

at best, incidental.").

### 5.     NH Proceeding

Richardson next argues that the NH Proceeding, filed and pursued solely by Richardson

and his local counsel, substantially contributed to the Debtor's estate and creditors by preventing

the expiration of the New Hampshire fraudulent transfer statute of limitations, "plac[ing] a cloud

on Gray's title and prevent[ing] any attempts by Gray to sell Rivco out from under Summit."

(Richardson Am. App. 26-27.) The Court cannot agree. First, like the MO Proceedings, the

Court does not believe the NH Proceeding conferred any benefit to the Debtor's estate or

creditors. The NH Proceeding was stayed with the commencement of this Case and no judgment

was ever entered on behalf of the Debtor. Although Richardson stated that the proceeding

prevented looting (Richardson Am. App. 26), there is no evidence that Gray was attempting to

35

sell Rivco and that the NH Proceeding prevented such a sale. Second, Richardson's own testimony indicates that the NH Proceeding was duplicative of the Committee's efforts in Delaware, and therefore, non-compensable. (See Hr'g Tr. 167:6-9, Apr. 4, 2006 ("Q: The New Hampshire claims were duplicative of the claims that were pending in Tennessee and Delaware, right? [Richardson's] A: Well, they were duplicative of the claims that were pending in Delaware."); see also Ex. 35 (July 28, 2003 facsimile from Richardson to Cameron Schilling, Esq. stating that, "The Delaware action . . . covers the same issues as the NH action . . . .").)

### 6.    Richardson Fiduciary Duty Proceeding

Although Richardson's primary argument for the reimbursement of expenses he incurred while defending the Richardson Fiduciary Duty Proceeding falls under section 503(b)(1)(A), Richardson also argues that this proceeding led to discovery that established the corporate opportunity claims alleged in the DE Adversary Proceeding. (Hr'g Tr. 131:19-22, Apr. 4, 2006.) Richardson's argument is flawed in two respects. First, Richardson admitted that the evidence establishing the corporate opportunity claims originated from the discovery performed in the Richardson Preference Proceeding and not the Richardson Fiduciary Duty Proceeding. (Hr'g Tr. 132:10-14, Apr. 4, 2006.) Second, Richardson's primary purpose in acquiring this information was to further his own defense. Because any benefit to the estate and creditors was merely incidental, Richardson cannot receive reimbursement for these expenses.

### 7.    Richardson Preference Proceeding

Richardson argues that the discovery he obtained while defending the Richardson Preference Proceeding substantially contributed to the Debtor's estate and creditors by establishing the corporate opportunity claims alleged in the DE Adversary Proceeding. Again,

Richardson primary purpose in acquiring this information was to further his own defense. (Hr'g
Tr. 144:16-22, Apr. 4, 2006 ("Q:  And the actions that you undertook in the suit were taken with
the intent of proving that you weren't liable?  [Richardson's] A:  Yes.  Q:  In connection with
those actions, you sought documents . . . to prove that Summit was solvent . . . ?  [Richardson's]
A:  That's correct."); accord Hr'g Tr. 16:10-17:11, Mar. 16, 2006.)  Therefore, any benefit to the
estate and creditors was merely incidental.

### 8.   Richardson Racketeering Proceeding

Richardson seeks reimbursement of his expenses incurred in defending the Richardson
Racketeering Proceeding, commenced on August 3, 1999 and voluntarily dismissed ten days
later.  However, Richardson admits that his defense of the proceeding provided no substantial
benefit to the Debtor's estate or creditors.  (Hr'g Tr. 151:6-9, Apr. 4, 2006 (testifying that there
was no "substantial benefit aspect" to the expenses, but rather, that the expenses were incurred in
defending an action brought by the Debtor).)  Additionally, like the Richardson Fiduciary Duty
Proceeding, the Richardson Preference Proceeding, and the TN Adversary Proceeding, any
benefit conferred as a result of Richardson's defensive efforts, however unlikely, was merely an
incidental result in light of Richardson's strong personal motive to prove the allegations against
him false.  Therefore, Richardson's request for reimbursement is denied.

### 9.   DE Adversary Proceeding

With regards to the DE Adversary Proceeding, Richardson asserts that he provided the
facts and theories for the Complaint, assisted in the Complaint drafting, and succeeded in getting
the case moved to Judge Jordan after more than two years of inactivity.  Additionally, Richardson
claims that he provided the evidence for a majority of the findings and the theories and

37

precedents for the legal conclusions in Judge Jordan's opinion issued in the DE Adversary

Proceeding. According to Richardson, his participation in the DE Adversary Proceeding

substantially contributed to the Case because it resulted in the recovery of Rivco and Jenkins.

(Richardson Am. App. 22-23.)

