## IN THE UNITED STATES DISTRICT COURT IN
## AND FOR THE DISTRICT OF DELAWARE

In re:
SUMMIT METALS, INC.,

    Debtor

Chapter 11

Bk. No. 98-2870 (KJC)

AMBROSE M. RICHARDSON, III

    Appellant,

  v.

Civil Action No. 08-005-SLR

U.S. TRUSTEE KELLY BEAUDIN
STAPLETON and CHAPTER 11 TRUSTEE
FRANCIS A. MONACO, JR..,

    Appellees.

## DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED

Richard E. Gray ("Gray"), acting pro se, moves this Court for entry of an order

preventing the payment of any amounts to Ambrose M. Richardson, III ("AMR") pursuant to

any order of the Court, settlement, or other resolution of AMR's appeal of the December 4,

2007 United States Bankruptcy Court, District of Delaware, Order Granting the Amended

Application of Ambrose M. Richardson, Esquire for Compensation as Post-Petition Creditor

and as Creditor Providing Substantial Benefit to the Estate until a final non-appealable

determination of a certain motion ("Rule 60(b)(6) Motion") filed by Gray pursuant to Rule

60(b)(6) of the Federal Rules of Civil Procedure, and Section 105(a) of Title 11 of the United States Bankruptcy Code, vacating the judgment against him and all of the other defendants against whom a judgment was rendered, as memorialized in certain Post-Trial Findings of Fact and Conclusions of Law issued on August 6, 2004, has been made by the appropriate court. Gray further asks that if the Court grants the Rule 60(b)(6) Motion, it also order that the payment of any amounts to AMR be deferred until after judgment on the merits in the new trial to be conducted, and that no monies be paid to AMR if the new trial results in a finding of no liability on the part of Gray or the other defendants.

In support of this Motion, Gray incorporates by reference his MEMORANDUM IN SUPPORT OF DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED, filed contemporaneously herewith.

Richard E. Gray, Pro se
211 Beede Lane
Keene Valley, NY 12943
Telephone: 518-576-9036
Fax: 518-576-9743

Dated: March 27, 2008

## IN THE UNITED STATES DISTRICT COURT IN
## AND FOR THE DISTRICT OF DELAWARE

In re:
SUMMIT METALS, INC.,

Debtor

Chapter 11

Bk. No. 98-2870 (KJC)

AMBROSE M. RICHARDSON, III

Appellant,

Civil Action No. 08-005-SLR

v.

U.S. TRUSTEE KELLY BEAUDIN
STAPLETON and CHAPTER 11 TRUSTEE
FRANCIS A. MONACO, JR..,

Appellees.

## MEMORANDUM IN SUPPORT OF DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED

Richard E. Gray ("Gray"), acting pro se, has moved ("Motion") for entry of an order

asking the Court to prevent the payment of any amounts to Ambrose M. Richardson, III

("AMR") pursuant to any order of the Court, settlement, or other resolution of AMR's

appeal of the December 4, 2007 United States Bankruptcy Court, District of Delaware

("Delaware Bankruptcy Court"), Order Granting the Amended Application of Ambrose M.

Richardson, Esquire for Compensation as Post-Petition Creditor and as Creditor Providing

Substantial Benefit to the Estate (Delaware Bankruptcy Court Docket #795) until a final non-

appealable determination of a certain motion ("Rule 60(b)(6) Motion") filed by Gray pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, and Section 105(a) of Title 11 of the United States Bankruptcy Code, vacating the judgment against him and all of the other defendants against whom a judgment was rendered, as memorialized in certain Post-Trial Findings of Fact and Conclusions of Law issued on August 6, 2004, has been made by the appropriate court.

Gray further asks that if the Court grants the Rule 60(b)(6) Motion, it also order that the payment of any amounts to AMR be deferred until after judgment on the merits in the new trial to be conducted, and that no monies be paid to AMR if the new trial results in a finding of no liability on the part of Gray or the other defendants.

In support of the Motion, Gray respectfully represents as follows:

## Appointment of Liquidating Trustee and AMR Fee Award

On August 9, 2007 a plan of liquidation of Summit Metals, Inc., a Delaware corporation ("Summit"), was confirmed, and the former Chapter 11 trustee of Summit was appointed by the Delaware Bankruptcy Court as liquidating trustee ("Trustee") for Summit.[1] On December 4, 2007, after more than a year of consideration, in a carefully written and detailed 44-page opinion, Judge Thomas J. Carey awarded AMR certain fees pursuant to his administrative fee application made in the Summit bankruptcy proceeding.

Not being satisfied by the amount awarded to him by Judge Carey, AMR filed a Notice of Appeal with the Delaware Bankruptcy Court on December 14, 2007[2], and with this Court on January 4, 2008.

Subsequent to the filing of these notices and the filing of other documents with this Court, AMR and the Trustee decided to mediate the question of whether additional fees

---

[1] See Delaware Bankruptcy Court Docket #772.

[2] See Delaware Bankruptcy Court Docket #809.

should be paid to AMR. The mediation was conducted by Brian J. Sullivan, Esq. who reported in a Mediator's Certificate of Completion filed with this Court on February 28, 2008 that, while the mediation was unsuccessful, the parties should continue to mediate because they were only "$75,000 apart".

The clear implication of the mediator's statement in the Certificate of Completion is that the Trustee is prepared to pay AMR substantially more than Judge Carey's award.

### Request By Gray to the Trustee That He Voluntarily Delay Distributions

Subsequent to his learning about the mediation referred to above, on March 17, 2008, Gray sent a letter ("Letter") to the Trustee asking him to voluntarily agree that if he reaches a resolution or settlement with AMR (through mediation, negotiation, or otherwise), he will (a) promptly advise Gray of both the fact and amount of such settlement, (b) not make any distribution whatever to AMR until the Rule 60(b)(6) Motion has been denied by this Court, and a final non-appealable order affirming denial of the Rule 60(b)(6) Motion has been entered by the appropriate court, and (c) if the Rule 60(b)(6) Motion is granted, make no payments whatever to AMR.

In the Letter, Gray advised the Trustee that if he did not receive such assurances by March 21, 2008 he would have no choice but to file the Motion.[3] Gray received no response from the Trustee, and has thus filed the Motion. As will be seen both from the Rule 60(b)(6) Motion itself and from the information and facts set forth below, AMR's misconduct provides a substantial part of the basis for the Rule 60(b)(6) Motion, and he should thus not be unjustly rewarded by the Trustee through payments to him of an amount in excess of that awarded to him by Judge Carey. Further, as noted in the Letter, if monies are paid to AMR without Gray having had the opportunity to challenge such payment in this Court, the

---

[3] A copy of this letter is attached hereto as **Exhibit 1**.

3

specific intent of Judge Carey would have been frustrated—for Judge Carey specifically said at a hearing on a related matter that if he awarded substantial monies to AMR pursuant to AMR's fee application, he would not make such an order effective for 10 days after entry so that Gray would have the right to appeal.[4]

## Background and Basis For the Rule 60(b)(6) Motion

Summit, by and through its Official Committee of Unsecured Creditors ("Committee"), pursuant to the Order entered by the Delaware Bankruptcy Court on September 21, 1999, filed its original Complaint in the litigation the subject of the Rule 60(b)(6) Motion on October 29, 1999, and it's First Amended Complaint ("Amended Complaint") on November 3, 2003.

On August 20, 2003, a default was entered against certain corporate defendants for their failure to retain legal counsel prior to a date specified by this Court.[5] The default judgment order specifically stated, however, that any judgment or remedy against the defaulting defendants would await the results of a trial ("Trial") against Gray.

On the morning of January 12, 2004, Gray filed, pro se, a voluntary Chapter 11 bankruptcy petition ("Petition") in the Bankruptcy Court for the Northern District of New York ("Northern District Bankruptcy Court") in Albany, New York, the Judicial District in which he resided.[6] The filing of the Petition resulted in an automatic stay of the Trial—as this Court and counsel for the Committee recognized, as reflected in the transcripts of the various conferences held on January 9, 2004, prior to commencement of the Trial.

---

[4] Settlement of the matter for an amount in excess of Judge Carey's award would also be inconsistent with Judge Carey's view of what AMR was legally entitled to receive under relevant provisions of the United States Bankruptcy Code.

[5] See Docket #181 for Case #: 1:00-cv-00387-KAJ.

