IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| )<br>) | CHAPTER 11 |
| In re: )<br>) | |
| SUMMIT METALS, INC., )<br>) | CASE NO. 1:08-cv-0005 (SLR) |
| Debtor. )<br>)<br>) | |
| _____ ) | |
| )<br>AMBROSE M. RICHARDSON, III )<br>) | |
| Appellant, )<br>) | |
| v. )<br>) | |
| U.S. TRUSTEE KELLY BEAUDIN STAPLETON, )<br>) | |
| Appellee. ) | |

APPELLANT'S MEMORANDUM OF LAW

TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………1

JURISDICTION…………………………………………………………………….2

ISSUES ON APPEAL……………………………………………………………..2

STATEMENT OF FACTS ………………………………………………………..4

       A. The New York Injunction..………………………………………………4

       B. First Suit Against Richardson………………………………………………5

       C. The Summit Chapter 11…………………………………………………….6

       D. Post Petition Renewal of the First Suit vs. Richardson……………………7

       E.  The Second Suit and Third Suits vs. Richardson…………………………7

       F.  Delaware Committee Adversary Proceeding..………………………………8

       G.  The Tennessee Chapter 11……………………………………………….10

       H.  The Homestar Chapter 7………………………………………………….14

       I.  Return to Delaware………………………………………………………...15

ARGUMENT………………………………………………………………………18

I.  THE NEW YORK INJUNCTION OBTAINED BY RICHARDSON
 SUBSTANTIALLY CONTRIBUTED TO THE ESTATE..…………………………18

II.  RICHARDSON'S ACTIVITIES IN THE ESP BANKRUPTCY THAT
(A) ESTABLISHED THE DEBTOR'S EQUITABLE INTEREST IN ESP;
(B) PROSECUTED THE DEBTOR'S CLAIMS AGAINST THE ESP ESTATE
 AND (C) PREVENTED THE SUCCESS OF GRAY'S PLAN OF
REORGANIZATION, BOTH PRESERVED AND SUBSTANTIALLY
 CONTRIBUTED TO THE ESTATE..……………………………………………….20

III.  IN SUCCESSFULLY RESPONDING TO FOUR PROCEEDINGS (NOT
COUNTING SANCTIONS MOTIONS) BROUGHT AGAINST HIM POST
PETITION BY THE DEBTOR OR ITS AFFILIATES, RICHARDSON
ENGAGED IN "TRANSACTIONS" WITH THE DEBTOR..……………………….26

IV.  THE TAX AND BANKRUPTCY FRAUD CRIMINAL PROCEEDINGS
 WERE RELATED TO THE CASE OR TO THE BUSINESS OR PROPERTY
 OF THE DEBTOR………………………………………………………………31

RICHARDSON'S CLAIMS ……………………………………………………33

CONCLUSION…………………………………………………………………34

TABLE OF AUTHORITIES

*Chariot Plastics v. U.S.,* 28 F.Supp.2d 874 (SDNY 1998)…………………………6

*Cowan v. Codelia*, 2001 WL 30501, *affd*. 2002 WL 31478922 (SDNY)……………30

*First Merchants Acceptance v. J.C. Bradford,* 198 F.3d 394 (3rd Cir. 1999) ……1, 30

*Gray v. Richardson*, 251 A.D.2d 268, 675 N.Y.S.2d 57 (1st Dept. 1998),
leave to appeal den., 92 N.Y.2d 815, 706 N.E.2d 747,
 683 N.Y.S.2d 759 (1998) ……………………………………………………6, 26, 30

*In re Airwest International,* 1988 WL 113101 (Dist. Hawaii 1988)…………………28

*In re American Preferred Prescription, Inc.,* 218 B.R. 680
(E.D. New York. 1998)……………………………………………………………27

*In re Charlesbank Laundry, Inc.* 755 F.2d 200 (1st Cir. 1985) …………………27, 28

*In Re Chicago Pacific Corp.,* 773 F.2d 909 (7th Cir.1985)…………………………28

*In Re Essential Therapeutics, Inc., (Del. 2004) 308 B.R. 17*……………………………23

*In re E.A. Nord Co., Inc.,* 78 B.R. 289 (W.D. Wash 1987)…………………………28

*In re Hemingway Transp. Inc.,* 993 F.2d 915 (1st Cir. 1993)…………………………27

*In re Met-L-Wood Corp.*, 115 B.R. 133 (N.D.Ill.,1990)……………………………27

*In re Women First Healthcare*, 332 B.R. 115 (D. Del. 2005) ……………………27

*Parker 72nd Associate v. Isaccs*, 109 Misc. 2d 57 (NYC. Civ. Ct. 1980)…………......30

*Reading Co. v. Brown,* 391 U.S. 471 (1968) ………………………………3, 27, 28

*Yorke v. N.L.R.B.,* 709 F.2d 1138 (7th Cir.1983)……………………………………28

11 U.S.C. §362……………………………………………………………………20

11 U.S.C. §363……………………………………………………………………24

11 U.S.C. §503(b)(1)(A) ………………………………………………20, 26, 33

11 U.S.C. §503(b)(3)(C).…………………………………………………………31

11 U.S.C. §503(b)(3)(D)……………………………………………………………20

11 U.S.C. §503(b)(4) ……………………………………………………………………2

18 U.S.C. §3057(a)……………………………………………………………………15

28 U.S.C. 157(b)(2)……………………………………………………………………9

28 U.S.C. §157(b)(4)…………………………………………………………………9

28 U.S.C. §158(a) ……………………………………………………………………..2

28 U.S.C. §1738………………………………………………………………………26

Delaware Gen. Corp. Law §145………………………………………………………28

Federal Rules of Civil Procedure 37…………………………………………………31

Bankruptcy Rule 1014(b) ……………………………………………………11, 20, 21

Local Rule 2016(b)……………………………………………………………………32

COLLIER BANKRUPTCY MANUAL, ¶503.06[2]……………………………………28

COLLIER BANKRUPTCY MANUAL, ¶503.06[3][c]…………………………………28

PRELIMINARY STATEMENT

This case began in July 1995.  The application for administrative expenses of A. M. Richardson, Esq., ("Richardson"), a creditor who initiated the case, runs through August 2004. The Bankruptcy Judge who made the decision on appeal, the tenth bankruptcy judge to be assigned to the case, was assigned in December 2005.[1]  Most of the activity in the case occurred outside the Bankruptcy Court and was therefore not observed by the Court.

Likewise, the Chapter 11 Trustee was appointed in the fall of 2004, after the case had been pending more than nine years and assets had been brought into the estate, due in large part to Richardson's efforts.  Until there were assets, the U.S. Trustee ignored the case.[2]

The briefing schedule below, after hearings on two separate days, called for Richardson to submit a brief, and for the Trustees and Committee Counsel to submit a brief containing new objections to which Richardson would have no opportunity to reply.  The Trustee and Committee Counsel were also given leave to submit an extra long brief.  This arrangement provided the opportunity to include misleading statements to which Richardson could not respond.

Richardson made claims under several subsections of 11 U.S.C. 503 that refer to "creditors".  The U.S. Trustee has persisted in a policy that only professionals appointed under 11 U.S.C. 327, the bankruptcy insiders, should be compensated.  The Third Circuit rejected that policy in *First Merchants Acceptance v. J.C. Bradford,* 198 F.3d 394 (3rd Cir. 1999), holding

---

[1] As a private attorney at the firm that initially represented the Creditors' Committee, Fox Rothschild, Kevin Carey traveled to New York and spent several hours in March 3, 2000, meeting with members of the Creditors' Committee and other creditors and attorneys who were dissatisfied with then Committee Counsel and seeking a replacement (A-332). Carey declined the representation, observing that payment was problematic since the estate had no tangible assets.  When the issue was raised, Judge Carey said he could not recall the meeting.

[2] The attorney who was active for Committee Counsel, Paul Brenman, Esq., left the firm in 2003.  Consequently, with limited exceptions, none of the persons opposing Richardson's claims had any personal knowledge of what they were arguing.

that §503(b)(3) and (4) mean what they say when they refers to a "creditor"[3].