Certainly, the DE Adversary Proceeding provided substantial benefits to the estate and its

creditors, including a $40 million judgment against Gray and over $18 million from the stock of

Rivco and Jenkins. However, the participation of many led to these results. First, the record is

clear that it was Prussin who drafted the Complaint. Richardson reviewed the Complaint and

provided comments, but these efforts are not extraordinary. (See, e.g., Supplement Invoice

1/1/99-12/31/00 46, 56 (time records indicating Richardson's review of Prussin's drafts of the

Complaint); Hr'g Tr. 200:2-8, Apr. 4, 2006 (Prussin's testimony that he was the "principal

draftsman" of the Complaint).) Second, the Complaint's facts and theories originated from

multiple sources and did not stem solely from Richardson. Out of the eight causes of action, the

first six originated from the NY Shareholder Lawsuits and from the Preliminary Injunction

Proceeding. (See, e.g., Hr'g Tr. 125:11-18, Apr. 4, 2006 (Richardson's testimony as to the

genesis of the DE Adversary Proceeding's causes of action); Hr'g Tr. 194-208, Apr. 4, 2006

(Prussin's testimony regarding the same). See generally Ex. 22 (Judge Jordan's Post-Trial

Findings of Fact & Conclusions of Law detailing the claims asserted in the NY Shareholder

Lawsuits and the Preliminary Injunction Proceeding); Ex. 24 (Opinions issued in the Contempt

Proceeding and Preliminary Injunction Proceeding).) There has been no evidence presented that

it was Richardson who developed the facts and the theories in those proceedings. As to the

seventh cause of action -- the corporate opportunity claim -- the record is unclear who developed

38

it. Although Richardson asserts that he developed the claim, he offers no evidence in support of this. Therefore, he has failed to meet his burden of proof. Finally, although Richardson presented no corroborating evidence to support his claim with regard to the first through seventh causes of action, Prussin testified that the eighth cause of action originated solely from Richardson. (Hr'g Tr. 208:18, Apr. 4, 2006.) Because Judge Jordan found in favor of the Debtor on this cause of action, Richardson's efforts in developing this claim increased the money judgment against Gray. As such, any expenses incurred by Richardson in developing this cause of action may be reimbursed. However, the Court has been unable to identify in the record any expenses attributable to these particular efforts and is therefore unable to make any award in connection therewith.

Third, there is no support for Richardson's conclusory statements that he unilaterally provided the evidence upon which the District Court relied. Rather, like so many of the proceedings relevant to this Case, many contributed to the evidence supply. The Committee subpoenaed all the documents produced in connection with the NY Shareholder Lawsuits and fought for their use in the DE Adversary Proceeding. Additionally, they performed their own discovery regarding the allegations in the Complaint. (Exs. 517-22 (requests for the production of documents and subpoenas duces tecum issued by the Committee).) Although Richardson may have obtained important evidence supporting the corporate opportunity claims from the Richardson Preference Proceeding, the benefit to the estate was merely incidental as Richardson's purpose in acquiring the documents was personal. Additionally, a majority of the supporting testimony came from Kelly, without whom, Richardson testified, "it would have been impossible to go to trial . . . ." (Hr'g Tr. 252:11-12, Apr. 4, 2006.)

Finally, like many of Richardson's assertions, he has failed to provide any supporting evidence that his complaint to the Court of Appeals for the Third Circuit regarding the stagnant DE Adversary Proceeding caused the case to be re-assigned to Judge Jordan. Moreover, even if evidence existed, the transfer did not result in the successful outcome of the DE Adversary Proceeding. Rather, the success stemmed from the evidence and presentation of the parties.

          10.    This Case

Finally, Richardson asserts that his efforts in this Case entitle him to the reimbursement of expenses because he: (i) was instrumental in forming the Committee, in hiring Prussin as counsel, and in obtaining the authority for the Committee to prosecute claims against Gray; (ii) helped prevent this Case from staying the Contempt Proceeding; (iii) objected first to the conversion of the Case to chapter 7; (iv) helped educate the Court as to the background of the relevant proceedings and the basis for claims against Gray; and (v) objected first to the fee requests of Debtor's counsel, thereby preventing a drain on the assets of the estate. (Richardson Am. App. 20-21.)