[6] At the time, Gray resided in Keene Valley, New York, which is approximately 120 miles north of Albany, New York, and approximately 400 miles from Wilmington, Delaware. At best, the trip from his residence to Wilmington, Delaware was approximately 9 hours by the most efficient available form of transportation.

4

Later in the day on January 12, 2004, after Gray had filed the Petition, the Committee filed an emergency motion in the Northern District Bankruptcy Court asking that the automatic stay be lifted so that the Trial could proceed. After the filing, the Northern District Bankruptcy Court immediately ordered that a telephonic hearing addressing the motion be held that afternoon, and it was necessary for Gray to participate in the telephonic hearing from his residence in Keene Valley, New York. Immediately after the hearing, late in the afternoon on January 12, 2004, the Committee's motion to lift the automatic stay was granted so that the Trial could proceed.

However, due to the shortness of time between the lifting of the automatic stay and the commencement of the Trial, Gray did not have sufficient time to gather his documents together and travel to Wilmington, Delaware on January 12 or 13, 2004, so that he could attend the Trial.

Thus, immediately after learning of the lifting of the automatic stay, Gray telephoned this Court at approximately 4:00 PM, EST, on January 12, 2004, to ask for a one-day postponement of the Trial so that he could travel to Wilmington, Delaware to be present at the Trial. Unfortunately, his request was denied by this Court.[7]

The Trial was in fact held starting at 9:03 AM., EST, on January 13, 2004, and lasted until 3:55 P.M., EST, on that date.

Thus, Gray could not (a) question or object to the documentary evidence presented by the Committee, (b) cross-examine the witnesses presented by the Committee, and/or (c) preserve applicable privileges that required preservation at the Trial.[8]

---

[7] See page 4, lines 9-18 of the transcript of the Trial ("Trial Transcript") attached to the Rule 60(b)(6) Motion as **Exhibit A**.

[8] Gray acknowledges that the Trial had been oft-delayed, and that both the Committee and the Court had

5

At the Trial, there were only two (2) witnesses whose testimony was offered by the Committee—James T. Kelly ("JTK") and AMR.[9] There was no other testimony offered by any other party.

At the Trial, JTK and AMR each testified regarding many matters, and their testimony and the documentary evidence introduced through them, was the sole basis for the Post-Trial Findings of Fact and Conclusions of Law entered by the Court that would ultimately provide the basis for any judgment against Gray and/or the other defendants.

On August 6, 2004, the Court issued its Findings of Fact and Conclusions of Law and Judgment ("Judgment"), in which it entered a judgment against Gray and the other defendants with respect to the relief sought by Summit through the Committee.[10]

In the Judgment, this Court found that Gray had breached his fiduciary duties to Summit in several respects, and directed Gray to pay over \$40,000,000.00 in damages to Summit. The Court also directed defendants Rivco Acquisition Corp. ("RAC") and Jenkins Acquisition Corp. ("JAC") to transfer the controlling stock interest (92%) they respectively held in each of Riverside Millwork Company, Inc. ("Rivco") and Jenkins Manufacturing Company, Inc. ("JMI") to Summit through the establishment of a

previously expressed frustration at this. However, Gray believes that it is unfortunate that this Court did not grant him the requested one-day delay in the Trial so that he could have attended the Trial as he had wanted to do. As it turns out, Gray's exercise of his legal rights under the United States Bankruptcy Code inadvertently resulted in his and the other defendants having been unfairly punished by the holding of what was, with the benefit of hindsight and recently discovered facts, a fraudulent Trial--as will be discussed below.

Gray had no way to know at the time he filed the Petition that the automatic stay would be lifted by the Northern District Bankruptcy Court so quickly, and that, as a result, he would not be able to travel to Wilmington, Delaware in time for the Trial. Nor could either this Court or Gray have known that counsel to the Committee and their witnesses would use his absence at the Trial as an opportunity to perpetrate the fraud on this Court that occurred. However, while Gray's inability to attend the Trial facilitated the commission of this fraud on the Court, as discussed below, his attendance would not have been relevant to many of the matters referred to below in any event.

[9] JTK had been affiliated with Gray and his related companies since 1984, and AMR had been Gray's former law colleague and legal counsel to Gray and many of the defendants since 1979. Thus, JTK and AMR knew each other well.

[10] A copy of the Judgment is attached to the Rule 60(b)(6) Motion as **Exhibit B**.

constructive trust.

As a result of the Judgment, the stock of Rivco and JMI was, in fact, transferred to a constructive trust in favor of Summit, and the assets of Rivco and JMI were subsequently sold by Summit pursuant to various orders of the Delaware Bankruptcy Court. The net proceeds of the sales of the assets of Rivco and JMI (approximately $4.6 million in the aggregate) were deposited into a bank account of Summit established by the Trustee. *The proceeds of the sales of the assets of Rivco and Jenkins, together with interest thereon, constituted at the time, and continue to constitute today, virtually the only monies currently available to Summit for the payment of fees, expenses, and distributions to creditors of Summit and others.*

The Trustee has already paid more than $4.0 million in fees, commissions and other expenses of Summit out of this bank account.[11] These fees have been paid to the Trustee himself, his counsel, the investment bankers responsible for the sales of the assets of Rivco and JMI, accountants, and counsel for the Committee, among others. Further payments to AMR would further diminish or completely exhaust the monies in the bank account.

## Factual Basis for the Rule 60(b)(6) Motion

Subsequent to the Trial, Gray learned about and discovered the occurrence of a variety of events and ongoing, evolving schemes relating directly to both the integrity of the Trial and to the only witnesses (JTK and AMR) who testified at the Trial. Further, subsequent to the Trial, several significant events relating to the Trial, JTK and AMR occurred. The last of these events happened and were discovered by Gray only within a month or two of his filing of the Rule 60(b)(6) Motion. These events and discoveries (all of which together constitute

---

[11] See page 4 of the Application of the Chapter 11 Trustee for Allowance of Commission on Amounts Distributed During the Period From September 18, 2004 Through September 18, 2006 (Delaware Bankruptcy Court Docket #647) attached to the Rule 60(b)(6) Motion as **Exhibit C**.

even now a continuing, ongoing and evolving scheme and course of conduct, as will be discussed below) are as follows:

## 1. Matters Involving JTK:

According to both the Trustee and the Committee, JTK provided approximately 75% of the "evidence" against Gray which provided the basis for the Judgment.[12] And yet:

### (a) JTK Was Accused by the Trustee of Perpetrating a Fraud On This Court In Another Matter Directly Related to the Trial:

On October 10, 2006, Summit filed a Brief In Support of Its Motion For Relief ("Brief") with this Court in support of its August 22, 2006 motion to vacate the release granted to Rich Realty, Inc. ("RRI") by this Court immediately prior to the Trial. [13] On page 7, first paragraph, of the Brief, the Trustee states that JTK—Summit's own witness— "withheld information regarding Gray's role in the acquisition and ownership of [RRI], putting the [RRI release] matter within the scope of Rule 60(b)(6)."

The Trustee then claimed that Rule 60(b)(6) is applicable to JTK's withholding of information based on a case (Hazel-Atlas) cited by the Trustee which stands for the proposition that a fraud under Rule 60(b)(2) or (3) also supports relief under Rule 60(b)(6) when the existence and discovery of newly-discovered evidence which was not tendered by a witness "may reflect 'something more'."[14] He then went on to state that in the instance of

---

[12] See pages 35-6 of the Joint Post-Hearing Brief In Support of Objection of Francis A. Monaco, Chapter 11 Trustee For Summit Metals, Inc., and the Official Committee of Unsecured Creditors of Summit Metals, Inc. To the Supplemental, Amended and Original Applications of Ambrose M. Richardson, Esq. For Compensation and Reimbursement (Delaware Bankruptcy Court Docket # 618) attached to the Rule 60(b)(6) Motion as **Exhibit D**.

[13] The Brief (Docket #236 in this case) is attached to the Rule 60(b)(6) Motion in its entirety as **Exhibit E**.

[14] The Trustee cited the case of Bros Inc. v. W.E. Grace Mfg. Co., 320 F2d 594 (5th Cir. 1963) for the proposition. See the second paragraph on page 7 of **Exhibit E** to the Rule 60(b)(6) Motion. In that case, the court held that "[w]hile the circumstances reflected by [a motion for relief] bear many of the earmarks of a mere plea for reopening for newly discovered evidence under (2) or fraud under (3)" it may also reflect "something more" supporting relief under Rule 60(b)(6). Id. at 609.