JURISDICTION

Notice of appeal pursuant to 28 U.S.C. §158(a) was filed on December 13, 2007, with respect to the Order of the Bankruptcy Court entered December 4, 2007.

ISSUES ON APPEAL

1.  Where Richardson, was solely responsible for obtaining New York Injunction (See A-56 and A-72), and where the Bankruptcy Court found that the New York Injunction substantially contributed to the Estate (A-32), did the Bankruptcy Court err in concluding that Richardson's efforts did not substantially contribute to the Estate?

The Bankruptcy Court wrongly credited H. Adam Prussin, Esq., with the New York Injunction, after being misled by the objectors' brief.  As shown by Prussin's fee application, Prussin's involvement began after the New York Injunction was issued (A-185).

2.  Where Richardson was primarily responsible in the ESP Bankruptcy for (a) establishing the Debtor's equitable interest in ESP; (b) preventing the success of Gray's plan of reorganization that would have deprived the Debtor of any assets, and (c) in prosecuting the Debtor's claims on behalf of the Committee, which resulted in the Debtor's receiving the right to ESP's corporate opportunity claims, did the Bankruptcy Court err in concluding that Richardson's efforts did not substantially contribute to the Estate?

The Bankruptcy Court was misled into concluding that the Tennessee proceeding was inconsequential and that all the work was done by Committee Counsel.  On the contrary, the Tennessee proceeding was crucial because it controlled all of the assets.  A review of the time

---

[3] §503(b)(4) was amended in 2005, after Richardson's administrative claims arose.

sheets shows a division of labor and that, without denigrating the work done by others, the contributions claimed by Richardson are attributable to him and not others.

3.   Where the Debtor or its affiliates initiated at least four formal post-petition proceedings against Richardson (not counting sanctions motions), a former officer of the Debtor and Chairman of the Creditors' Committee, and where Richardson successfully defended all of such claims, did the Bankruptcy Court err in determining that Richardson did not have any post-petition "transactions" with the Debtor?

The Bankruptcy Court referred to precedents where a third party brought pre-petition claims against former corporate directors, and some the defense expenses arose post petition. These cases, even if rightly decided, are distinguishable (given the opportunity). Richardson's claims are based on suits by the Debtor itself, and a long line of authority back to *Reading Co. v. Brown,* 391 U.S. 471 (1968), supports Richardson's claims**.**

4.   Where Richardson, was solely involved in two criminal proceedings against Gray resulting in guilty pleas, for the evasion of the taxes for which the Debtor was responsible and for which the Debtor obtained a judgment against Gray, and looting an affiliate of the Debtor protected by the New York Injunction, whose funds were commingled with those of other Debtor affiliates, did the Bankruptcy Court err in finding the criminal proceedings to be "unrelated?"

No one but Richardson had any involvement with civil or criminal tax issues.  Gray pleaded guilty to one count of tax evasion, which involved the same set as facts as were involved in Summit's tax claims against Gray.  The second criminal conviction involved Homestar Industries, another corporate opportunity acquired with ESP's funds and subject to the New York Injunction.  Gray commingled funds looted from Homestar with those of other Debtor affiliates

that were defendants in the Delaware Committee Adversary Proceeding.  Homestar, like other operating companies, was rightfully owned by Chariot/Summit.

STATEMENT OF FACTS

A. The New York Injunction.

Richard E. Gray was the majority stockholder of a public company, The Chariot Group, Inc., which was listed on the American Stock Exchange.  Chariot was a holding company that owned a subsidiary, Energy Saving Products, Inc. ("ESP"), a manufacturer of windows and doors in Tennessee.  ESP, in turn, owned another operating company, B. F. Rich, a manufacturer of windows and doors, in Newark, DE.  Substantially all of Chariot's revenue came from ESP.  There was also a sister company, acquired with ESP funds, Homestar Industries, involved in related businesses.

In 1990, after Chariot's Board rejected Gray's going private offer, Gray eliminated the Board, delisted and deregistered Chariot's stock and began looting the company.

In 1994, Gray entered into a consent judgment with the IRS on behalf of Chariot Holdings, Ltd. ("CH"), his personal holding company, which had filed consolidated returns with Chariot up until 1986 when Chariot went public.  The judgment admitted that CH owed millions in back taxes.  Chariot had given the tax money to CH, but Gray had pocketed the money and filed fraudulent returns.  Gray later pleaded guilty to a charge of tax evasion in connection with these taxes.

In June 1995, Gray arranged with himself to "sell" Chariot's ESP stock to a shell company for a ten-year note for $15 million from another shell company, called "Hallowell Industries."  The revelation of Gray's looting and the ESP sale resulted in a stockholder derivative action in New York.  Richardson gathered the evidence and arranged and paid for the

legal work.  Much of the work was done by Richardson's firm or Richardson himself (A-295 et seq.).

Shortly after the stockholder derivative action was initiated, Gray engineered a "freeze out" merger of Chariot into Summit Metals, a shell company, which was to issue 10-year notes to Chariot stockholders.  The announcement of the merger resulted in a second action seeking to nullify the merger.

The lawsuits resulted in a temporary restraining order in 1995 (A-53) and later a preliminary injunction, with a decision issued in October 1996 (A-56), and a formal order entered in January 1997 (A-72)(the "New York Injunction") enjoining Gray from further looting of ESP, B.F. Rich or Homestar or engaging in transactions out of the ordinary course of business, and from effectuating the sham merger.

Among those seeking administrative compensation, Richardson was solely responsible for the temporary restraining order and injunction.  The findings in these proceedings constitute the first 41 findings and conclusions of Judge Jordan's decision of August 6, 2004 (A-134).

By January 1997, Richardson was dealing with Gray's suit against him as well as paying for the stockholder actions, and sought new counsel for the stockholder actions on a contingency basis.  As acknowledged in his fee application, Prussin was first substituted into the case in February 1997, after Richardson had already obtained the New York Injunction on behalf of the stockholders (A-185).

B. First Suit Against Richardson.

In retaliation for Richardson's sponsorship of the stockholder suits, Gray sued Richardson, a former officer of Chariot, for breach of his fiduciary duty to Chariot.  In March 1997, Richardson won summary judgment, dismissing the claims against him and holding that he

was entitled to indemnification for successfully defending the suit (A-84).  The judgment was affirmed on appeal (A-92).  Of necessity, the judgment only ran through March 1997.  The costs of the proceedings to establish the amount of the award and the appeal were not part of the original judgment.

The appellate decision held that under the corporation's By-laws and the Delaware General Corporation Law, Richardson was entitled to be compensated for his own time spent in defending the action against him and in prosecuting his claim for indemnification. *Gray v. Richardson*, 251 A.D.2d 268, 675 N.Y.S.2d 57 (1st Dept. 1998), leave to appeal den., 92 N.Y.2d 815, 706 N.E.2d 747, 683 N.Y.S.2d 759 (1998).

A few days before filing for bankruptcy, Richardson was paid his judgment through March 1997 with earmarked money from a company called Riverside Millwork (Rivco).  Soon thereafter, as described below, Gray would sue to get the money back.

C. The Summit Chapter 11 (Dkt. #98-02870).

In October 1998, Gray was found in contempt for having taken ESP's money in violation of the New York Injunction.  It was then known that some of this money was used in 1997 to buy interests in two companies in the window and door business, Rivco and Jenkins Manufacturing (Jenkins).  Gray was ordered to pay $4.3 million back to ESP.

In December 1998, the U.S. District Court for the Southern District of New York granted partial summary judgment to the IRS and set trial on the issue of fraudulent transfer relating to the ESP "sale" for February 1999.  *Chariot Plastics v. U.S.,* 28 F.Supp.2d 874 (SDNY 1998). Gray filed for bankruptcy in Delaware for Summit later that month.