The Court concludes that Richardson's expenses incurred while performing the above-referenced activities cannot be reimbursed under section 503(b)(3)(D). First, Richardson argues that he formed the Committee but, as the Objecting Parties correctly argue, the power to form a committee lies with the United States Trustee. Richardson failed to present any evidence to suggest that the United States Trustee failed to do her duty or to explain the nature of Richardson's contributions to the Committee's formation. Moreover, Richardson's expenses incurred while obtaining Committee authority to pursue claims against Gray and while pursuing additional committee counsel are equally non-reimbursable as these efforts are routine duties and

powers delineated in section 1103(a) and (c). See Worldwide Direct, 334 B.R. at 124 (denying

reimbursement to a committee member under section 503(b)(3)(D) for "fulfilling its fiduciary

duties as a Committee member and performing the routine Committee tasks delineated in section

1103(c)"). Additionally, there is no evidence that Richardson acted beyond what is expected

from a committee member during these pursuits. (See Ex. 9 (Letter from Richardson to Paul

Brenman, Esq. noting that he only had "three minor comments on the draft" Committee motion

to prosecute the Gray claims).) However, while these efforts are not reimbursable under section

503(b)(3)(D), the Court concludes Richardson may receive reimbursement for these expenses

pursuant to section 503(b)(3)(F).

Second, to further support his claim, Richardson relies on his opposition to the Debtor's

attempt to stay the Contempt Proceedings. However, again, there is no evidence as to how his

particular objection effected the outcome of the Debtor's attempt. Additionally, Richardson's

effort was duplicative of that of the Committee, which also opposed the Debtor.

Third, Richardson has argued that his expenses incurred while opposing the Debtor's

motion to convert should be reimbursed because the Committee "missed the motion" and failed

to respond. (Hr'g Tr. 25:22, Mar. 16, 2006.) This argument fails because the record indicates

that the Committee subsequently filed their response on January 9, 2001. (Ex. 504 (Docket Item

No. 251).) Thus, because Richardson's efforts were duplicative of those efforts performed by the

Committee, his expenses cannot be reimbursed.

Richardson continues his argument by noting how his numerous pleadings "served to

educate the Court about the facts and circumstances of the case." (Richardson Am. App. 21.)

Although Richardson's pleadings may have served to educate the Court more quickly as to the

41

relevant proceedings and Gray's background, the Court cannot conclude that his actions were extraordinary. See Psychiatric Hosps. of Hernando County, Inc., 228 B.R. 764, 767 (Bankr. M.D. Fla. 1998) ("Administrative expense compensation based on a substantial benefit to a bankruptcy estate must be strictly limited to extraordinary creditor actions that led directly to tangible benefits to the creditors, the debtor, or the estate.").

Finally, according to Richardson's speculation, his objection to the final fee application of Debtor's counsel, Klehr Harrison Harvey Branzburg & Ellers LLP ("Klehr Harrison"), stopped the flow of funds to them and caused Debtor's counsel to get "kind of discouraged about [not acting in the best interest of the estate]." (Hr'g Tr. 26:2-4, Mar. 16, 2006; see also Hr'g Tr. 52:15-17, Apr. 4, 2006 (Q: How did [the objection] benefit the estate? [Richardson's] A: Well, I think it did stop the – you know, the payment of fees to Klehr Harrison which were then deferred.").) While it is true that Klehr Harrison subsequently reduced its final fee allowance by $100,000, the Court cannot conclude that Richardson's objection was the cause. The Trustee also filed an objection seeking a reduction in Klehr Harrison's fee allowance. (Docket Item No. 420 (Objection of the Chapter 11 Trustee of Summit Metals, Inc. to the Tenth and Final Application of Klehr Harrison Harvey Branzburg & Ellers LLP for Compensation and Reimbursement of Expenses as Counsel to the Debtor Pursuant to 11 U.S.C. § 330); Docket Item No. 441 (Revised Objection of the Chapter 11 Trustee).) On August 2, 2005, the Trustee and Klehr Harrison entered into a stipulation reducing Klehr Harrison's fees and resolving the Trustee's objection. (See Docket Item No. 510 (Certification of Counsel Regarding the Order Approving the Final Application of Klehr Harrison Harvey Branzburg & Ellers LLP for Allowance of Compensation and for Reimbursement of Expenses).) Richardson was not a party

42

to this stipulation and the record fails to indicate how his objection contributed to the resolution.

### E.    Section 503(b)(3)(F)

Despite the Court's denial of Richardson's request for administrative expense claims under sections 503(b)(1)(A), 503(b)(3)(C) and (D), and 503(b)(4), the Court will award Richardson reimbursement for his expenses "incurred in the performance of" Committee duties. 11 U.S.C. § 503(b)(3)(F). Expenses that qualify for reimbursement under this section include travel, lodging, and meal expenses incurred while attending committee meetings or court hearings. See In re Worldwide Direct, Inc., 259 B.R. 56, 63 (Bankr. D. Del. 2001) ("Travel expenses for committee members to attend committee meetings or court hearings are necessary for the functioning of the committee and are normally reimbursable."). Therefore, the Court will allow an administrative expense claim totaling $2,533.65. Details of the allowed expenses, derived from the Supplement, are set forth on Exhibit A attached hereto.