8

JTK's withholding of information, there was in fact "something more".[15]

But the Trustee went even <u>further</u> than that. For in a subsequent filing relating to the RRI release, he definitively claimed that JTK actively and affirmatively wanted to "snooker" the Court.[16] And lastly, both the Trustee and the Committee claimed (as stated in the objections to the fee applications they filed with the Delaware Bankruptcy Court) that JTK is a liar who committed perjury in either this or another bankruptcy proceeding by giving inconsistent answers under oath.[17]

Thus, as stated in detail in the Brief, the Trustee claimed that the Committee's own witness at the Trial (JTK) was dishonest and not forthcoming in matters relating to one of the defendants, RRI, as respects its release, and that JTK committed fraud on the Court with respect to the RRI release—and that there indeed is "something more".[18]

But if the Trustee is telling the Court that JTK perpetrated a fraud on it and committed perjury with respect to one matter relating to the Trial, and that the release given to RRI should thus be revoked as a result of such fraud pursuant to Rule 60(b)(6), how can the Court permit JTK's testimony at the Trial relating to Gray and the other defendants to have sufficient credibility and weight to provide the basis for the Judgment? And as will be seen below in this Section, JTK actually engaged in dishonesty of <u>an even far more serious nature</u> that that claimed by the Trustee.

---

[15] See page 8, first full paragraph of **Exhibit E** to the Rule 60(b)(6) Motion.

[16] See page 2, 2nd full paragraph, of Plaintiff's Reply To Opposition of Rich Realty, Inc., James Kelly, and JEPSCO, Ltd., to Plaintiff's Motion For Relief, attached to the Rule 60(b)(6) Motion as **Exhibit F**.

[17] See footnote 2 on page 14 of the Post-Hearing Response of Francis A. Monaco, Jr., Chapter 11 Trustee For Summit Metals, Inc., and the Official Committee of Unsecured Creditors of Summit Metals, Inc. To Amended Application of JEPSCO, Ltd for Compensation and Reimbursement For Administrative Expenses (Delaware Bankruptcy Court Docket #620), attached to the Rule 60(b)(6) Motion as **Exhibit G**.

[18] While Gray believes that the mere maintenance of silence by JTK in the absence of a duty to speak and volunteer information not asked is not by itself "something more", the course of conduct engaged in with respect to the Trial by JTK and AMR, both individually and together, certainly is, as will be discussed below.

(b) JTK Wanted to Be Paid For His Testimony and the "Help" He Provided to the Committee:

After the Trial, through JEPSCO, Ltd. ("JEPSCO")[19], his wholly-owned corporation, JTK applied to the Delaware Bankruptcy Court for fees and expenses of almost $80,000—a fee claim which was based primarily on the testimony he gave at the Trial. [20]

Although Judge Carey ultimately denied this fee claim, neither prior to nor during the Trial did either JTK ever tell the Court or any other party that he intended to file a substantial claim for fees for providing his testimony at the Trial. The fact that JTK intended to benefit financially from his testimony at the Trial was a fact never disclosed to or known by the Court or any party to the litigation the subject of the Trial.[21] And the Trustee, the United

---

[19] That JEPSCO is wholly-owned by JTK is a fact both well known to all the parties, and readily admitted by JTK in his various filings with the Delaware Bankruptcy Court.

[20] The fact that JTK was a witness fully cooperating with the Committee both at and before the Trial is not in doubt, as the Notice of Filing of First Interim Application of Pomerantz Haudek Block Grossman & Gross LLP for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Unsecured Creditors (Delaware Bankruptcy Court Docket # 400) demonstrates at pages 20-21, paragraph 63. These pages are attached to the Rule 60(b)(6) Motion as **Exhibit H**.

While ultimately JTK's fee application was denied by the Delaware Bankruptcy Court, his Amended Application of JEPSCO, Ltd For Compensation and Reimbursement for Administrative Expenses (Delaware Bankruptcy Court (Docket #451) also stated, at page 3, paragraph 14, that

> JEPSCO played a critical role in the ...Committee's successful prosecution of its case against...Gray....JEPSCO's CEO, [JTK], provided critical background information to the...Committee and lengthy testimony at the [T]rial...which resulted in 92% of the stock of...[Rivco and JMI] being turned over to [Summit].

See page 3 of this Application attached to the Rule 60(b)(6) Motion as **Exhibit I**.

Finally, the Post-Hearing Brief of JEPSCO, Ltd In Support of Application and Amended Application for Compensation and Reimbursement for Administrative Expenses (Delaware Bankruptcy Court Docket # 609) is replete with claims regarding JTK's testimony helping to secure the Judgment and transfer of the Rivco and JMI stock to Summit. A copy of this Brief is attached to the Rule 60(b)(6) Motion as **Exhibit J**.

[21] Attached to the Rule 60(b)(6) Motion as **Exhibit K** is page 15 of the Post-Hearing Response of Francis A. Monaco, Jr., Chapter 11 Trustee For Summit Metals, Inc., and the Official Committee of Unsecured Creditors of Summit Metals, Inc. to Amended Application if JEPSCO, Ltd. For Compensation and Reimbursement for Administrative Expenses (Delaware Bankruptcy Court Docket #620). See footnote 3.

The Trustee also filed an Objection of the Chapter 11 Trustee of Summit Metals, Inc. to Amended Application of JEPSCO, Ltd For Compensation and Reimbursement For Administrative Expenses and Expenses Pursuant to 11 U.S.C. 330 (Delaware Bankruptcy Court Docket #467) in which he stated in footnote 1 that JTK never once

States Trustee, and the Committee all find this claim to be so offensive and unusual, that they all strenuously objected to it.[22]

In fact, the objection of the Committee stated that (a) the entire fee application by JTK is based on his having provided information to the Committee and his having testified against Gray on behalf of the Committee, and (b) although JTK did communicate with the Committee counsel prior to the Trial, and that he did testify for the Committee at the Trial, at no time did JTK advise the estate's professional he or his corporation were intending to file fee applications for such activities.[23]

(c) JTK's Interest In Buying RIVCO and JMI:

Another significant fact not disclosed to the Court by JTK at the Trial was how far he would go in lying in his testimony at the Trial to further his interests as part of various investor groups (together with and in cooperation with AMR, as will be discussed below) called "T.S.P.G.", "Chariot Recovery" and "Soundview Partners" which both (a) had previously attempted to purchase Rivco and JMI, and (b) remained interested in purchasing these companies from Summit as of the date of the Trial--if the stock of these companies could be transferred to Summit pursuant to the Judgment.[24]  For while JTK knew or should

_____

told the Trustee that he intended to file a fee claim, and that "this Application [is thus] all the more egregious." See footnote 1 on pages 4 and 5 of this Objection attached to the Rule 60(b)(6) Motion as **Exhibit L**.

[22] The Committee filed an Objection of Official Committee of Unsecured Creditors of Summit Metals, Inc. to Amended Application of JEPSCO, Ltd For Compensation and Reimbursement For Administrative Expenses (Delaware Bankruptcy Court Docket #467) in which it objected to JTK's basis for the fee claims because he was claiming fees for testifying and never told anyone in advance of his intent to do so.  See page 3 of the Objection attached to the Rule 60(b)(6) Motion as **Exhibit M**.

[23] See page 3 (including footnote 1) of **Exhibit M** to the Rule 60(b)(6) Motion.  The United States Trustee also filed an Objection of the United States Trustee to Application of JEPSCO, Ltd For Compensation and Reimbursement For Administrative Expenses (Delaware Bankruptcy Court Docket #469).

[24] The United States Trustee stated on page 5 of the Post-Hearing Memorandum In Support of the United States Trustee's Objection to Amended Application of JEPSCO, Ltd For Compensation and Reimbursement Pursuant to Sections 507(a)(1) and 503(b) (Delaware Bankruptcy Court Docket #621) that "the Committee's suit against Gray resulted in his turning over his interests in...Rivco...and [JMI].  [JTK] was part of a group that was interested in purchasing those companies."  A copy of page 5 of this Memorandum is attached to the Rule 60(b)(6) Motion as **Exhibit N**.  Also attached hereto as **Exhibit O** are pages 109-111 of the transcript of the 4/4 Hearing in the Delaware Bankruptcy Court regarding the fee applications filed by JTK and AMR.