Summit had no business, assets or employees. There were about six actual creditors, including Richardson, who was owed about $50,000 for 1997 and 1998 fees and expenses. Since

the New York Supreme Court had enjoined the effectuation of the merger of Chariot Group into Summit, the legal status of Summit as Chariot Group's successor in interest was problematic.

A motion was made to dismiss the bankruptcy as a bad faith filing (Summit Dkt. #29). However, the Bankruptcy Court ruled that it was possible to reorganize a shell company with no business or assets, whose only business purpose was to insulate Gray from liability. Even though the case had been pending in the New York state and federal courts for several years, the Bankruptcy Court held that, because of its expertise, it could move expeditiously to resolve the fraudulent transfer issues.

D. Post Petition Renewal of the First Suit vs. Richardson.

Shortly after filing for bankruptcy, Gray/Summit moved in the New York Supreme Court to vacate the Richardson's judgment on the basis of "newly discovered evidence." The motion was rejected and an appeal was ultimately dismissed. This all occurred post petition.

E. The Second Suit and Third Suits vs. Richardson.

In addition, Summit brought two adversary proceedings against Richardson, to establish a preference for the December 1997 payment and for "racketeering." The latter suit, which was against Richardson, his firm, has family and his clients, as well as others, was promptly dismissed, though not without some consternation. The adversary proceeding lasted until 2005 (Dkt. #A-99-126). Richardson used the adversary proceeding against him to obtain discovery from third parties in New York, such as banks, which established the amount and source of funds used for the acquisitions of Rivco and Jenkins.

F.  Delaware Committee Adversary Proceeding.

Richardson became Chairman of the creditors committee (there were no other candidates), and the Committee obtained the right to prosecute claims of the debtor against Gray and "Gray entities."  It engaged Prussin on a contingency basis to prosecute the claims.

In October 1999, the Committee brought an adversary proceeding against Gray and his various entities (Dkt.# A-99-557).  The first item of relief sought was the rescission of the ESP "sale."   The proceeding, which was based on the New York litigation initiated by Richardson, also sought damages for the looting and tax liabilities and a constructive trust on the corporate opportunities, Rivco and Jenkins, as well as two real estate companies that owned the plants (A-97).

The corporate opportunity claims were based on discovery done by Richardson in the adversary proceeding against him.  That discovery had shown that Gray had used ESP's money and credit to pay the entire purchase price for two additional operating companies and related real estate.  The Committee did not seek judgment on the Hallowell Note, which it argued was worthless.

Paragraph 70 of the Committee Adversary Complaint read:

> "Gray, Harcar and other defendants used millions of dollars improperly extracted from ESP, either directly or by utilizing its lines of credit, to pay for their purchase of other corporations and assets, including the stock and/or assets of defendants Riverside, Rivco Realty, Jenkins, Jenkins Realty and Rich Realty.  Both Riverside and Jenkins are, like ESP, in the business of manufacturing windows and doors for the home construction market.  ESP, whose funds were used for these purchases, had the capability of acquiring them in its own name.  Accordingly, the purchases of Riverside and Jenkins were corporate opportunities that Gray misappropriated from ESP for his own personal benefit."

Prussin immediately moved for partial summary judgment, seeking the rescission of the ESP transfer, the primary relief sought.  ESP, including its subsidiary B. F. Rich, was worth at

least $15 million, the face amount of the Hallowell Note, but the Hallowell Note was a worthless piece of paper (Dkt.#4). ESP was the key to everything. It was the source of all assets and revenues, and all the corporate opportunity claims ran through it.

Before the motion for partial summary judgment could be heard, Gray moved to "remove the reference" and transfer the case from the Bankruptcy Court, which had been hearing various motions for more than a year, to the District Court (Summit Adv. Dkt.#32). In a ten-page brief, Committee Counsel, without prior approval, apologetically conceded that the adversary proceeding was not a "core" proceeding under 28 U.S.C. 157(b)(2), but that the Court should consider as a non-core proceeding under §157(b)(4). In fact, it was a "core" proceeding under several of the subsections of §157(b)(2), i.e., (A),(E),(F),(H) and (O), but that was not argued. The case was accordingly designated "non-core" and the reference was removed.[4]

After four years in the New York Supreme Court, two years in the U. S. District Court for the Southern District of New York and one year in the Delaware Bankruptcy Court, the case was starting again from scratch in a fourth court that considered the case, now labeled as "non-core," as less than urgent. Dismissal of the bankruptcy proceeding had been denied on account of the expertise and efficiency of the Bankruptcy Court, which was no longer applicable.

After hearing oral argument in May 2000 on the Committee's partial summary judgment motion, The District Court then placed the motion on its "less than urgent" pile for more than two years. That motion was joined on the "less than urgent" pile by several pending discovery motions, ensuring that nothing would happen soon in the case in Delaware.

Finally, in July 2002, Richardson complained to the Third Circuit about the delay, and Prussin moved to lift the bankruptcy stay so the case could go back to the New York State courts

---

[4] This virtual default led the Committee to seek new counsel.

(Summit Dkt. #301).  In response to the Third Circuit complaint, the District Court denied

summary judgment (Summit Adv. Dkt.#96) and transferred the case to another judge in January

2003.

The Bankruptcy Court was essentially left with nothing to do.  In 1999, there were 188

docket entries.  In 2000, there were 61 entries, 20 relating to Richardson's plan of reorganization

that was rendered moot by the removal of the adversary proceeding to the District Court.

In 2001, there were 41 docket entries, 15 of which related to Richardson's motion to

transfer the bankruptcy of ESP to Delaware, and 7 of which were related to applications by

Debtor's counsel do withdraw because it was not being paid and it had nothing to do.

In 2002, there were 19 docket entries, seven of which related to the Committee's relief

from stay seeking to move the case back to the New York Supreme Court because the

Committee Adversary Proceeding was going nowhere in the District Court.

In 2003, there were 3 docket entries, 2 of which were status reports.  Approximately 75%

of the docket entries occurred under Judge Walrath in 1999 and 2000.

During this period, there were no monthly operating reports.  Over a five-year period,

there were operating reports for January and February 1999, and none thereafter until the

appointment of the Chapter 11 Trustee.

G.  The Tennessee Chapter 11 (Dkt. #00-bk-9273).

In the meantime, the Debtor's assets were fast disappearing.  An involuntary bankruptcy

proceeding was filed against ESP in the Middle District of Tennessee in the fall of 2000.  Gray

then converted the bankruptcy to a Chapter 11 and took control.  Gray had thus cut off Summit

from its assets, which were now under the control of the Tennessee Bankruptcy Court.

Committee Counsel thought all was lost, negotiated an unapproved settlement that would have

paid Committee Counsel but left creditors and stockholders with nothing, and stood by as Gray

filed a motion in Delaware to convert the case to a Chapter 7.  When Committee Counsel

defaulted, Richardson opposed the conversion motion (Summit Dkt. #247).[5]

In Tennessee, Gray first engineered an emergency 363 sale of B. F. Rich, ESP's

profitable operating subsidiary, to a Gray-controlled shell, for $4.5 million in cash and two notes,

for approximately $1.75 million and $3.75 million, the first of which was short term.  Prussin

and Richardson both unsuccessfully opposed the sale on the basis of the New York Injunction.

Nonetheless, the Tennessee Bankruptcy Court approved the sale, because it was not established

that B.F. Rich's purchaser, known as "ESPAH," was owned by Gray, which would have invoked

the Injunction.

Richardson moved to transfer the Tennessee bankruptcy to Delaware under Rule 1014(b)

based on the assumption that Summit was the rightful owner of ESP (ESP Dkt. #164).  Hearings

were held in Tennessee before a skeptical Court, which concluded that ESP was probably an

"affiliate" of Summit, and allowed the motion to proceed in Delaware, and stayed a pending

motion to enjoin the Delaware Adversary Proceeding.

In Delaware, because of its inactivity, the case was referred to the first of several (8 in

all) temporary judges, who denied the motion because the Tennessee Creditors expected their

bankruptcy to be completed in a few months[6] while the Delaware case was going nowhere

(Dkt.#273).  However, the motion did establish, in the minds of the Tennessee Creditors'

Committee Counsel, that Summit was the rightful owner of ESP.