### III.    Conclusion

For the reasons set forth above, Jepsco's request for the allowance of its fees and expenses as administrative expenses pursuant to section 503(b)(3)(D) is denied. Richardson's request for the allowance of his fees as an administrative expense is also denied. However, the Court will allow an administrative expense claim totaling $2,533.65 for Richardson's incurred expenses. Appropriate Orders follow.

### IV.    Epilogue

The function of the Court as gatekeeper of the expenditure of estate resources is among the most important responsibilities conferred upon it. The purpose behind establishing the

43

demanding threshold to recovery under § 503 is obvious.  But despite the applicants' inability to meet the rigorous standard set by the Bankruptcy Code, no one should infer that the efforts of Messrs. Richardson and Kelly are unappreciated by the Court or the parties.  There was here no challenge to their skill, diligence or dedication in connection with their respective roles, official or otherwise, in this Case.  Their participation was certainly helpful and should not be viewed as lacking what was, at least in part, their effort "to do the right thing" in connection with this Case.

BY THE COURT:

Dated: December 4, 2007

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

44

## EXHIBIT A

| DATE | DESCRIPTION | LOCATION IN SUPPLEMENT | COST |
|---|---|---|---|
| 1/11/99 | Train and taxis to creditors meeting | Invoice 1/1/99-12/31/00 p.94 | $97.00 |
| 3/25/99 | Metroliner to Wilmington | 95 | 75.00 |
| 3/25/99 | Train to Wilmington | 95 | 152.00 |
| 5/27/99 | Metroliner to Wilmington | 95 | 150.00 |
| 6/25/99 | Tvl to Wilmington | 96 | 126.00 |
| 8/10/99 | Train to Wilmington | 96 | 152.00 |
| 8/27/99 | Tvl to Wilmington | 97 | 152.00 |
| 2/22/00 | Train to Wilmington | 98 | 132.00 |
| 4/27/00 | Metroliner to Wilmington | 99 | 158.00 |
| 1/11/01 | Metroliner and reserved train to and from Wilmington | Invoice 1/1/01-8/31/04 p.66 | 136.00 |
| 5/31/01 | Amtrak to Wilmington on 5/1/01 | 67 | 138.00 |
| 6/26/01 | Train to Wilminton [sic] | 67 | 138.00 |
| 2/13/04 | Amtrak to Wilmington on 2/10/04 | 68 | 60.00 |
| 2/13/04 | Hotel in Wilmington 1/10 - 1/14 | 68 | 867.65 |
| TOTAL AMOUNT ALLOWED | | | $ 2,533.65 |

**TRANSMITTAL SHEET FOR APPEAL SUBMITTED TO U.S. DISTRICT COURT**

**Related Bankruptcy Case #:**  98-2870 KJC

**SUMMIT METALS, INC.**

**Deputy Clerk Transferring Case:** J. Renee Kuesel

**Case Type:** BK

**Cause of Appeal:** Order Granting the Amended Application of Ambrose M. Richardson, Esquire for Compensation as Post-Petition Creditor and as Creditor Providing Substantial Benefit to the Estate. ( Related Doc # 587, 793, 795 )

**Appellant Counsel:**  Ambrose M. Richardson

Creditor of Chariot Group/Summit

40 Wall Street

New York, NY 10005

212-530-4771 _____

**Appellee Counsel:** United States Trustee

844 King Street, Suite 2207
Wilmington, DE 19899-0035
302-573-6491

-

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

**In Re:**                                             **Case No.:** 98–02870–KJC

SUMMIT METALS, INC.

                                                       **Chapter:** 11

### CLERK'S NOTICE REGARDING FILING OF APPEAL

Please be advised that A.M. Richardson filed a Notice of Appeal on 12/14/07 regarding the Order Granting the Amended Application of Ambrose M. Richarson, Esquire for Compensation as Post–Pet The Notice of Appeal may be viewed at docket number 809 The order on appeal may be viewed at docket number 795

                                        David D. Bird
                                        CLERK OF COURT

Date: 12/27/07
(VAN–440)

**AMENDED TRANSMITTAL SHEET FOR APPEAL SUBMITTED TO U.S. DISTRICT COURT**

**Related Bankruptcy Case #:**  98-2870 KJC

**SUMMIT METALS, INC.**

**Deputy Clerk Transferring Case:** J. Renee Kuesel

**Case Type:** BK

**Cause of Appeal:** Order Granting the Amended Application of Ambrose M. Richardson, Esquire for Compensation as Post-Petition Creditor and as Creditor Providing Substantial Benefit to the Estate. ( Related Doc # 587, 793, 795 )

**Appellant Counsel:**  Ambrose M. Richardson

Creditor of Chariot Group/Summit

40 Wall Street

New York, NY 10005

212-530-4771 _____

**Appellee Counsel:** United States Trustee

844 King Street, Suite 2207
Wilmington, DE 19899-0035
302-573-6491

-