11

have known from available corporate records that Gray did not own Rivco or JMI at the date of the Trial, by testifying that Gray did own them, as he did, JTK could facilitate a transfer of the stock of these companies to Summit in the event of a Summit judgment against Gray— and, of course, again, Gray couldn't be there to prevent JTK from lying.[25]   And, of course, that is exactly what occurred.

(d) The Erroneous "My Testimony For Your Money" Assumption By JTK:

At the time JTK provided assistance and testimony to and on behalf of the Committee, he assumed that by providing such assistance and testimony he could then come into the Delaware Bankruptcy Court and claim administrative fees without the objection of the Committee or any other party. While he may have been wrong in such assumption (and only an evidentiary hearing, if ordered by the Court, will determine all the relevant facts), that does not negate the fact that JTK's testimony was influenced strongly by this economic

---

[25] Various corporate records and tax returns of these companies and the consolidated tax groups of which they were members during the relevant period confirm this fact even though JTK testified otherwise. See the Trial Transcript at p.106-7, attached to the Rule 60(b)(6) Motion as **Exhibit P**. Even though there was certain dicta in a case in another jurisdiction to the effect that such corporations may have been owned or controlled by Gray, this dicta was not of any legal effect. However, JTK used this dicta to defraud this Court in his testimony.

Attached to the Rule 60(b)(6) Motion as **Exhibit Q** are (a) the Schedules K of JAC's federal income tax returns (Forms 1120) for the fiscal years ended December 31, 1997 (year of acquisition of JMI), 1998, 1999, 2000, and 2001, and (b) the Schedules K of the federal income tax returns (Forms 1120) of CSC Recovery Corp.("CSC") (the ultimate parent of RAC and Rivco) for the tax years ended December 31, 1998 (the year of acquisition of Rivco), 1999, 2000, 2001, and 2002. Line #5 of each of the attached Schedules K requires that the parent corporation (JAC or CSC, as appropriate) state whether at the end of the relevant fiscal year, any individual, partnership, corporation, estate or trust owned, directly or indirectly, 50% or more of its voting stock. The attached Schedules K show that in each year the answer to Line #5 was "No" as to both JAC and CSC. These tax returns were not prepared by Gray, but rather by independent accounting firms retained by JMI (of which JTK was a Director during the period) and CSC (several subsidiaries of which JTK was an officer and/or a director during the period) for that purpose. Presumably, these accounting firms reviewed the books and records of JAC and CSC at the end of each fiscal year and asked other relevant questions of JAC, JMI, CSC, RAC, Rivco, JTK, and others before responding "No" each year. JTK's lies are even more egregious since he knows full well that (a) the independent accountants were retained by him, (b) he worked with such accounting firms regularly, and (c) they prepared, signed, and filed the very tax returns which prove that Gray is not the owner of Rivco, JMI, JAC or RAC.

Gray believes that the information in the above-referenced Schedules K parallels that in the books and records of Rivco and JMI (which are in the possession of the Trustee and to which Gray thus does not have access), and also reflect the fact that Gray never owned them. If the Court were to order an evidentiary hearing on the Rule 60(b)(6) Motion, these books and records would be produced in discovery relating to such hearing.

JTK's lies are even more egregious since he knows that independent accountants retained by him prepared and signed some of the very tax returns which prove that Gray is not the owner of Rivco, JMI, JAC or RAC.

12

motivation—a motivation that he never disclosed to the Court.

For example, on one extremely important matter referred to above, JTK conveniently said in his testimony that Gray owned Rivco and JMI when he knew that Gray did not. He said that Chariot Holding, Ltd. owned VDC Recovery Corp. and RAC Investors, Inc. when he knew that it did not. He said that Gray was the ultimate owner of Chariot Management, Inc. when he knew Gray was not. He said that Gray owned AMW Recovery Corp. when he knew or should have known that he did not. He said that Gray did nothing to earn the monies that were paid to him, yet said that Gray was his ultimate boss and maintained a staff at an office in New York City; at yet another place in his testimony, he outlined what Gray actually did to earn his compensation (at best confusing the Court, but generally creating the impression that Gray was simply "looting" or "skimming" profits). He said that there were no management agreements between The Chariot Group, Inc. and others requiring the payment of management fees when there in fact were. He said that certain signatures on documents introduced as evidence were those of Gray when they were not. He said that no monies had been paid on the "note from Hallawell to Chariot" when there had been such a payment. He created the false impression that Gray was the mastermind behind all of the fund distributions, transfers, and alleged "looting", when, in fact, JTK was the one involved in and structuring virtually all of the fund transfers—in most instance without Gray's knowledge.[26] There are many, many, many other instances in his testimony when JTK falsely accused Gray of doing certain things, authorizing payments, etc., and these will all come out in an evidentiary hearing on the Rule 60(b)(6) Motion, if the Court chooses to conduct one. [27] The pattern is clear: JTK said and will say whatever he thinks will benefit

---

[26] And he was the one who was able to explain it all to the Court when asked by the Court at the Trial how various fund flows worked. Also, remember that according to JTK's testimony (the relevant pages of which are included with **Exhibit R** to the Rule 60(b)(6) Motion), Gray did no work, and was not an officer or director of any of these companies. JTK testified that he was CEO, officer and/or director of most of them.

[27] Pages 10, 45, 46, 47, 49, 52, 53, 57, 62, 66, 79, 88 and 89 of the Trial Transcript are attached to the Rule

his economic interest that he thinks he can get away with. Truth is irrelevant.

(e) What JTK Did Not Say:

In addition, what JTK did not say--because Gray was not able to be at the Trial to ask him about it—was, among other things, that (i) Gray was entitled to indemnification from Summit and its predecessor, The Chariot Group, Inc. under their by-laws[28] for actions taken in good faith—including, for example, the preparation and filing of the income tax returns which gave rise to the tax liability the subject of the Internal Revenue Service ("IRS") priority claim,[29] (ii) in general, the organization charts introduced as evidence were not accurate, and were mere hearsay in all events, (iii) what Gray did was legally proper, was permitted by Delaware law, and was undertaken only after advice from and approval by legal counsel, (iv) most of the payments which were made went to employees or other personnel or expenses which had nothing to do with Gray and were not for his benefit at all— including, without limitation, the payment of salaries and bonuses to JTK himself and others, and (v) many of the claims made by Summit were barred by the applicable statute of limitations. Also, through JTK, counsel for the Committee was able to introduce many bogus or hearsay documents which would not have been admissible if challenged.[30]

---

60(b)(6) Motion as **Exhibit R** in order to verify that such statements were in fact made by JTK, and to point out some of the internal inconsistencies in his testimony. If Gray were to cite all of them, this document would turn into more of a book of non-fiction rather than motion papers.

[28] On the same basis as that claimed by AMR in **Exhibit DD** to the Rule 60(b)(6) Motion.

[29] Ernst & Whinney had prepared and filed these tax returns.

[30] While, prior to introduction of the documents, the Court did ask whether there were any objections to document introduction, the only party at the Trial who was even questionably adverse to the interests of the Committee was counsel to Rivco and JMI whose biggest interest was to avoid being liquidated. Such counsel had no objection to introduction since the documents did not directly impact his clients. Had Gray been able to attend the Trial as he wanted to do but could not, he could have successfully challenged the introduction of these documents on the basis of hearsay, lack of business record, authenticity, relevance, signature, and/or privilege. For example, on page 37 of the Trial Transcript, counsel for the Committee introduced Exhibits 69 to 84 which purported to be general ledgers, income statements and balance sheets for The Chariot Group, Inc., Summit's predecessor. They were, in fact, not—and Gray would have been able to successfully object to their introduction had he been at the Trial. The same is true with respect to the general ledgers, balance sheets and income statements of Summit introduced as Exhibits 85 to 93.

(f) JTK's Testimony Was Influenced by the Fact That He Was a Creditor of Summit:

JTK never advised the Court that his testimony was influenced by the fact that as a creditor of Summit, and knowing that there were no assets in Summit except the litigation the subject of the Trial, the stock of Rivco and JMI would have to be transferred to Summit if there was to be any value to the creditor claim he had against Summit.[31]

## 2. Matters Involving AMR:

### (a) Fee Application Filed by AMR:

AMR applied to the Delaware Bankruptcy Court for fees aggregating approximately $875,000.[32] Neither prior to nor during the Trial did AMR ever tell this Court or any other party that he intended to file a substantial claim for administrative fees for allegedly providing "services" to Summit and others. The fact that AMR intended to benefit financially from the results of the Trial (and thus presumably his testimony) through the filing of a substantial administrative fee application was a fact never disclosed to or known by this Court or any party to the litigation.[33] And the Trustee, the United States Trustee, and even the very Committee of which he was Chairman at the time all found this claim to be so offensive, that they all strenuously objected to it.[34]

---

[31] See footnote 1 on page 6 of **Exhibit J** to the Rule 60(b)(6) Motion.