---

[5]  The time records of Committee Counsel contain no entries around the time Richardson
opposed the conversion motion (A-266).
[6] The Tennessee case took three years longer than the Tennessee Committee expected.

Gray then filed a plan or reorganization (ESP Dkt. #176) providing for payment of the administrative fees and general creditors out of the proceeds of the first note. The second note, which was to be paid to ESP's equity holders, would never be paid because of classifications established under the plan subordinating the equity to Gray's own spurious claims. The reorganized debtor would have the authority to pursue "estate claims", including "claims for transfers of property which are avoidable or recoverable," such as the corporate opportunity claims relating to Rivco and Jenkins. In order to make payments on the first note, Gray needed additional financing.

In April 2001 Gray brought an adversary proceeding against Richardson and the Delaware Committee seeking to enjoin the Delaware adversary proceeding. In June 2001, The Tennessee Court found that the automatic stay was violated by the Delaware adversary proceeding, but a preliminary injunction was denied provided ESP was dropped from the Delaware adversary proceeding. However, the Tennessee Court that if the Committee pursued claims belonging to ESP, he would consider further sanctions.

> "As to the violation of the automatic stay, the Court finds that the Defendants have violated the automatic stay imposed by § 362 when this involuntary case was commenced. The action in the adversary proceeding pending in the Delaware District Court seeks either relief from this Debtor or seeks to establish some dominion or control over claims and other assets of the Debtor. … This Court is accordingly left with attempting to fashion an appropriate remedy for the violations of the stay having continued against this Debtor and its assets and hereby orders the Defendants to either non-suit or dismiss Energy Saving Products from the Delaware District Court adversary proceeding within ten days from the date of the entry of this Order. Furthermore, this Court will consider additional sanctions should the Defendants take any action against any assets of the Debtor or pursue any action belonging to the Debtor in the Delaware District Court action."

ESP was dropped as a party to the Delaware adversary proceeding, and at Richardson's suggestion, the complaint was later amended to claim that the corporate opportunities belonged to Summit rather than ESP.  The Delaware Committee then moved in Tennessee to lift the stay against its adversary proceeding, but the Tennessee Court, on August 24, 2001, denied the motion (ESP Dkt. #263).  Thus it remained unclear which entity owned the corporate opportunity claims.

Summit Committee Counsel filed a perfunctory claim in May 2001 in the ESP bankruptcy, without any details or legal theories, but never followed through.  It was left for Richardson acting with local counsel in Tennessee to prosecute Summit's claims.

When objections were made to the Summit claim, Richardson responded on behalf of the Delaware Committee in June 2001 (ESP Dkt. #209), together with local counsel whom Richardson had employed, advancing two claims – that dividends paid by ESP should have gone to Summit and such declared but unpaid dividends were a debt, and that ESP, as successor by down-stream merger to the entity that bought it, was itself liable for the Hallowell Note (A-434).  Richardson then participated with local counsel in preparing the joint pretrial statement on behalf of the Committee in July 2001 (ESP Dkt. #224)(A-436).  Committee counsel did not participate in prosecuting Summit's claim, but did respond to the adversary proceedings against the Delaware Committee and those associated with it, including Committee Counsel.

Throughout the Tennessee proceedings, Richardson incurred the expenses of two sets of local counsel (Baker, Donelson and Dinsmore & Shohl), on behalf of himself and the Committee, Wolf Block and Prussin, all of whom were defendants.  Wolf Block and Prussin were asked to share the costs, but refused to respond to Richardson's requests.[7]

---

[7] Richardson incurred more than $55,000 in fees in Tennessee.

Gray's first note for the purchase of B.F. Rich stock was secured by the B.F. Rich stock. To complete the acquisition of B.F. Rich, Gray needed to pay off the first note, and to do that, he needed financing. Gray managed to arrange financing, but Richardson intervened by informing the financing bank (PNC) of the New York Injunction that, in Richardson's view, would have prohibited using the assets of B.F. Rich to support the financing (A-454).

Gray brought an emergency motion in Tennessee in February 2002 (ESP Dkt. #347) to approve the financing, enjoin anyone from interfering with it and insulating PNC for any liability for violating the New York Injunction. By this time, Gray had been indicted for bankruptcy fraud in Missouri, and was being held in prison without bail. The motion blamed Richardson for obstructing the financing, and asked that he be enjoined from interfering.

Gray's credibility was gone, his emergency motion was denied to the extent that the Court refused to insulate PNC from liability. As a result, Gray's plan of reorganization, for which the disclosure statement had already been approved, was dead. He defaulted on the first note, and the Tennessee Creditors' Committee levied on the B.F. Rich stock and later sold it off. The Tennessee Creditors' Committee was later granted authority to act on behalf of the ESP.

H. The Homestar Chapter 7 EDMO Dkt.# 97-51831).

Homestar Industries, headquartered in Missouri, was another Chariot/Summit corporate opportunity, acquired with ESP's money and credit and placed in the name of another Gray entity. Homestar was rightfully owned by Chariot/Summit and was referred to in the October 1996 decision of the New York Supreme Court (A-69) and protected by the New York Injunction (A-79, 80, 81). When an involuntary petition was filed against it in 1997 and later converted to a Chapter 11 by Gray, it may well have been insolvent. This did not prevent Gray from looting it.

Gray transferred and commingled cash and assets from one controlled company to another of the approximately 55 corporations that he controlled.  Cash diverted from Homestar was used by other Gray entities, and when an adversary proceeding in the Homestar bankruptcy brought by the Chapter 7 Trustee, in part for violating the New York Injunction, was settled, Gray used money that had been earmarked to satisfy the contempt order against Gray in New York.

Apart from the commingling, the most significant aspect of the Homestar bankruptcy was Gray's indictment for bankruptcy fraud in December 2001, as a result of the referral from the Chapter 7 Trustee pursuant to 18 U.S.C. §3057(a).  Richardson worked with special agents of the FBI and the U.S Attorney's office to guide them through the maze of Gray's approximately 55 different corporate entities.

The indictment and subsequent guilty plea of Gray arising out of the bankruptcy of one of his affiliates that commingled funds with several of the defendants in the Delaware adversary proceeding had the effect of coloring everything Gray said or wrote thereafter.

I.  Return to Delaware.

The Delaware Committee's adversary proceeding was reassigned to Judge Kent Jordan in January 2003.  Progress was intermittent because Gray was in jail and not paying his lawyers. Since it would be difficult for Gray to defend the case in jail, the Committee agreed that he could be released from the contempt incarceration after completion of his federal incarceration so long as Gray escrowed the shares of Rivco and Jenkins.

After several delays, trial was set for January 2004.  Rather than appear, Gray filed a bankruptcy petition in the Northern District of New York, but the Committee successfully lifted

the automatic stay.  The trial proceeded, and Gray did not show up.  Since Gray's personal

bankruptcy did not have its desired effect, Gray later abandoned it.

With the issues submitted to the District Court, the Tennessee Committee, which was

conducting the bankruptcy in Tennessee on behalf of the Debtor (there was no trustee), began

negotiations with the Delaware Committee to resolve the claims of the latter.  Committee

Counsel thought the claims in Tennessee were a waste of time and money.  However, at

Richardson's insistence, the Delaware and Tennessee Committees stipulated to a compromise

whereby Summit would receive the stock of ESP, which still had various assets (unaccounted for

receivables) and claims (against third parties), as well as all ESP's claims against Gray.  The

compromise was approved by the Tennessee Bankruptcy Court in April 2004. (ESP Dkt. #592)

Although Gray did not appear at the trial, he filed a post-trial brief in which he argued

that the corporate opportunity claims rightfully belong to ESP, not Summit.  In response, Prussin

and Committee Counsel argued that after depriving Summit of its equitable interest in ESP, Gray

was in no position to make that argument.  Then Prussin and the Committee played their ace of

trumps.