[32] See the Amended Application of Ambrose M. Richardson, Esq. For Compensation and Reimbursement Pursuant to Sections 503(b)(1)(A)(i), 503(b)(3)(B),(C), (D) and (F) and 503(b)(4) attached (with Appendices) to the Rule 60(b)(6) Motion as **Exhibit S**.

[33] Interestingly, as the Trustee correctly pointed out in his objection to AMR's fee application, AMR's claim for administrative fees (which put him near the top in terms of distribution) put him in direct conflict with the very Committee of which he was Chairman. Thus, not only did AMR admit in his fee application that he provided testimony at the Trial to facilitate the transfer of the Rivco and JMI stock to Summit, he tried and through his appeal and mediation continues to try to "stiff" the very constituency for which, as a fiduciary, he was charged with the responsibility to obtain money. And ironically as the Trustee pointed out, if AMR had prevailed in his fee application, Summit would be administratively insolvent, and his constituency (the unsecured creditors) would have gotten absolutely **nothing**—after waiting for the 8 years it has taken AMR to pursue his personal "crusade" (**Exhibit U** to the Rule 60(b)(6) Motion, page 5, footnote 2) against Gray, and to accumulate the alleged time charges on which his fee claim was based.

[34] See the Joint Post-Hearing Brief in Support of Objection of Francis A. Monaco, Chapter 11 Trustee For Summit Metals, Inc., and the Official Committee of Unsecured Creditors of Summit Metals, Inc. to the Supplemental, Amended and Original Applications of Ambrose M. Richardson, Esq. For Compensation and

15

It is clear from hundreds of pages of testimony and documents filed in connection with both the Trial and the Summit bankruptcy that AMR knew that unless he could have this Court order the transfer of the Rivco and JMI stock to Summit, there would be no funds against which he could make his substantial fee claim. Thus, his testimony was influenced (even though he never told this to the Court) by his wanting to have the stock of Rivco and JMI transferred into Summit so that he could make his outrageous and substantial fee claim, as well as his claim for indemnification, against a company with substantial assets with which to pay those claims.[35]

(b) AMR's Bounty Agreement with the Internal Revenue Service ("IRS"):

Gray also eventually learned that at the time of AMR's testimony at the Trial, he was party to a so-called "bounty agreement" with the IRS pursuant to which he would receive a "commission" or "bounty" on all monies collected by the IRS from Gray and/or the other defendants.[36] The fact of the existence of this bounty agreement was never disclosed by AMR to this Court prior to or at the Trial. Astonishingly, as Gray's former lawyer and the former lawyer to the other defendants, in the "bounty agreement" he agreed to "make an attempt to obtain property that might be useful to the IRS in collecting all or a portion of its...judgment."

AMR thus had a secret, undisclosed, strong, self-serving financial incentive to lie in his testimony to this Court so that a judgment would be entered against Gray and the other

Reimbursement (Delaware Bankruptcy Court Docket #618) attached to the Rule 60(b)(6) Motion as **Exhibit T**, the Objection of the Chapter 11 Trustee of Summit Metals, Inc. To the Application of Ambrose M. Richardson, Esq. For Compensation as Post-Petition Creditor and As Chairman of the Official Committee of Unsecured Creditors (Delaware Bankruptcy Court Docket #421) attached to the Rule 60(b)(6) Motion as **Exhibit U**, and Objection of the United States Trustee to Application of Ambrose Richardson for Compensation and Reimbursement Pursuant to Sections 507(a)(1) and 503(b) (Delaware Bankruptcy Court Docket #427) attached to the Rule 60(b)(6) Motion as **Exhibit V**.

[35] See the Post Hearing Brief in Support of Amended Application of Ambrose M. Richardson, Esq. For Compensation as Post-Petition Creditor and As a Creditor Providing Substantial Benefit to the Estate Pursuant to Sections 503(b)(1)(A)(i), 503(b)(3)(C),(D) and (F) and 503(b)(4) (Delaware Bankruptcy Court Docket #610) attached to the Rule 60(b)(6) Motion as **Exhibit W**.

[36] A copy of this bounty agreement is attached to the Rule 60(b)(6) Motion as **Exhibit X**.

16

defendants. For since there were no other assets in Summit, the only way the IRS could collect on its priority claim against Summit—a corporation directly responsible for the payment of the IRS tax claims, and against which the IRS had a priority claim—was for there to be assets of value in Summit. And the best way to get such assets into the hands of Summit was to convince this Court that Gray's alleged actions required the establishment of a constructive trust for the stock of Rivco and JMI. For if this occurred, it meant that assets owned by Summit would be available to the IRS ahead of the claims of the other creditors (including the very unsecured creditors to which he had a fiduciary duty as Chairman of the Committee), and that the IRS would be more likely to be paid monies—and, of course, that AMR would collect on his "bounty".[37]

In fact, AMR's billing records (attached to the Rule 60(b)(6) Motion as part of his fee application as **Exhibit S**) show numerous contacts with various IRS personnel subsequent to the date of the bounty agreement--presumably, in a continuing effort to perform under the bounty agreement.[38] For in communicating with these personnel, what else could AMR have been doing except providing services under the bounty agreement?

While Gray long had suspected that AMR might have breached his ethical and legal duties and responsibilities toward both him personally and the other defendants, he did not realize, until the saw he time charges which AMR submitted in support of his fee application, how extensive and appalling such breaches were.

---

[37] The IRS has already collected substantial monies from the sale of certain assets owned by Gray, from another bankruptcy estate, and from Summit. Not being satisfied to have presumably been paid once by the IRS under the bounty agreement, AMR now wants to be paid again for the same efforts through administrative fee claims.

[38] The name references to "Jacobus", "Klapper", "Cenawood", "Schneiderman", and "Best" referred to in **Exhibit S** of the Rule 60(b)(6) Motion are all IRS personnel or representatives.

17

(c) <u>AMR's Improper Failure to Protect the Attorney-Client Privilege at the Trial</u>:

AMR had been legal counsel to Gray and the various defendants over a period of
many years and learned most of the information he had about those parties in that capacity. [39]
Thus, AMR had a legal and ethical obligation to both preserve confidential information and
protect and invoke all applicable attorney-client privileges.[40]    Nonetheless, AMR used
confidential and privileged information at the Trial and testified as to confidential and
privileged matters, and Gray did not have the opportunity to protect the appropriate
privileges because he could not attend the Trial.

Thus, these privileges were improperly and unilaterally waived by AMR, <u>de facto</u>,
during his testimony—even though he had absolutely no legal or ethical right to do so. If one
looks at the Trial Transcript, almost everything AMR disclosed in his testimony was
attorney-client privilege protected, and AMR also effectively admitted serious ethical
breaches in his actions by his failure to preserve attorney-client privileges, failure to preserve
client confidences and secrets, and by his very testimony.[41]

---

[39] Attached to the Rule 60(b)(6) Motion as **Exhibit Y** are voluminous bills, invoices and other documents
demonstrating some (but not all) of AMR's substantial representation of Gray and many of the other defendants
over a period of many years. AMR himself admitted these relationships in his testimony at the April 4, 2006
continued evidentiary hearing ("4/4 Hearing") on administrative claim before Honorable Kevin J. Carey United
States Bankruptcy Judge, relating to his fee claims. Also, see page 95 of the transcript of the 4/4 Hearing
attached to the Rule 60(b)(6) Motion as **Exhibit Z**.

[40] See Cannon 4 of the New York State Bar Association Lawyers Code of Professional Responsibility and
DR4-101 there under attached to the Rule 60(b)(6) Motion as **Exhibit AA**. While in certain circumstances,
there is a limited exception to the obligation of confidentiality and the attorney-client privilege, as the record is
clear through thousands of pages of documents (which Gray is mercifully not asking this Court to read at this
time), AMR went way, way, way beyond what is ethically and legally permitted in pursuing his "crusade" and
"vendetta" (as the Trustee refers to it in his prior-referenced papers and on page 86 of **Exhibit BB** attached to
the Rule 60(b)(6) Motion) against Gray and the other defendants.