> "In any event, the issue is moot because Summit has acquired all
> of ESP's right, title and interest in these corporate opportunity
> claims, whatever that interest might be." (The ESP settlement
> agreement was then attached as Exhibit A to the brief.)(Summit
> Reply Br. P. 13)

In August 20004, the District Court issued findings of fact and conclusions of law, 75%

of which were based on facts and theories already established by Richardson or evidence

obtained by Richardson in defense of the actions against him.

Since Gray essentially defaulted the findings and conclusions were overwhelmingly in the Committee's favor, with one very significant exception. In footnote 114 to the Findings and Conclusions (A-168), Judge Jordan wrote:

> "Because Gray is liable for money damages for his breach of the fiduciary duties of loyalty and good faith to Chariot, and because the ESP stock is, at this point, of questionable value, see supra n. 59, Summit's inconsistent request to rescind the sale of ESP and direct Gray and the Gray Entities to transfer all shares of ESP stock they own or control to Summit will be denied."

Even with Gray defaulting, Committee Counsel and Prussin failed to obtain the primary and most important item of relief that it sought. Richardson in vain requested Committee Counsel to seek a modification of the findings and conclusions. The total amount of the judgment added up to $40 million, and only a portion of that was collectable. Any additional money judgment against Gray was redundant and essentially worthless, whereas ESP had a variety of claims, such as missing receivables and claims against third parties, which could be exploited.

However, the compromise in Tennessee, giving Summit ESP's rights against Gray, preserved the corporate opportunity claims for the ownership of Rivco and Jenkins. It was ESP that was in the window business, and the assets of which were used to acquire Rivco and Jenkins. Summit, a shell, was at best in the holding company business. Debtor's counsel had in fact described Summit as being in the "litigation business." Summit, apart from its ownership of ESP, had no claim for corporate opportunity.

The significance of this ruling may have been overlooked by Judge Jordan and Committee Counsel, but it was not lost on Gray. He appealed the approval of the compromise in Tennessee based upon the footnote 114, and won! (ESP Dkt. #661)

The compromise was therefore amended in October 2004 to exclude the ESP stock from Summit's assets.  However, at least the right to ESP's claims against Gray remained, and Gray had no basis for seeking to rescind the transfer of the Rivco and Jenkins stock to Summit.

ARGUMENT

## I.  THE NEW YORK INJUNCTION OBTAINED BY RICHARDSON SUBSTANTIALLY CONTRIBUTED TO THE ESTATE.

Judge Carey found (A-32):

> In this Case, the Preliminary Injunction Proceeding … substantially contributed to the estate.  [That proceeding] established facts and theories asserted in the  DE Adversary Proceeding, and thereby "lessened the burden on the Debtor['s] professionals[,]" reduced fees and expenses, and eased the professionals' preparation. … Moreover, [that proceeding] led to the escrow of Rivco and Jenkins stock, ensuring its preservation for the Debtor's estate and its creditors.

Regrettably, misled by the Trustees and Committee Counsel, Judge Carey credited Prussin with the injunction (A-32).

> "The benefits produced from the Preliminary Injunction Proceeding … resulted from the participation of many, especially Prussin"

.

Especially NOT Prussin (also, not "many").  Prussin never claimed such credit.  Prussin's fee application states (A-185):

> "11.  In October of 1996 the New York court issued a preliminary injunction barring extraordinary payments of transfers to Gray or to the Gray Entities.

> "12.  In February of 1997 the law firm of Silverman Harnes Harnes Prussin & Keller was substituted as counsel for the plaintiff…"

Prussin's involvement began after the opinion in October 1996 and the subsequent injunction order in January 1997.  Up until then, Richardson and attorneys employed by

Richardson had done all of the work.  Richardson, not Prussin, not many, was solely responsible for the New York Injunction.

In several instances in his Opinion, Judge Carey said that he could not determine which attorney performed which service.  The simple and obvious method is to review the time records.

As noted above, the first 41 Findings and Conclusions by Judge Jordan in his Decision of August 6, 2004, came directly from the October 1996 opinion granting the New York Injunction. After the 1996 opinion, everything from a factual and legal standpoint was downhill.

The New York Injunction was also used by Richardson to prevent the completion of Gray's plan of reorganization in the ESP bankruptcy that would have prevented any recovery by the Debtor, and for many other purposes.

Judge Carey 's fundamental misconception also carried over into his discussion of the Delaware adversary complaint (A-38).

> "Second, the Complaint's facts and theories originated from multiple sources and did not stem solely from Richardson. <u>Out of the eight causes of action, the first six originated from the NY Shareholder Lawsuits and from the Preliminary Injunction Proceeding.</u>[i.e., from Richardson] … There has been no evidence presented that it was Richardson who developed the facts and the theories in those proceedings.  As to the seventh cause of action — the corporate opportunity claim — the record is unclear who developed it. Finally, although Richardson presented no corroborating evidence to support his claim with regard to the first through seventh causes of action, Prussin testified that the eighth cause of action originated solely from Richardson."(emphasis supplied and bracketed material supplied)

In almost every case, the corroboration is contained in the detailed time records. There is no dispute that Richardson originated and brought the original New York action and obtained the New York Injunction, which contributed the first six causes of action. Therefore, of the eight causes of action in the Delaware Committee's Adversary

complaint, seven of them, indisputably, originated with Richardson, and the origin of the eighth is disputed.  Seven out of eight – and maybe eight out of eight -- is a lot of substantial contribution.

II.  RICHARDSON'S ACTIVITIES IN THE ESP BANKRUPTCY THAT (A) ESTABLISHED THE DEBTOR'S EQUITABLE INTEREST IN ESP; (B) PROSECUTED THE DEBTOR'S CLAIMS AGAINST THE ESP ESTATE AND (C) PREVENTED THE SUCCESS OF GRAY'S PLAN OF REORGANIZATION, BOTH PRESERVED AND SUBSTANTIALLY CONTRIBUTED TO THE ESTATE.

Richardson's efforts in connection with the ESP bankruptcy fall into the categories of "preserving the estate" (§503(b)(1)(A)) and "substantial contribution." (§503(b)(3)(D))

When an involuntary bankruptcy petition was filed against ESP in 2000, and after Gray converted the proceeding to a Chapter 11, the locus of activity moved to the Middle District of Tennessee, which then controlled virtually all of the assets of the Debtor's estate.  Committee Counsel was ready to throw in the towel, and without consulting anyone, arranged a settlement that Richardson overruled.

Since Committee Counsel was reluctant to act (it was not being paid, there being no assets in the Delaware estate), Richardson filed his own motion in Tennessee and Delaware under Bankruptcy Rule 1014(b) to transfer the ESP proceeding to Delaware and bring assets into the Delaware proceeding (ESP Dkt.# 164).  Since Richardson had been unaware of this option, the motion was made several months into the ESP bankruptcy, after Gray had already obtained Court approval to sell B.F. Rich, a profitable operating subsidiary, to a company known as "ESPAH."  However, the transfer motion was filed before the Tennessee Court could hear Gray's motion to enjoin the Delaware adversary proceeding as a violation of the §362 stay.

For the Tennessee Court to entertain Richardson's motion, Richardson had to persuade the Court that ESP was an "affiliate" of Chariot/Summit. On the other hand, Gray claimed that he owned ESP through a company called "Harcar," notwithstanding that Gray had not given anything but a promissory note from a shell company for such ownership.

Based on the New York Injunction, Richardson was able to make the required showing in Tennessee, which resulted in a stay of Gray's motion for an injunction against the Delaware Committee. Ironically, Committee Counsel, who traveled to Tennessee merely to observe the proceedings, but not to participate, was paid for his time and expenses. Richardson, who brought the motion, and engaged and paid for local counsel, was not compensated for time or expenses.