Most of what AMR testified to at the Trial he learned in his capacity as legal counsel to Gray, one of the
defendants, or one of their respective affiliates. And the extent to which he actively and aggressively solicited
action and involvement by and cooperated with the Federal Bureau of Investigation, IRS, United States
Attorney, the Committee, and others regarding his former clients is way, way, way beyond the comprehension
of all of the ethical members of the legal profession who have become aware of these activities. While he has
not yet been punished by any authority for his activities, he has clearly demonstrated that in his "crusade",
"vendetta" or "jihad"—whatever it is called—he would say and/or do anything to achieve this goal--whether it
was ethical, a breach of his fiduciary duty, or even criminal (as is perjury).

[41] See examples of these breaches are admitted by AMR in his own testimony on page 13, 21, 22-24, 30, 38,

18

(d) AMR's Interest in Purchasing Rivco and JMI:

As noted above in Section 1, together with JTK, AMR had also been part of several investment groups that wanted to acquire Rivco and JMI prior to the Trial, and had made offers to purchase those companies through Soundview Partners after the Judgment. Further, he never advised this Court that he would breach any ethical responsibility and tell any lie to achieve that purpose. [42]

(e) Lack of Disclosure to the Court of AMR's Extreme Animus Toward and "Crusade" Against Gray:

At the Trial, there was no disclosure to this Court of AMR's extreme animus toward Gray and the other defendants by AMR or by any other person participating in the Trial. AMR even admitted in his testimony at the hearing held in the Delaware Bankruptcy Court relating to his fee application that "the incarceration of Gray provided psychic gratification."[43] Such disclosure (together with the other matters referred to in Section 2 above about AMR) would surely have influenced the Court in its view of the veracity of AMR's testimony—especially since Gray could not attend the Trial to question AMR about his testimony.

AMR's own fee application papers reveal, in his own words, the animus and breaches of lawyers' responsibilities in which he engaged as a continuing course of conduct for many years.[44] None of this was disclosed to the Court by AMR, and Gray could not inquire about this at the Trial because he was not able to attend.

---

39, and 43 of proceedings before the Honorable Kevin J. Carey, United States Bankruptcy Judge held on March 16, 2006 relating to AMR's fee claim, pages 46, 82-84 and 219 of the transcript of the 4/4 Hearing, and pages 157-174 of the Trial Transcript (all attached to the Rule 60(b)(6) Motion as **Exhibit BB**).

[42] See page 31 of **Exhibit T** to the Rule 60(b)(6) Motion.

[43] See pages 158 and 159 of the transcript of the 4/4/ Hearing attached to the Rule 60(b)(6) Motion as **Exhibit CC**.

[44] See pages 8-10 of Post Hearing Brief In Support of Amended Application of Ambrose M. Richardson, Esq. For Compensation As Post-Petition Creditor and As Creditor Providing Substantial Benefit to the Estate Pursuant to Sections 503(b)91)9A)(i), 503(b)(3)(C), (D) and (F) and 503(b)(4) (Delaware Bankruptcy Court Docket #610) attached to the Rule 60(b)(6) Motion as **Exhibit DD**.

Even the Trustee recognizes this animus as stated in one of his objections to AMR's

fee application when he says that

> Moreover, from the [fee] Application, there is no evidence
> that the ...[Committee] counsel or the [C]ommittee itself
> solicited {AMR} to act on its behalf with respect to discreet
> legal issues. **Instead [AMR] seems to have been acting on
> his own crusade against Gray and Gray's related entities**.
> [emphasis added][45]

## 3. JTK and AMR Cooperative Pattern of Conduct and Plotting to Receive Mutual Economic Benefit:

It is obvious that the "pattern" here is more than simply innocent misstatements by

JTK and AMR at the Trial. JTK and AMR were working together since before the Trial to

attempt to acquire Rivco and JMI. They had known each other for almost 20 years. AMR

put in supporting testimony for JTK's fee application, and JTK put in such testimony in

support of AMR's application.[46] Who knows what other "side deals" they have with each

other even now. Both willingly testified against Gray to suit their own purposes. Both were

admittedly involved with T.S.P.G., Chariot Recovery, and Soundview. Both wanted to

acquire Rivco and JMI. What we have here is not simply innocent misstatements of fact by

witnesses. What we have is two people working together to accomplish an objective—even

if the truth is at odds with their testimony at the Trial.

## 4. Conduct of Wolf Block et al. and Pomerantz Haudig et al.:

Pomerantz and Wolf Block knew that AMR was former counsel to Gray and the other

defendants. They knew that AMR was violating his professional responsibilities and

---

[45] See footnote 2, on page 5 of **Exhibit U** to the Rule 60(b)(6) Motion.

[46] In the Post-Hearing Brief of JEPSCO, Ltd. In Support of Application and Amended Application For Compensation and Reimbursement For Administrative Expenses (**Exhibit J** to the Rule 60(b)(6) Motion) at pages 2, 3 and 9, JTK (a) cites testimony by AMR which occurred at the fee hearing held on the matter supporting his fee application, and (b) assisted AMR by providing information (pages 7 and 8). AMR was called by JTK to testify at his fee application hearing as part of a continuing effort to "scratch each other's back". While this may be a sound strategy in politics or business it certainly furthers the point that truth at the Trial was secondary to achieving their shared objectives. Also see pages 15, 180, 181 and 244 of the transcript of the 4/4 Hearing attached to the Rule 60(b)(6) Motion as **Exhibit EE**.

obligations in asking him to testify in the manner he did at the Trial. They knew of AMR's and JTK's long-standing interest in acquiring the stock of Rivco and JMI--and yet, as officers of this Court, they did nothing to either stop AMR's breaches of his duties, or to advise this Court of the above facts at the Trial. Why? Because it suited their purposes.

Wolf Block and Pomerantz also both knew that because of the extreme animus of AMR toward Gray and the other defendants (which drove him more than fulfilling his legal, ethical and fiduciary responsibilities), he would say anything as a witness at the Trial to further his "crusade", his "vendetta", his "jihad"—especially if REG was not able to be at the Trial. And, in fact, that is exactly why they were so eager to have the Trial conducted when Gray could not attend[47]—so AMR and JTK could say whatever they wanted to say, and not be subject to accountability for their testimony to Gray and the other defendants. As officers of the Court, they should not have permitted this fraud on the Court to have been the basis for the Judgment, but did so anyway. In short, they aided and abetted the fraud on the Court that they knew was happening—and did nothing to stop it.[48]

## Possible Effect of the Rule 60(b)(6) Motion On Distributions to AMR

If Gray is successful in the Rule 60(b)(6) Motion, the stock of Rivco and JMI previously transferred to Summit pursuant to the constructive trust established by the Court will properly belong to RAC and JAC, respectively, until and unless a new judgment, if obtained, requires transfer to Summit. And all proceeds from the sales of the assets of Rivco and JMI will still properly belong to those companies, not Summit. Thus, any distributions which have been made from the Summit bank account from

---

[47] First, insisting that the Trial be held prior to Gray's freedom from incarceration, then trying to have the civil contempt incarceration extended past Gray's release date, and finally having the Northern District Bankruptcy Court lift the stay to the conducting of the Trial on such short notice that they knew that Gray could not possibly attend the Trial. After years of trying, they finally succeeded in their goal—unless this Court recognizes their deception and remedies the injustice to Gray and the other defendants.

[48] It is unclear whether counsel to the Committee was aware of AMR's "bounty agreement", and final determination of that question will have to await the results of an evidentiary hearing, should the Court choose to order one.

which the proceeds of the sales of Rivco and JMI's respective assets have been made (including all monies paid to AMR) would have been inappropriate since the monies used to pay such amounts would not have belonged to Summit.[49]

## Legal Authority for Relief Under Rule 60(b)(6)

Federal Rule of Civil Procedure 60(b)(6) states in relevant part that

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ........or (6) any other reason justifying relief from the operation of the judgment....

Gray believes that there is substantial merit to the Rule 60 (b)(6) Motion under the above-quoted language and relevant case law, and that this Court should thus not diminish the remedy if it is granted.