The motion was heard in Delaware by the first of several temporary judges, who concluded that since the Delaware case was dormant, the adversary proceeding against Gray having been removed to the District Court, where it was also dormant, it would be unfair to hold up the ESP bankruptcy by moving it to Delaware. The temporary judge then issued an order show cause, *sua sponte*, why the Delaware proceeding should not be dismissed or converted (Summit Dkt.#269), a motion that Richardson and the Committee had already resisted on two prior occasions.[8]

The Rule 1014(b) proceeding had the effect of convincing that Tennessee Court and the Tennessee Committee that Chariot/Summit was the rightful owner of the ESP stock.

In its decision below, the Bankruptcy Court stated that (A-36-7):

---

[8]  When Committee Counsel defaulted, Richardson objected at the last minute to Gray's motion to convert the Delaware bankruptcy to Chapter 7 (Del. Dkt. #247).

> [Richardson] filed a separate claim in the TN Bankruptcy
> Proceeding and 'prosecuted [both the Committee's claim and his
> claim] on behalf of the Committee. . . .' (Hr'g Tr. 33:22-23, Mar.
> 16, 2006.) … it was duplicative of the Committee's effort."

On the contrary, Richardson's effort <u>was</u> the Committee's effort so far as the prosecution of the Debtor's claims.  One way to show this is by a comparison of the time records of Richardson and Committee Counsel.  On June 18, 2001, the Debtor responded to objections to its claim, in a response prepared by Richardson.  Richardson's time records show considerable activity for that day and prior periods (A-434).  Committee Counsel makes no reference to the response in that time period (A-276).

Two weeks later, Richardson wrote the pretrial statement on behalf of the Committee with respect to the Debtors' claims (A-436).  This is not to say that Committee Counsel was idle.  Paul Brenman was occupied with the suit by ESP against the Delaware Committee, and he prepared the pretrial statement on behalf of the Committee for that proceeding.  Prussin was occupied with the contempt proceeding against Gray in New York.  There was a division of labor.

When the Debtor's claims in the ESP bankruptcy became an issue again in the fall of 2003, Committee Counsel, as shown by its time records, spent many hours to familiarize itself with the Debtor's claims and the legal theories supporting them, which had been formulated by Richardson (A-277-278).

With no assets in the Debtor's estate and no one being paid, it made sense to compromise the Debtor's claims in the ESP bankruptcy to include the ESP stock, which carried with it several valuable claims, and ESP's claims against Gray, which included

the corporate opportunity claims.  The ESP Bankruptcy Court had previously refused to

lift its stay to permit Chariot/Summit to pursue these claims

     The Bankruptcy Court, in attempting to trivialize the ESP proceedings, wrote (A-36):

> "The Committee, in resolving the proof of claim dispute,
> relinquished the Debtor's claim against ESP. As a result, ESP's plan
> of reorganization and its proposed distribution schedule bore no
> effect on the Debtor's estate and creditors."

     A look at the docket in either Tennessee or Delaware quickly shows this

conclusion to be wildly inaccurate (See ESP Dkt. #572 and Summit Dkt. #314, approving

the compromise and ESP Dkt. #661, modifying compromise).  The Debtor's claims were

not relinquished.  They were traded for ESP's stock and its claims against Gray,

including ESP's corporate opportunity claims.

     The Bankruptcy Court also stated (A-37):

> " … no evidence has been submitted to demonstrate a resulting
> benefit to the estate or creditors. <u>See, e.g.</u>, <u>Essential</u>, … Judge
> Jordan's opinion in the DE Adversary Proceeding found that "the
> acquisition of Rivco and Jenkins were corporate opportunities that
> belonged to Summit" — not ESP. (Ex. 509 ¶ 94.)

     Again, this statement by the Bankruptcy Court is totally false insofar as it states

that Judge Jordan found that Rivco and Jenkins were not corporate opportunities of ESP,

and indicates that the Court was unfamiliar with Judge Jordan's Findings and

Conclusions.  The relevant paragraphs by Judge Jordan are as follows (A-160):

> "64. At the time of these acquisitions, <u>ESP, B.F. Rich, Jenkins and
> Rivco were all in the same line of business</u>.  Kelly testified that
> Jenkins and Rivco were acquired precisely because they were a
> "good fit" with Gray's existing companies, ESP and B.F.
> Rich.

> "65. Because the opportunity to acquire Rivco and Jenkins were
> within the line of business of Chariot and Summit, it appears that <u>if</u>

28

Gray had not transferred ESP, B.F. Rich, and the management services businesses away from Chariot, then Chariot or Summit could have taken advantage of these opportunities.

67. The funds Gray used to purchase Rivco and Jenkins, apart from what was paid or borrowed by the acquired companies, were obtained directly or indirectly from dividends or other payments made by ESP.   Specifically, the $1 million equity investment used in the acquisition of Rivco was part of a $2.2 million dividend Gray caused ESP to pay to Harcar.  The $700,000 equity investment in Jenkins was also obtained from dividends paid by ESP.

"94. Rivco and Jenkins operated in Summit and its subsidiaries' lines of business, namely window and door manufacturing. Summit could have acquired Rivco and Jenkins if Gray had not diverted this line of business from Summit and breached his fiduciary to duties to Summit by wrongfully using assets of ESP to acquire those companies. *Milton*, 221 A.2d at 497 (fiduciary usurps a corporate opportunity if he employs the corporation's resources to acquire a business opportunity for himself). Finally, Gray's decision to use ESP assets and Gray's decision to have Kelly and Aylward, Summit's operating executives, serve as the operating executives of Rivco and Jenkins, demonstrates that Summit would have had an interest in acquiring Rivco and Jenkins. Accordingly, the acquisition of Rivco and Jenkins were corporate opportunities that belonged to Summit."

At no point did Judge Jordan conclude that Rivco and Jenkins were not corporate opportunities of ESP.  Without ESP, Summit was not in the window business.  The Committee's Reply Brief conceded that the Rivco and Jenkins might be opportunities of both ESP and Summit, but it was academic because Summit had acquired ESP's rights against Gray – thanks to Richardson.

The Bankruptcy Court's statement also fails to appreciate that there were two plans of reorganization in Tennessee: Gray's plan, which would have wiped out the Chariot/Summit claims, and the Tennessee Committee's plan, which as a result of a compromise gave the ESP stock and ESP's claims against Gray to Chariot/Summit.

The Gray plan was defeated by a combination of circumstances, all involving

Richardson.  The original §363 sale of B.F. Rich to ESPAH was not blocked because the New York Injunction forbade transfers of ESP assets to Gray but not necessarily to third parties.  At the time, of the approval, Gray's ownership of ESPAH was concealed. Gray's disclosure statement, which did not mention the New York Injunction (but attributed all the litigation against him to Richardson), had been approved.

During the Gray contempt hearings in New York, a mass of information was produced, to which Richardson had access because he had previously intervened in that proceeding to overturn a confidentiality order.  The information produced included tax returns and accountant work papers showing Gray's ESPAH ownership.

Richardson's time records state, that on September 5, 2001, Richardson attended the contempt hearings and reviewed the tax returns (A-444-445).  The next day he was on the phone to the U.S. Trustee in Tennessee.  On September 10, 2001, he reviewed further materials, and on September 11, 2001, when the contempt hearing was postponed due to an attack on the World Trade Center, Richardson managed to get back to his office and fax the Tennessee Trustee information about Harcar's ownership of ESPAH.

On December 7, 2001, Gray was indicted for bankruptcy fraud in Missouri and taken into custody by the U. S. Marshall's service and held without bail.  This did not enhance Gray's credibility.  Gray had already been remanded to custody as a result of the New York contempt proceedings.

Armed with the information from the New York contempt proceeding, Richardson confronted PNC Bank, which was to finance Gray's acquisition of B.F. Rich, with the New York Injunction, and the fact that Gray was in jail for violating it (A-454). PNC would not proceed without assurances from the Tennessee Bankruptcy Court.  In an

emergency motion to approve the financing and insulate PNC from liability (ESP Dkt.