It is well settled that Rule 60 is to be liberally construed. Klapprott v. United States, 335 U.S. 601, 615 (1949); Tozer v. Charles A. Krause Milling Co., 189 F.2d 242, 245 (3d Cir. 1951). The liberal construction of Rule 60 is to help ensure that justice is done. Radack v. Norwegian American Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963). Moreover, it has been recognized that under Rule 60(b), a court should liberally exercise its power to vacate or modify a judgment when necessary to "accomplish justice." In re Durkalec, 21 B.R. 618 (Bankr.E.D..Pa. 1982). In this case, it is clear that (a) the only two witnesses at the Trial had material and varied financial interests in their testimony which was undisclosed to this Court, (b) one of the witnesses for the Committee and the Trustee is now being called a liar by Summit, (c) privileges were improperly ignored by AMR, (d) both witnesses lied to

---

[49] Gray recognizes that investment bankers and accountants have been necessary to the sale of the Rivco and JMI assets, and is thus not contesting the validity or possible disgorgement of these fees. Neither is he challenging the fees of the Trustee or his law firm as administrator of the Summit estate, since the Trustee had not yet been appointed at the time of the Trial, and thus did not participate in the wrongdoing which occurred as outlined above.

22

accomplish their ongoing economic objectives, and (d) Gray could not attend the Trial to stop the above-referenced fraud on the Court.

The "something more" (previously referred to by the Trustee in his papers) sufficient to support a claim under Rule 60(b)(6) is what the Trustee so correctly recognized as the principle, pattern and scheme that JTK will say <u>whatever</u> he has to in order to benefit or protect his own economic interests and/or provide a basis for him to claim money. What is clear from the above-referenced actions and allegations is that there was a pattern of conduct on JTK's part from prior to the time of his testimony at the Trial until the filing of his fee application, to try to find a way to benefit himself and/or his corporation financially from his testimony and/or protect his economic interests—no matter what the truth may be.

Based on the Trustee's own statements as noted above, it would appear that JTK says something only when he expects to get paid for it or for it to benefit him or his corporation financially. JTK did not tell the Committee or Summit about the matters referred to in the Brief because to have done so would have put his ownership of RRI in jeopardy. Given the fact that JTK, through JEPSCO, owns approximately 4% of RRI, it would appear that JTK's non-disclosure was motivated by his own economic interests—not truth

Based on the same principles, he (a) wanted to have a judgment rendered against Gray, RAC and JAC so that the stock of RIVCO and JMI would be transferred to Summit so he and AMR could buy it, and (b) testified against Gray at the Trial to please the Committee in the mistaken view that no one would oppose his "egregious" fee application--even though he didn't tell anyone in advance of his intent to seek compensation for his testimony.

Thus, it can now be conclusively inferred that he testified against Gray at the Trial not because he was telling the truth, but because he perceived that it was in his own economic interest to testify as he did. Thus, he is hardly the disinterested witness the Court perceived

23

him to be at the time of his testimony at the Trial.[50]

Here there is "even more" than the "something more" that the Trustee referred to in his papers, and in the case he cited. The "even more" is the only two witnesses at the Trial working together to achieve common and nefarious economic objectives—to attempt to collect fat administrative fees and purchase Rivco and JMI—and, in the process, to perpetrate a fraud on the Court. Both schemes appear to have now failed. However, if the Trustee is permitted by this Court to settle AMR's fee claim for an amount greater than the amount awarded by Judge Carey, he will have permitted AMR partial success in his scheme.

In the Rule 60(b)(6) Motion, in the interest of justice, Gray seeks relief under subsection (6). As discussed in the seminal case of Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238 (1944), this court has broad authority under Rule 60(b) to set aside a judgment for fraud upon the court. Harford brought suit against Hazel alleging patent infringement, and in 1932 the Third Circuit affirmed judgment in favor of Hartford. In 1941, Hazel petitioned to have the judgment set aside on the grounds that Hartford's attorney had written an article favorable to the patent at issue and arranged to have the article printed in a trade journal under the name of a purportedly disinterested party. The article was cited by both the United States Patent Office in granting the patent and by the Third Circuit in upholding the patent's validity. The Supreme Court vacated the judgment because of the

---

[50] Moreover, the United States Trustee recognized that JTK was not, in fact, a "disinterested" person in the case. On page 3, paragraph 10, of the Objection of the United States Trustee To Application of JEPSCO, Ltd For Compensation and Reimbursement For Administrative Expenses Pursuant to 11 U.S.C. 330 (Delaware Bankruptcy Court Docket #425), it is stated that neither JTK nor JEPSCO, Ltd. ever filed an affidavit "contain[ing] a statement of disinterestedness." Why could such a statement not be filed? Because for JTK to have done so would have meant he would have had to have committed more perjury. A copy of this Objection is attached to the Rule 60(b)(6) Motion as **Exhibit FF**.

Further, in the pages of the Memorandum attached to the Rule 60(b)(6) Motion as **Exhibit N**, the United States Trustee also stated that JTK's "actions [in testifying against Gray] indicate his motive was self interest...." And this fact was further confirmed by the Committee in its Objection attached to the Rule 60(b)(6) Motion as **Exhibit L**, since it, too, recognized on page 5, first full paragraph, that JTK:

> was part of an investor group that wanted to purchase the Rivco and [JMI] stock from Summit in the event the Committee's efforts to acquire a 92% interest in those entities was successful. Hence, he had a personal motive for working with the Committee and providing trial testimony.

24

attorney's actions. As Justice Black explained:

> Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside the fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.

Id., at 245.

While the Third Circuit found that Hazel had not exercised proper diligence in uncovering the fraud, the Supreme Court found that, even if that were the case, that alone did not support allowing the fraud to be condoned by the courts. Thus, as Justice Black reasoned:

> This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. [citations omitted] Furthermore, tampering with the administration of justice in the prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment....

Just as with the matter of a patent dispute, a Delaware District Court case involves the establishment and administration of the rights and interests of many parties beyond the particular litigants to an adversary proceeding. In this case, Gray and the other defendants have a legitimate and material interest in not letting stand a Judgment obtained by testimony motivated by undisclosed self-interest, greed, dishonesty, and fraud on the court that resulted in this Court rendering the Judgment in the first place.

To permit the Judgment to stand under the current circumstance would be a fundamentally unfair result given the pattern of conduct exhibited by JTK, AMR, and counsel to the Committee, and would undermine the public's support of the vital role of the legal system. Just as there was no reason for the courts to stand mute in the face of Hartford's

fraud, similarly the Court should not condone the conduct JTK, AMR, and counsel to the Committee. And this Court should certainly not permit AMR to be further rewarded by the payment of additional monies to him by the Trustee which are not legally required—at least until this Court has first decided whether such monies are properly the property of Summit by its decision of the Rule 60(b)(6) Motion.

In McKinney v Boyle, 404 F.2d 632 (9th. Cir. 1968), cert. denied, 394 U.S. 992, the court was faced with a question of what may constitute the type of circumstances requiring relief under Rule 60(b)(6). McKinney originally brought suit seeking damages as the result of an automobile accident. The case was dismissed with prejudice on December 4, 1962, by stipulation of the parties signed by attorneys for all parties. Subsequently, on June 16, 1967, McKinney moved to vacate the dismissal under Rule 60(b), claiming fraud on the part of his own counsel and his former wife. While the district court dismissed McKinney's motion as time barred under Rule 60(b)(3), the Ninth Circuit reversed, finding that the matter was within Rule 60(b)(6) and thus not subject to the one year limitation requirement. Analogously, Summit's witnesses in this matter, JTK and AMR, withheld information and had hidden agendas, as discussed above. AMR also engaged in the other conduct referred to above-- thus putting the present matter squarely within the scope of Rule 60(b)(6).

In summary, the Trial was so fraught with personal interests, vendettas, hidden agendas, and undisclosed motivations, and so devoid of fundamental fairness that, in the interest of justice, pursuant to Rule 60(b)(6), the Judgment should be vacated and a new trial scheduled by the Court. In the interim, the assets of Summit which may well be the property of Gray and others should not be distributed to AMR as further reward for his misconduct in connection with the Trial and otherwise. For if payment is made to AMR and the Court subsequently grants the Rule 60(b)(6) Motion, such decision would be a meaningless victory since there would no longer be any assets in Summit which might be recouped.

## CONCLUSION

WHEREFORE, Gray respectfully requests the following relief:

(a) That the Court enter an order preventing the Trustee from making any distributions to AMR until and unless the Rule 60(b)(6) Motion has been denied by the Court and a final non-appealable order affirming the Court's decision has been obtained from the appropriate court, or, if the Rule 60(b)(6) Motion is granted by the Court, preventing any such distributions until a new trial which results in liability of Gray and the other defendants has been conducted; and

(b) That the Court grant such other and further relief as it may deem appropriate and as justice may require.