347), Gray's motion stated:

> "15.  In order to pay the $1.6 million on Note A pursuant to the Compromise Order, ESPAH and B.F. Rich must obtain financing.
> …
> "19.  On or about December 20, 2001, … Richardson sent to PNC a telecopy transmission … Mr. Richardson threatened PNC that a proposed financing of BF Rich might violate the New York State Court injunction.
>
> "20.  Because of Mr. Richardson's notice to PNC, PNC is not willing to go forward with the proposed financing of BF Rich and ESPAH without an assurance that the proposed financing arrangement, and its security interests thereunder, will be fully enforceable."

Although the Tennessee Court granted the motion approving the financing, the

approval was without the requested relief concerning the New York Injunction.  As a

result, Gray's plan was dead, and Chariot/Summit's claims were still alive.

III.  IN SUCCESSFULLY RESPONDING TO FOUR PROCEEDINGS (NOT COUNTING SANCTIONS MOTIONS) BROUGHT AGAINST HIM POST PETITION BY THE DEBTOR OR ITS AFFILIATES, RICHARDSON ENGAGED IN "TRANSACTIONS" WITH THE DEBTOR.

The Bankruptcy Court rejected Richardson's 503(b)(1)(A) claims on the grounds

that he did not have any post petition "transactions" with the Debtor.  With respect, being

on the receiving end of a lawsuit or adversary proceeding feels very much like a

"transaction."  Although the Bankruptcy Court dutifully recites the several proceedings, it

failed to make the connection between those proceedings and a "transaction."

Richardson established his right to indemnification in the New York Supreme

Court, and that right was sustained by the Appellate Division, which also sustained his

right to collect for his own time as an attorney. *Gray v. Richardson*, 251 A.D.2d 268, 675

N.Y.S.2d 57 (1st Dept. 1998), leave to appeal den., 92 N.Y.2d 815, 706 N.E.2d 747,683

N.Y.S.2d 759 (1998).  This decision is entitled to full faith and credit. 28 U.S.C. §1738.

In fact, Richardson's pre-petition claim for fees and expenses, advanced on the

same theory as approved in the New York Appellate ruling, was allowed in full.

In disallowing Richardson's defense claims, the Bankruptcy Court cited a number

of cases involving indemnification where a contract was entered pre-petition and

corporate officers were sued by third parties for pre-petition events, but the expenses of

defense were incurred post-petition.  It is difficult conceptually to distinguish

indemnification contracts from lease or royalty agreements that, if entered pre-petition,

are given administrative expense treatment for post-petition charges, and it is

questionable whether the indemnification cases cited are logically consistent.

In any event, Richardson's case is distinguishable because it is based on

proceedings brought post-petition by the Debtor itself.  As such, Richardson's cases falls

under the reasoning of the U. S. Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471

(1968).  There the Court held that where a debtor, operating under the protection of the

bankruptcy laws, causes damage or expense, then in the interest of fairness, the party

damaged should be able to obtain compensation as an administrative expense.

This reasoning has been followed in numerous contexts, including reimbursement

for legal defense costs (see, e.g., *In re Met-L-Wood Corp.*, 115 B.R. 133 (N.D.Ill.,1990)

and *In re American Preferred Prescription, Inc.,* 218 B.R. 680 (E.D. New York. 1998)).

The reasoning was applied to civil penalties for the violation of an injunction *In re*

*Charlesbank Laundry, Inc.* 755 F.2d 200 (1st Cir. 1985), and statutory violations. *In re*

*Hemingway Transp. Inc.,* 993 F.2d 915 (1st Cir. 1993). It was applied by Judge Walrath

in *In re Women First Healthcare*, 332 B.R. 115 (D. Del. 2005).

Although Judge Carey said that the reasoning of *Reading* was confined to tort

claims (A-22, fn.8), there is nothing in the *Reading* decision to so limit its application

and, as shown, it has not been so limited by other courts.[9]  Moreover, Richardson's

claims could be styled as tort claims for frivolous litigation or malicious prosecution, as

well as a statutory claim under Delaware Gen. Corp. Law §145.[10]  Three of the four

proceedings against Richardson (the proceeding to vacate Richardson's original

judgment, the preference claim and the racketeering claim) were unquestionably

frivolous.

Richardson's defense of the Delaware adversary proceeding against him also

made a substantial contribution to the estate, although this is not necessary for the success

of this claim.  As shown by Richardson's detailed time records(See, e.g., A-363 – 389),

---

[9] The Court in MetLWood wrote: "The decision in *Reading* called for "fairness to all persons having claims against the insolvent." 88 S.Ct. at 1763. Although *Reading* involved a tort claim against the estate, the doctrine has been extended beyond the tort context. In *Yorke v. N.L.R.B.,* 709 F.2d 1138 (7th Cir.1983), the Seventh Circuit cited *Reading* for the proposition that those injured during the administration of the estate by the Trustee are entitled to priority as an administrative expense. 709 F.2d at 1143. Several courts have applied *Reading* to award attorney's fees and costs resulting from the trustee's frivolous litigation. *See In Re Airwest International,* No. 86-00145, 1988 WL 113101 (Dist. Hawaii October 12, 1988), *citing In Re E.A. Nord Co., Inc.,* 78 B.R. 289 (Bankr.W.D.Wash 1987); *In Re Charlesbank Laundry, Inc.,* 755 F.2d 200 (1st Cir.1985); *In Re Chicago Pacific Corp.,* 773 F.2d 909 (7th Cir.1985). Although it is not clear that the Trustee's litigation was frivolous, none of his attacks on T & Z proved to have any merit whatsoever. We agree with Judge Coar's finding that fundamental fairness entitles T & Z to reimbursement of its related expenses as an administrative expense under *Reading*".

[10]  Judge Carey cited to COLLIER BANKRUPTCY MANUAL, ¶503.06[2], but did not read far enough.  Otherwise he would have reached ¶503.06[3][c], which supports Richardson's claim.

in August, September, October, November and December of 1999, Richardson

subpoenaed records of various lenders to ESP and Chariot/Summit, namely Fleet Capital,

Brown Brothers Harriman and CIT Financial, as well as Chariot/Summit's accountants,

American Express Financial Services.

Enforcement of the subpoenas in each case required motions to compel under

FRCP 37 and actual hearings before the U.S. District Court for the Southern District of

New York.   The result of the discovery was evidence that ESP provided all the funds to

acquire Rivco and Jenkins.  This evidence was physically passed on to Prussin (he had

been orally informed before) in December 1999, and later in October 2000 (when some

of them were misplaced by Prussin).  The evidence was later used in the presentation to

Judge Jordan and cited as evidence in Judge Jordan's findings.

In opposing Richardson's claims, the Trustees and Committee Counsel conceded

that Richardson had, through litigation, obtained this evidence, but said that Committee

Counsel and Prussin had duplicated this effort <u>four years later</u>[11] and that Richardson's

earlier efforts were therefore duplicative.

It was also said Richardson's evidence in bringing multiple discovery proceedings

to obtain evidence for Chariot/Summit's corporate opportunity claims was primarily self-

interested, and that any benefit to the bankruptcy estate was incidental.

However, it is absurd to argue that Richardson would spend hundreds of

thousands of dollars of time and money in order to defend against a claim for $50,000.

The adversary claim against Richardson was readily defensible on the ground that he was

paid with earmarked funds from Rivco, and not from the Debtor.  The corporate

---

[11]  Discovery in Delaware was stayed by pending motions to quash made in 2000 that
were not decided until 2003.

opportunity evidence was totally unnecessary for Richardson's defense, but vitally necessary for Chariot/Summit as a whole.  The fact that Richardson acted for the greater good is not a reason not to compensate him.

It was similarly erroneous for the Bankruptcy Court to find that the costs of Richardson's defense in Tennessee was "personal" and not related to the estate.  Richardson was sued in his capacity as Chairman of the Creditors' Committee and for seeking to prevent Gray's acquisition of B.F. Rich.  Committee Counsel and Prussin were compensated for being personally sued (and for traveling to Tennessee), but Richardson, who also traveled to Tennessee, and who incurred the costs of the Committee's local counsel as well as his own, was not.  This is fundamentally unfair.