Richard E. Gray, Pro se
211 Beede Lane
Keene Valley, NY 12943
Telephone: 518-576-9036
Fax: 518-576-9743

Dated: March 27, 2008

27

# EXHIBIT 1

# RICHARD E. GRAY
## P.O. BOX 182
## KEENE, NY 12942
### TEL: 518-576-9036
### FAX: 518-576-9743
### e-mail: Richardegray@aol.com

March 17, 2008

**FACSIMILE AND CERTIFIED MAIL—**
**RETURN RECEIPT REQUESTED**

Kevin J. Mangan, Esq.
Womble Carlyle Sandridge & Rice
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

Francis A. Monaco, Jr., Esq.
Womble Carlyle Sandridge & Rice
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

In Re: Summit Metals, Inc. (Delaware Bankruptcy Court Case No.
98-2870, and Delaware District Court Case No. 1:2008cv00005)

Gentlemen:

In a decision dated December 4, 2007, in the In Re Summit Metals, Inc. bankruptcy proceedings, Judge Kevin J. Carey awarded Ambrose M. Richardson, III ("AMR") a sum of money in respect of his administrative fee application. Not being satisfied with Judge Carey's award, AMR filed both a Notice of Appeal with the Delaware District Court ("Court") on January 4, 2008, and other subsequent court pleadings pursuant to which he asking the Court to overturn Judge Carey's carefully reasoned and detailed opinion.

After various appellate papers were filed with the Court by both AMR and you, you and he evidently decided to mediate the matter, and a mediation session was conducted. The mediation concluded unsuccessfully, and on February 28, 2008, mediator Brian A. Sullivan, Esq. filed a Mediator's Certificate of Completion ("Report") in which he stated that he recommended that the parties continue settlement discussions because they had "negotiated to within $75,000 of settlement". The clear implication of the Report is that you are

agreeable to paying AMR significantly more than the amount awarded to him by Judge Carey.

As you know, on November 17, 2006, I filed a Rule 60(b)(6) motion ("Motion") with the Court. The Motion was only recently transferred to Judge Sue L. Robinson from the vacant judgeship created by Judge Kent A. Jordan's elevation to the appellate court, and has not yet been decided. By the Motion, I seek to vacate the judgment ("Judgment") against me and others entered by Judge Jordan on August 6, 2004.

Virtually all of the monies which have been collected by Summit (approximately $4.9 million) and already distributed to others (also millions of dollars) have been derived from Summit's collection efforts pursuant to the Judgment. The monies remaining in Summit (including the monies which you would presumably distribute to AMR if settlement with him were reached) were also obtained as a direct result of collection on the Judgment.

Thus, if you settle with AMR and distribute monies to him and/or others, all of the monies in Summit will have been distributed or used for other purposes before the Motion has been decided. However, if the Motion were to be granted by the Court at a later date, these distributed monies would properly have belonged to me and others, not to Summit. In such a circumstance, the Court's subsequent granting of the Motion would have been a meaningless victory, and I and the other defendants the subject of the Judgment would have suffered irreparable harm. For if monies were paid to AMR and/or others, at best, these monies would be difficult to retrieve, and the process of retrieval would be both time-consuming and significantly more difficult.

As matters currently stand, if you do reach a settlement with AMR, I will not know either the fact or amount of such settlement; nor will I know whether you will have subsequently actually paid monies to him. Thus, I will not (a) know whether you will have frustrated the purpose of the Motion, or (b) have had the chance to object to the settlement [1].

As a result of the forgoing, I ask that you voluntarily agree that if you reach a resolution or settlement with AMR (through mediation, negotiation, or otherwise), you will (a) promptly advise me of both the fact and amount of such settlement, (b) not make any distribution whatever to AMR until the Motion has been denied by Judge Robinson, and a final non-appealable order affirming denial of the Motion has been entered by the appropriate court, and (c) if the Motion is granted, make no payments whatever to AMR.

This will also advise you that if you do not provide the requested agreements within 5 days of the date of this letter, I will have no choice but to file an appropriate motion with the Court.

---

[1] You may recall that Judge Carey indicated at a related hearing in the Summit bankruptcy that he would delay the effectiveness of any fee award to AMR for 10 days so that I would have the right to appeal. While I had no problem with the amount of fees awarded to AMR by Judge Carey, I do have a problem with your now agreeing to pay him more. Further, if you were to now pay AMR monies prior my having the opportunity to formally object, you would also frustrate Judge Carey's intent as expressed at that hearing.

Very truly yours,

RICHARD E. GRAY

cc: Brian A. Sullivan, Esq.
    Mr. Ambrose M. Richardson, III
    (both via first class mail)

3

**IN THE UNITED STATES DISTRICT COURT IN
AND FOR THE DISTRICT OF DELAWARE**

In re:
SUMMIT METALS, INC.,

          Debtor

          Bk. No. 98-2870 (KJC)

Chapter 11

---

AMBROSE M. RICHARDSON, III

          Appellant,

    v.

U.S. TRUSTEE KELLY BEAUDIN
STAPLETON and CHAPTER 11 TRUSTEE
FRANCIS A. MONACO, JR..,

          Appellees.

Civil Action No. 08-005-SLR

---

**ORDER**

This     day of     , 2008, having considered DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED, and the MEMORANDUM IN SUPPORT OF DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION

FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED, and having heard the argument of Richard E. Gray ("Gray") and counsel; it is

(a) ORDERED, that the Summit Metals, Inc. Liquidating Trustee ("Trustee") is hereby prohibited from making any distributions to Ambrose M. Richardson, III ("AMR") until and unless a certain the Rule 60(b)(6) motion filed by Gray on or about November 17, 2006 has been denied by the Court, and a final non-appealable order affirming the Court's decision has been obtained from the appropriate court; and

(b) ORDERED, that if the aforementioned Rule 60(b)(6) Motion is granted by the Court, the Trustee is hereby prohibited from making any such distributions to AMR until a new trial which results in liability of Gray and the other defendants has been conducted.

_____

Sue L. Robinson, United States District Judge

Dated:          , 2008

## IN THE UNITED STATES DISTRICT COURT IN
## AND FOR THE DISTRICT OF DELAWARE

In re:
SUMMIT METALS, INC.,

         Debtor

Chapter 11

Bk. No. 98-2870 (KJC)

AMBROSE M. RICHARDSON, III

         Appellant,

v.

Civil Action No. 08-005-SLR

U.S. TRUSTEE KELLY BEAUDIN
STAPLETON and CHAPTER 11 TRUSTEE
FRANCIS A. MONACO, JR..,

         Appellees.

### CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2008, I caused to be filed with the Delaware District Court each of the following:

(i) DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED;

(ii) MEMORANDUM IN SUPPORT OF DEFENDANT RICHARD E. GRAY'S MOTION TO DELAY ANY PAYMENT BY THE SUMMIT METALS, INC. CHAPTER 11 TRUSTEE TO AMBROSE M. RICHARDSON, III, UNTIL A FINAL NON-APPEALABLE

DETERMINATION WITH REGARD TO THE RULE 60 (b)(6) MOTION FILED BY RICHARD E. GRAY HAS BEEN MADE, AND THEREAFTER UNTIL A NEW TRIAL HAS BEEN CONDUCTED IF THE RULE 60(b)(6) MOTION IS GRANTED;

(iii) CERTIFICATE OF SERVICE; and

(iv) the proposed form of ORDER.

and that on that same date, I sent notification of such filing, by United States Postal Service, first class mail, to each of the following:

Mr. Ambrose M. Richardson, III
40 Wall Street
New York, NY 10005

Kevin J. Mangan, Esq.
Womble Carlyle Sandridge & Rice
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

Richard L. Schepacarter, Esq.
Office of the United States Trustee
844 King Street, Lockbox 35
Wilmington, DE 19801

Richard E. Gray, Pro se
211 Beede Lane
Keene Valley, NY 12943
Telephone: 518-576-9036
Fax: 518-576-9743

Dated: March 27, 2008



Richard E. Gray
P.O. Box 182
Keene, NY 12942

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE
www.USPS.com

Office of the Clerk
United States District Court,
District of Delaware
844 N. King Street
Wilmington, DE 19801

MAR 26 2008

MAR 26 2008