On the subject of fairness, it should be noted that Gray's legal costs were paid by the Debtor and its affiliates.  Gray was found to have breached his fiduciary duties to the Debtor, but no effort has been made to recover those costs.[12]  Gray injured many other persons to enrich himself.  Richardson, at his own risk and expense, sought to benefit those persons.  It does not make sense that Gray should get preferred treatment.

The public policy of Delaware requires the indemnification of officers and directors in order to encourage persons to serve in those capacities.  The same policy should be extended to members of creditors' committees, as indeed it was in *First Merchants Acceptance v. J.C. Bradford, supra.*

The New York state courts held that Richardson was entitled to collect for his own time in defending the Debtor's suits against him.  The rationale is set out in an opinion that followed the opinion in *Gray v. Richardson, supra.*

---

[12] The Trustees have made no serious effort to collect anything from Gray.  Instead, their time and attention has been largely devoted to attacking Richardson.

> "In Parker 72nd Associates, the court identified some of the
> policies underlying the award of fees to pro se attorneys. From the
> attorney's perspective, he incurs opportunity costs when he devotes
> to his own defense professional time that would otherwise be
> expended on his clients. Were he not representing himself, the
> attorney would have to payfor someone else's professional
> services. Moreover, from the point of view of the adversary, it
> should make no difference whether fees are paid to the attorney
> pro se or to another attorney he hires. Parker 72nd Associates, 109
> Misc.2d at 59, 436 N.Y.S.2d at 544-45.." *Cowan v. Codelia,* 2001
> WL 30501, *affd. 2002 WL 31478922.*

This is not just the law, generally, but it is the law in <u>this case</u>. It was recognized

in the bankruptcy proceeding in the allowance of Richardson's pre-petition claim.

The Bankruptcy Court cited two cases where *pro se* fees were not allowed to

creditors pursuing their claims, but neither of them involved the defense of suits against

the claimant by the Debtor[13].  Both cases spoke of the difficulty in separating the

activities as a creditor from those of an attorney.  It is submitted that when the time

records show the drafting of subpoenas, the making of Rule 37 motions and attendance at

oral arguments at court, the time described is for legal services.

## IV.  THE TAX AND BANKRUPTCY FRAUD CRIMINAL PROCEEDINGS WERE RELATED TO THE CASE OR TO THE BUSINESS OR PROPERTY OF THE DEBTOR.

Gray was convicted of both tax and bankruptcy fraud.  The Bankruptcy Court

completely overlooked the tax fraud case, and concluded that the bankruptcy fraud was

unrelated (A-31-32).  Both proceedings qualify under §503(b)(3)(C).

---

[13] <u>In re Gimelson,</u> Nos. 04-3216, 00-11773F,2004 WL 2713059 (E.D. Pa. Nov. 23, 2004), and <u>In re Pappas,</u> 277 B.R. 171 (Bankr. E.D.N.Y. 2002).  The *Gimelson* case is *sui generis,* and involved questions of double counting and over securitization.

The tax fraud was the same fraud described in paragraphs 6 through 14 of Judge Jordan's Findings and Conclusions and paragraph V of the resulting judgment. Clearly, the tax fraud conviction is related to the case.

The Bankruptcy Court stated that he discerned nothing in the record to indicate a link between Homestar and Chariot/Summit. He only needed to look at the New York Injunction and the underlying opinion. Both refer to Homestar as a corporate opportunity of Chariot. Indeed, Homestar is a party to the New York litigation. It was acquired with Chariot's money and credit, and was rightfully owned by Chariot/Summit.

In indictment and conviction of Gray for bankruptcy fraud affected Gray's credibility in any other bankruptcy proceeding. This was especially crucial in Tennessee, where Gray's acquisition of B.F. Rich and his disclosure statement and plan had once been approved by the Court.

Gray's conviction also affected his credibility in Delaware. In all likelihood, there is no way that Judge Farnan would have delayed decision or denied the Committee's summary judgment motion knowing that Gray had pleaded guilty to bankruptcy fraud. To suggest that Judge Jordan was unaffected is to ignore human nature.

RICHARDSON'S CLAIMS

In his amended application, Richardson classified his claims and organized his time records according to venue, similar to the classifications used by Prussin and Committee Counsel.

| Forum | Time Period | Fees | Expenses | Total |
|---|---|---|---|---|
| NY Stkhlder (i) and (ii) | 6/1/95-12/31/98 | $118, 614.59 | $23,638.17 | $142,252.76 |
| Committee (iv) | 1/1/99-8/31/04 | $19,341.57 | | $19,341.57 |
| Criminal (xiii) | 1/1/99-8/31/04 | $11,466.67 | | $11,466.67 |
| DEL (iv), (vi), (vii) | 1/1/99-8/31/04 | $109,619.24 | $4406.19 | $114,025.43 |
| DEL/MO (viii), (ix) | 1/1/99-8/31/04 | $21,114.58 | $1827.59 | $22942.17 |
| DEL/NH (xii) | 1/1/99-8/31/04 | $14529.17 | $14,170.00 | $28,669.17 |
| DEL/NY (ii), (v) | 1/1/99-8/31/04 | $302,700.94 | $7604.85 | $310,305.79 |
| DEL/TN (x), (xi) | 1/1/99-8/31/04 | $123,656.66 | $55,405.54 | $179,062.20 |
| Gray v. Richardson (iii) | 1/1/99-8/31/04 | $40,990.99 | 544.75 | 41,535.74 |
| Totals | | $762,034.41 | $107,597.09 | $869,631.50 |

Judge Carey then directed that Richardson reorganize and reclassify his claims and nine years of time records according to statute section – an effort that required over a week of time – and then denied everything except the cost of train trips to Wilmington.

| Section | Time Period | Fees | Expenses | Total |
|---|---|---|---|---|
| 503(3)(D)/(4) | 6/1/95-12/31/98 | $118, 614.59 | $23,638.17 | $142,252.76 |
| 503(1)(A)(i) | 1/1/99-8/31/04 | $57,615.06 | $541.55 | $58,156.61 |
| 503(1)(A)(i)/ (3)(D)/(4) | 1/1/99-8/31/04 | $561,380.81 | $81,816.65 | $643,177.46 |
| 503(3)(C) | 1/1/99-8/31/04 | $11,466.67 | $3.00 | $11,469.67 |
| 503(C)/(D)/(4) | 1/1/99-8/31/04 | $19,864.58 | $1,827.59 | $21,692.17 |
| Totals | | $768,921.71 | $107,826.96 | $876,748.67 |

Even when Richardson's claims or testimony was unrebutted, the Bankruptcy Court faulted Richardson for lack of corroboration, or substituted disbelief for evidence. Yet Richardson's claims are corroborated by time records that are vastly more detailed than those of either Prussin[14] or Committee Counsel.  They were also corroborated by extensive documentary evidence, excerpted for dozens of boxes of material, that apparently went unread.

The conclusion that Richardson was not responsible for the New York Injunction, a fact that was never contested, and was supported by copious evidence in the record, indicates a predisposition that makes a fair hearing impossible.

CONCLUSION

The Opinion of the Bankruptcy Court was so thoroughly based on such fundamental misconceptions of the underlying facts and proceedings as to taint the entire

---

[14]  Prussin did not even make a pretense of complying with Local Rule 2016(b).

analysis.  If the Court disbelieved statements that were indisputably true, it was most likely confused about many other factual matters that were viewed in a distorted context.

      With respect to the several post-petition claims by the Debtor against Richardson that he was called upon to defend, the Bankruptcy Court demonstrated a misconception of the law applicable to §503(b)(1)(A).

      The procedures below, which allowed for objections and arguments to which Richardson was not allowed to respond, was fundamentally unfair.

      The appropriate relief would be a remand for rehearing with fair procedures.

April 3, 2008

Respectfully submitted,

_____
    A. M. Richardson
40 Wall Street, 35th Floor
New York, NY 10005
(212) 530-4771; Fax: (212) 267-2030