IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | CHAPTER 11 |
| SUMMIT METALS, INC., | CASE NO. 1:08-cv-0005 (SLR) |
| Debtor. | |
| AMBROSE M. RICHARDSON, III | |
| Appellant, | |
| v. | |
| U.S. TRUSTEE KELLY BEAUDIN STAPLETON, | |
| Appellee. | |

APPELLANT'S REPLY MEMORANDUM OF LAW

## TABLE OF CONTENTS

INTRODUCTION ............................................................................1

I. THE STATUTORY SCHEME. ...................................................1

II. STANDARDS OF REVIEW.......................................................2

III. THE PROCEEDINGS BELOW.................................................3

IV.  THE BANKRUPTCY COURT'S FACTUAL FINDINGS. .......................4

    A. The Correct, Uncontested Rulings...............................................4

        1.  That the Preliminary Injunction Proceeding substantially contributed to the estate..............................................4

        2.  That the Committee Adversary Proceeding, wherein six of the eight causes of action were based on the New York stockholder lawsuits, substantially contributed to the estate............................5

    B.  The Clearly Erroneous Rulings...................................................5

        1.  That the substantial benefits of the "Preliminary Injunction Proceeding" were "especially" due to Prussin, who had no involvement whatsoever in commencing the stockholder lawsuits or obtaining the temporary restraining orders, and no significant involvement in obtaining the preliminary injunction against Gray.......5

        2.  That the theories and causes of action in the adversary complaint came from "many" persons.  That there was no evidence that they originated with Richardson.............................8

        3.  That Richardson's efforts in Tennessee did not substantially contribute to the enlargement or preservation of the estate (this is a mixed question of law and fact) ...................................8

        4.  That Richardson's efforts in Tennessee were duplicative of the Committee's efforts...................................................9

        5.  That in defending himself in Tennessee, Richardson was primarily defending his own interest (this is a mixed question of law and fact)...........................................................10

6.  That the primary purpose of the discovery in the adversary
proceeding against Richardson was for his own interest
(this is also a mixed question of law and fact)............................11

7.  That there is no support for the claim that Richardson uni-
laterally supplied the evidence on which the District Court relied.....12

C. The Belated Demand for Corroboration........................................12

V. THE BANKRUPTCY COURT'S ERRONEOUS CONCLUSIONS OF LAW....14

A.  That the suits by the Debtor against Richardson were not
"transactions" with the Debtor for purposes of Section 503(b)(1)(A)..........14

B.  That Richardson is not entitled to be compensated for his own time
under 503(b)(1)(A) or 503(b)(4).    .................................................15

C.  That Richardson is not entitled to be compensated for the expenses
of attorneys employed by him under 503(b)(4). ................................18

D.  That Richardson's efforts in the Tennessee proceeding did not
substantially benefit the estate......................................................19

E.  That the settlement of the Debtor's proof of claim in Tennessee
did not result in the Debtor's ownership of Rivco and Jenkins...................19

G.  That the Missouri and Connecticut criminal proceedings were not
related to the business or property of the debtor................................19

CONCLUSION..............................................................................20

TABLE OF AUTHORITIES

CASES

*Gray v. Richardson*, 251 A.D.2d 268, 675 N.Y.S.2d 57 (1st Dept. 1998),
leave to appeal den., 92 N.Y.2d 815, 706 N.E.2d 747, 683 N.Y.S.2d 759 (1998).....17

*In re 9281 Shore Road Owners Corp.*, 214 B.R. 676 (E.D. NY 1997) .................18

*In re American International, Inc.,* 203 B.R. 898, 903 (Del. 1996) ......................3

*In re American Preferred Prescription, Inc.,* 218 B.R. 680
(E.D. New York. 1998)..........................................................................15

*In re Charlesbank Laundry, Inc.* 755 F.2d 200 (1st Cir. 1985)..........................15

*In re E. A. Nord Company, Inc.,* 78 B.R. 289 (W.D. WA 1987) ........................15

*In re Gimelson*, 2004 WL 2713059 (E.D. Pa. 2004)......................................16

*In re Hemingway Transp. Inc.,* 993 F.2d 915 (1st Cir. 1993) ...........................15

*In re The Highland Group, Inc.,* 136 B.R. 475, 481 (E.D.OH 1992)...................14

*In re Met-L-Wood Corp.,* 115 B.R. 133 (N.D.Ill.,1990) .................................15

*In re Overland Park Corporation,* 240 B.R. 402 (D.KS 1999)..........................14

*In re Pappas,* 277 B.R. 171 (E.D.N.Y. 2002).............................................16

*In re Patriot Aviation Services, Inc.,* 2008 WL 506260 (S.D.FL 2008)................16

*In re United States Lines, 103 B.R. 427, 429 (SDNY 1989)* .............................2

*Jones v. Lujan,* 883 F.2d 1031, 1034-5 (D.C. Cir. 1989) ..........................16, 17

*In re Women First Healthcare*, 332 B.R. 115 (D. Del. 2005)...........................15

*Lebron* v. *Mechem Financial, Inc.*, 27 F.3d 937 (3rd Cir. 1994).......2, 3, 7, 10, 11, 18

*Reading Co. v. Brown,* 391 U.S. 471 (1968)...............................................15

STATUTES AND RULES

11 U.S.C. §102 ...............................................................................9

11 U.S.C. §330 ...................................................................................2

11 U.S.C. §503(b)..........................................................................1, 18

11 U.S.C. §503(b)(2) ........................................................................2

11 U.S.C. §503(b)(1)(A ........................................................1, 14. 15, 18

11 U.S.C. §503(b)(3) ..............................................................1, 2, 12, 16

11 U.S.C. §503(b)(4) ..............................................................1, 15, 16

28 U.S.C. §1738 ...............................................................................18

Equal Access to Justice Act, 28 U.S.C. §2412(b) ..............................16, 17, 18

8 Del. C. ¶145.................................................................................18

Bankruptcy Rule 1014(b)....................................................................9

Local Rule 2016-2(d)........................................................................8

INTRODUCTION

The U.S. Trustee's answering brief supplies a description of the underlying statutory scheme and the standards of review, but does so in a misleading and incorrect fashion. In reply, this brief will attempt to supply the necessary corrections, and succinctly describe the statutory scheme, standards of review, the proceedings below, the clearly erroneous errors of fact and the erroneous conclusions of law.

The brief of the Chapter 11 Trustee, who was appointed nine years after the case began, demonstrates a lack of substantive knowledge of what transpired before his appointment.

I. THE STATUTORY SCHEME.

Creditors can recover administrative expenses under 11 U.S.C. §503(b)(1)(A), 11 U.S.C. §503(b)(3) and (4).

Subsection 503(b)(1)(A) relates to expenses incurred by the debtor while it is the protection of the bankruptcy laws, i.e. post-petition expenses. Anyone doing business with the debtor post-petition is entitled to claim under this subsection.

Subsection 503(b)(3), has six subsections:

(A) In connection with filing an involuntary petition (not applicable);
(B) In connection with recovering assets for the estate after court approval (not applicable);
(C) In connection with related criminal proceedings;
(D) For making a "substantial contribution (this subsection applies only to Chapter 9 and Chapter 11 bankruptcies);" and
(F) For expenses incurred in connection with service on a committee.

In addition, creditors qualifying under Subsection 503(b)(3) can recover for reasonable expenses of attorneys under Subsection 503(b)(4).

A large portion of Richardson's claims fall under Subsection 503(b)(3)(D)

[substantial contribution], of which the Third Circuit, in *Lebron* v. *Mechem Financial, Inc.*, 27 F.3d 937, 944 (3rd Cir. 1994), wrote:

> Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging "meaningful creditor participation in the reorganization process," *Richton*, 15 B.R. at 855-56 (citation omitted), and "keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Otte v. U.S.,* 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974) (citation omitted).

According to the late Judge Buschman, writing in *In re United States Lines*, 103 B.R. 427, 429 (SDNY 1989):

> "The burden of proof as to the substantial benefit rendered to the estate is on the applicant, and the entitlement to an award must be established by a preponderance of the evidence.[1] *Hanson Industries, 90 B.R. at 409; In re 1 Potato 2, Inc., 71 B.R. 615, 618, Bankr.L.Rep. (CCH) ¶ 71764 (Bankr.D.Minn.1987).*"

Section 503(b)(2) permits payment of attorneys appointed by the court to represent various interests subject to the standards of 11 U.S.C. §330. There is nothing in the statutory scheme to indicate that applications under subsection 503(b)(3) should be judged by any different standard than those under subsection 503(b)(2), as they have been in this case.

## II. STANDARDS OF REVIEW.

Generally the courts have said that factual rulings are to be viewed on a "clearly erroneous" standard, and legal rulings are to be reviewed "de novo." Cf. *Lebron,* at 942. The *Lebron* court also states that "substantial contribution" is a factual issue. *Lebron,* at

---

[1] The U.S. Trustee speaks of a "steep" burden. The burden is no greater here than in any other case. Courts have said that Section 503 should be strictly construed, but that is a legal issue.

946. However, Judge Farnan, stated in *In re American International, Inc.,* 203 B.R. 898, 903 (Del. 1996):

> "The question of whether acts undertaken by an actor give rise to substantial contribution under Section 503(b)(3)(D) of the Bankruptcy Code is a question of law for the court, and accordingly, is examined on appeal under a *de novo* standard of review. *See In re Flight Transportation Corp. Sec. Litig.,* 874 F.2d 576, 580, 582-83 (8th Cir. 1989). However, whether the acts give rise to a substantial contribution is a different question from the determination of which facts should be considered in the substantial contribution analysis. The selection of the proper facts to consider in the substantial contribution analysis is a question of fact reviewed under the clearly erroneous standard. *Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 946 (3d Cir. 1994); Bankr. Rule 8013.

It is submitted that Judge Farnan is correct when the legal implications of a certain event must be determined, as in this case with the impact of the bankruptcy proceeding of Energy Saving Products, Inc. ("ESP") in Tennessee, and the settlement granting the Debtor all of ESP's claims against Gray and his affiliates.

III. THE PROCEEDINGS BELOW.

After Richardson submitted his administrative claim, both the U.S. Trustee and the Chapter 11 Trustee submitted general, pro forma objections. Richardson then amended his claim to facilitate the Court's review, breaking out the activities into areas that could be separately considered. The claims were supported by detailed time records.

At the hearings, Richardson present sworn testimony and extensive documentary evidence of the work done by him and by the various attorneys he employed. Most of the testimony was unrebutted. The objectors presented one witness who made various specific objections, and Richardson addressed those objections in this post-hearing submissions.

Then the objectors, in their "over long" brief of 72 pages, submitted a vast

number of new objections and arguments, raised for the first time, to which Richardson

was not allowed to respond, and on which the bankruptcy court heavily relied.

In short, Richardson submitted sworn testimony, corroborated by detailed time

records and extensive documentary evidences.  The objectors submitted arguments in an

overlong brief, on which the court relied instead of the evidence in the record.  The result

was a large number of clearly erroneous findings.[2]

## IV.  THE BANKRUPTCY COURT'S FACTUAL FINDINGS.

A. The Correct, Uncontested Rulings.

1.  That the Preliminary Injunction Proceeding substantially contributed to
the estate.

The Bankruptcy Court was correct in finding that the "Preliminary Injunction

Proceeding," a stockholder derivative suit and a class action in the New York Supreme

Court, in which the New York Supreme Court issued two temporary restraining orders

and a preliminary injunction after finding that the evidence that Richard E. Gray ("Gray")

had breached his fiduciary duties was "overwhelming," substantially contributed to the

estate.

---

[2]      In an effort to mitigate the appearance of unfairness of the proceedings below, the
U.S. Trustee, in footnote 12 on page 13 of its brief, writes:

> "The chapter 11 trustee and Committee sought leave to file a brief
> in excess of the page limits as the post-trial brief was joint in
> nature and addressed not only Richardson's Amended Application
> but that of Jepsco, another section 503(b) application."

This statement by the U.S. Trustee was recklessly or deliberately false.  The
application for an overlong brief related only to Richardson (Docket No. 619) and the
overlong, 72 page brief (Docket No. 618) related only to Richardson.  There was a
separate brief of 21 pages (Docket No. 620) directed to Jepsco's application.

2. That the Committee Adversary Proceeding, wherein six of the eight causes of action were based on the New York stockholder lawsuits, substantially contributed to the estate.

The Bankruptcy Court was also correct in finding that the six of the eight causes of action in the Committee Adversary Proceeding, which substantially contributed to the estate, were based upon the New York stockholder lawsuits. The New York complaints were written by Richardson and Joseph Adams, Esq.

B. The Clearly Erroneous Rulings.

The Bankruptcy Court made a number of clearly erroneous factual rulings, not all of which are the subject of this appeal. Among those that are subject to this appeal are the following:

1. That the substantial benefits of the "Preliminary Injunction Proceeding" were "especially" due to Prussin, who had no involvement whatsoever in commencing the stockholder lawsuits or obtaining the temporary restraining orders, and no significant involvement in obtaining the preliminary injunction against Gray.

The stockholder derivative and class actions were started by Richardson in 1995, before he had any interest as a creditor in the Summit estate. Counsel of record was Joseph Adams, Esq., who drafted the two complaints, obtained two temporary restraining orders and wrote the brief for the motion for the preliminary injunction. Richardson wrote several of the factual affidavits. Adams appears as one of Richardson's "expenses," and Adams assigned any interest in fees from the Preliminary Injunction Proceeding to Richardson. From the beginning, Richardson had interests in this matter that transcended his subsequent limited interest as a creditor.

There is nothing in the record to support the finding that Prussin represented the stockholders in the Preliminary Injunction Proceeding. All the evidence in the record in

the contrary. The finding is based on the Bankruptcy Court's assumption, based on misleading arguments by Trustees' counsel.

This is mostly a matter of public record and should not be controversial. Yet the U.S. Trustee, in a sleazy effort to mislead the Court, states:

> "Indeed, Richardson acknowledged that "[t]he in court work was done by Prussin" in obtaining the preliminary injunction which, according to Richardson, laid the groundwork for all the assets subsequently brought into the estate." UST Brf. P. 11

This is a classic example of a statement taken out of one context and placed in another context. The quote came from a sentence that was referring to the contempt proceeding. The excerpt misleadingly extracted, was preceded by the statement:

> "In the New York stockholder actions, Richardson obtained the preliminary injunction that was used to hold Gray in contempt and ultimately incarcerate him, and served to prevent further actions by Gray adverse to the Debtor."

The paragraph later referred to the contempt proceedings, where Prussin was piggy backing on the efforts of others who had already established the groundwork for everything that followed.

The Chapter 11 Trustee follows a similar tack in repeating the same misleading statement that appeared in his overlong brief:

> "The attorney who was retained in New York, Mr. Prussin, has already been paid $1 million for his work on behalf of the estate, including his work in New York."

The implication is that Prussin was responsible for the preliminary injunction, and the Bankruptcy Court was accordingly misled. Prussin never said that he was responsible for the preliminary injunction, but would undoubtedly be pleased to be given the credit for the work of others if it meant more money for him.

To clear up this matter once and for all, attached as Exhibit A is a copy of the Summons and complaint initiating the first of the stockholder actions, over the name of Joseph Adams, Esq. Attached as Exhibit B is a copy of the application for and first of the temporary restraining orders obtained by Mr. Adams. Attached as Exhibit C is a stipulation of the parties' counsel, further restraining the defendants, signed by Mr. Adams as attorney for the plaintiffs. Attached as Exhibit D is a copy of the brief submitted by Mr. Adams in support of the motion for a preliminary injunction.

Adams, with Richardson's support, did remarkable work against an opponent with much greater resources. Prussin had virtually nothing to do with the any of the efforts leading up to the preliminary injunction that provided the basis for everything thereafter. When Prussin signed on in 1997, he was handed a case on a silver platter, after it was essentially won.

Richardson arranged for Adams' retainer paid Adams for his services. As shown by the time records, Richardson and others in this firm prepared the factual presentation and the "overwhelming" evidence that resulted in the preliminary injunction. Richardson was not counsel of record in order to avoid distracting *ad hominem* attacks, which occurred nonetheless. The initial plaintiff was one of Richardson's sons, Ben, then a twenty-eight year old teacher of economics and history, to whom Richardson had given shares soon after they were purchased in the company's public offering for $11 per share.

If the Trustees did indeed pay Prussin for non-existent work related to the preliminary injunction, then they were ignoring their charge to keep administrative costs

to a minimum, abrogating their responsibilities once again.[3]   Needless to say, Prussin's

application was not subject to the same standards and burdens that have been applied to

Richardson's.

The pre-petition work by Richardson is similar to that provided by the claimant in

*Lebron, supra.*

2. That the theories and causes of action in the adversary complaint came
from "many" persons.  That there was no evidence that they originated with Richardson.

Richardson originated the stockholder actions.  The claims were originated by

Richardson and Adams.  As the Bankruptcy Court correctly found, six of the eight claims

in the adversary complaint came from the stockholder actions.[4]  The corporate

opportunity claims also came from Richardson, who discovered the evidence to support

the claim.  What more proof is needed?

3. That Richardson's efforts in Tennessee did not substantially contribute
to the enlargement or preservation of the estate (this is a mixed question of law and fact)

Richardson's efforts to prevent Gray's plan of reorganization from succeeding in

Tennessee preserved the Summit estate, which would have been deprived of its

opportunity claims.[5]

---

[3] Prussin's fee application made no pretense of complying with Local Rule 2016-2(d).
Also, The Trustees have ignored assets and allowed statutes of limitation to expire on
claims, amounting to as much as ninety percent of the entire estate.  The figures cited by
U.S. Trustee for sale figures for the operating companies are misleading, as they do not
reflect the net amounts actually received by the estate.
[4] Prussin drafted the Delaware adversary complaint, which paraphrased the two original
stockholder complaints.  His stubborn refusal to place the claims in a bankruptcy context
opened the door for Gray's motion to remove the reference.
[5] During the pendency of the ESP bankruptcy, Rivco Realty, which was acquired by Gray
in the same transaction as the acquisition of Riverside Millwork Company ("Rivco"),
defaulted on its mortgage and a foreclosure followed.  After the foreclosure sale, there
was a surplus, which went to ESP (notwithstanding Richardson's urgings to Committee
counsel to pursue the claim on behalf of Summit).

In order to bring a Rule 1014(b) proceeding for a change of venue for the ESP bankruptcy, Richardson had to prove that ESP was a Summit "affiliate," which under Section 102 of the Bankruptcy Code is defined to mean a company owned more than twenty-percent. At the time of the motion, Summit did not own ESP, but was only claiming to own ESP in its stalled adversary proceeding. However, Richardson's presentation of the findings in the Preliminary Injunction decision were convincing to the Tennessee Bankruptcy Court and the Tennessee Creditors.

Thereafter, Summit was treated as an equity owner of ESP. The motion of the ESP Committee to subordinate Summit's claims were based on Summit's being an equity holder. This also led to the settlement of Summit's claim whereby it was to receive the ESP stock and all of ESP's claims against Gray.

The ownership of the ESP claims against Gray enabled Summit to win its corporate opportunity claims, even after the Delaware District Court denied the relief of rescinding the sale of ESP to Gray. Summit needed either ESP's stock or ESP's claims against Gray to have any basis to make the corporate opportunity claims. Without ESP, Summit had no window business and no assets to take advantage of an opportunity in the window business.

4. That Richardson's efforts in Tennessee were duplicative of the Committee's efforts.

The reason why the Committee's claims and Richardson's claims were identical is because Richardson wrote and prosecuted both of them. Committee counsel originally filed a perfunctory claim that merely referred without explanation to the adversary complaint in Delaware. When the claim was challenged, Richardson stepped in and provided substance to the Committee claim, and prosecuted both claims.

9

There is nothing in the record to support the finding that Delaware Committee counsel (other than local counsel engaged by Richardson) prosecuted the Committee claims. The finding is merely the Bankruptcy Court's assumption based on the misleading arguments of counsel.

For the Chapter 11 Trustee to argue that Richardson had no authority for what he was doing in Tennessee manifests a lack of understanding of the legal realities. Neither the Committee nor Richardson had any authority to proceed in Tennessee on behalf of Summit. Only Gray, who controlled Summit, had that authority. The only authority that the Committee had was to sue Gray and his affiliates. Ideally, Committee counsel would have obtained authority to represent Summit in Tennessee, but that never happened.

Despite the lack of standing, and the pessimism and unwillingness of Committee counsel, Richardson persisted with the Committee's claims until they were finally resolved by settlement, essentially bootstrapping the Preliminary Injunction into the final relief that Committee counsel and Prussin failed to obtain in the Delaware District Court.

The claims in Tennessee were also tenuous because the Summit bankruptcy was based on a legal fiction. The New York Supreme Court had enjoined the consummation of the merger of Chariot Group into Summit. Substantially all the assets of Chariot Group were "sold" to Gray for worthless promissory notes. The rest were transferred to a company called "Chariot Management," rather than to Summit. Despite the legal and factual realties, the Summit bankruptcy assumes that the merger, the consummation of which was legally enjoined, was actually consummated.

5. That in defending himself in Tennessee, Richardson was primarily defending his own interest (this is a mixed question of law and fact).

The Third Circuit in *Lebron,* at 944, observed:

10

> "Most activities of an interested party that contribute to the estate
> will also, of course, benefit that party to some degree, and the
> existence of a self-interest cannot in and of itself preclude
> reimbursement."

In Tennessee, Richardson was sued separately for opposing ESP's sale of B.F. Rich to

Gray. Richardson had no personal interest in this effort apart from the general interest of

the estate. Of the various participants, Richardson was the least self-interested. It could

be justly said that Committee counsel would not have shown up at all in Tennessee had it

not itself been sued as a firm and individually.

Moreover, much of the defense work in Tennessee, for the Committee and the

firms and individual defendants, was done by local counsel, who had been employed by

Richardson. Committee counsel and Prussin were more than willing to accept and

benefit from the services of local counsel, but not pay for them.

6. That the primary purpose of the discovery in the adversary proceeding
against Richardson was for his own interest (this is also a mixed question of law and
fact).

The time records demonstrate that in 1999, Richardson obtained from third parties

the evidence that was later used to establish the Committee's corporate opportunity

claims.[6] If Committee counsel and Prussin duplicated this effort four years later, as they

claim -- although it cannot be determined from their time records if they actually did so --

then their fees should be disallowed as duplicative under Section 330.

By the time he commenced third party discovery, Richardson already had a

---

[6] The reasons for Richardson's actions in this regard, as in almost every other case, was
that everyone else was unwilling or unable to do the job. Committee counsel had secretly
stipulated with Debtor's (i.e., Gray's) counsel that the former would not inquire into the
"sale" of ESP or any of the corporate opportunities, and that Richardson would not be
allowed to ask questions at a Rule 2004 examination. This is not part of the record in this
proceeding, but is memorialized in a deposition transcript in possession of Committee
counsel.

complete defense to the preference claim against him. The money that was used to pay

him was "earmarked," having come from Rivco, not Summit, and was laundered through

Summit in a manner that precluded any other creditor from having access to the funds.

Nor did it make any sense for Richardson to spend more than the claim against

him to obtain evidence that he did not need personally. Richardson had already shown

his concern for the greater good by initiating the stockholder actions in 1995, nearly four

years before he had any standing as a creditor in a bankruptcy proceeding.

7. That there is no support for the claim that Richardson unilaterally
supplied the evidence on which the District Court relied.

Richardson never claimed to have provided <u>all</u> the evidence. He only claimed to

provide most of the <u>relevant</u> evidence. And any evidence obtained by Richardson had to

come from somewhere before Richardson obtained it. Obviously, all the evidence used

for the preliminary injunction came from Richardson.[7] There is nothing in 503(b)(3)(D)

that requires a creditor to supply every shred of evidence in a case in order to make a

substantial contribution.

There were objections raised at the hearing to Richardson's claim that he had

obtained the corporate opportunity evidence, but Richardson subsequently showed that

assertion to be true in his post-hearing submission.

C. The Belated Demand for Corroboration.

Richardson's application was based on mostly unrebutted testimony, detailed time

records and documentary evidence, which was far more than was required of any other

---

[7] The financial statements showing Gray's looting came from a stockholder action in
Delaware brought by Synalloy Corp., who provided the evidence to Richardson. It was
Richardson who analyzed and presented the evidence in convincing form to obtain the
preliminary injunction.

applicant for compensation. Before that, Richardson was subjected to interrogatories and document requests. Richardson was mostly involved when no one else would make the effort. Moreover, the authority cited for the requirement of corroboration, *In re United States Lines, supra,* indicates that corroboration is necessary only in the absence of other proof sufficient to establish a claim by a preponderance of the evidence.

The demand for corroboration, as with most of the other objections, comes late in the game, after Richardson has already presented evidence to rebut objections that had not yet been made and at which he could only guess. As previously noted, there is no evidence in the record to rebut Richardson's presentation.

Given the opportunity, Richardson would present the following witness list:

| Witness | Subject Matter |
|---|---|
| Joseph Adams, Esq., attorney for stockholders in NY stockholder suits | The stockholder suits and the preliminary injunction |
| Lawrence Ahern, Esq., attorney for ESP Creditors' Committee | ESP proceeding in Tennessee |
| Teresa Azan, Esq., counsel to U.S. Trustee in Tennessee | ESP proceeding in Tennessee |
| Stuart J. Benton, former executive vice president of Chariot Group | Stockholder suits and preliminary injunction |
| Rebecca Case, Esq., Chapter 7 Trustee in Homestar Bankruptcy in MO | Homestar relation to Chariot Group and Gray's conviction for bankruptcy fraud in MO |
| Sean Cenawood, Esq., Asst. U.S. Attorney, Southern District of New York | Tax claims against Gray |
| Billy Cox, Special Agent, FBI | Criminal claims against Gray in MO |
| Thomas Donovan, Esq., attorney for Committee in NH | Committee Proceedings in NH |
| Lisette Gago, Criminal Investigation Division, Internal Reveue Service | Tax claims against Gray in CT |
| Alan Gordon, Esq., Richardson counsel for Rule 1014(b) proceeding. | Rule 1014(b) proceeding |
| Charles Grant, Esq., counsel to Committee in TN | Richardson role in TN |

13

| | |
|---|---|
| Jeff Jenson, Asst. U.S. Attorney, E.D. MO | Criminal proceedings against Gray in MO |
| James T. Kelly, Former Chief Operating Officer of Chariot | Richardson role in all proceedings |
| Randal Mashburn, Esq., counsel to Richardson in Rule 1014(b) proceeding and adversary proceeding | Richardson role in TN |
| Edward Ramage, Esq., counsel to Committee in TN | Richardson role in TN |

## V. THE BANKRUPTCY COURT'S ERRONEOUS CONCLUSIONS OF LAW.

The Bankruptcy Court made the following errors of law:

A. That the suits by the Debtor against Richardson were not "transactions" with the Debtor for purposes of Section 503(b)(1)(A).

Beginning in 1999, the Debtor or its affiliates brought four post-petition suits or proceedings against Richardson. The U.S. Trustee contends that the transactions "arose" fifteen years earlier, in 1984, when Richardson first became an officer of the Debtor's predecessor. Why not go back to the Big Bang?

The authorities relied upon by the Bankruptcy Court and the Trustees, such as *In re Overland Park Corporation,* 240 B.R. 402 (D.KS 1999), dealt with indemnification of expenses for claims brought by third parties against the claimant, often arising out of pre-petition conduct.

However, the Court in *In re The Highland Group, Inc.,* 136 B.R. 475, 481 (E.D.OH 1992), also relied upon by the Trustees, in discussing actions by the debtor giving rise to a claim for indemnification, states:

> "The focus should be on the time when the act giving rise to the claim was performed…"

The suits and proceedings were initiated by the Debtor against Richardson post-petition, in order to punish him for opposing Gray's wrongful conduct, as part of Gray's

strategy to continue that wrongful conduct. As such, the suits against Richardson became part and parcel of Gray's wrongful conduct.

The fact that Richardson's claims under 503(b)(1)(A) are based on the Debtor's own post-petition activities, places those claims squarely within the reasoning of *Reading Co. v. Brown,* 391 U.S. 471 (1968) and *In re Met-L-Wood Corp.,* 115 B.R. 133 (N.D.Ill.,1990)(defense against meritless claims); *In re American Preferred Prescription, Inc.,* 218 B.R. 680 (E.D. New York. 1998)(defense of debtor's motion); *In re E. A. Nord Company, Inc.,* 78 B.R. 289 (W.D. WA 1987)(fees and costs of defending arbitration brought by debtor); *In re Charlesbank Laundry, Inc.* 755 F.2d 200 (1st Cir. 1985)(legal services and disbursements to enforce injunction); *In re Hemingway Transp. Inc.,* 993 F.2d 915 (1st Cir. 1993)(CERCLA response costs), *In re Women First Healthcare,* 332 B.R. 115 (D. Del. 2005)(expenses due to debtor's misrepresentation).

Other claimants were compensated for their time in defending Gray's adversary proceeding in Tennessee against the Delaware Committee and Richardson, Prussin and Paul Brenman, Esq., individually.[8] However Richardson, who footed the expenses for all of the defendants, was not the only defendant not compensated.

The stipulation dismissing the preference proceeding against Richardson dealt only with that proceeding, not with any claims that might be made in the underlying proceeding for administrative expenses or even pre-petition claims. The wording of the stipulation was not raised before the Bankruptcy Court, and is mentioned for the first time in the U.S. Trustee's answering brief on this appeal. It was not raised by the Chapter 11 Trustee, who was a party to the stipulation.

---

[8] Even Gray was compensated from the Debtor's post-petition assets.

B.  That Richardson is not entitled to be compensated for his own time under 503(b)(1)(A) or 503(b)(4).

The cases relied upon by the Bankruptcy Court in ruling whether Richardson could be compensated for his own time, and that of other lawyers in his firm, *In re Gimelson*, 2004 WL 2713059 (E.D. Pa. 2004), and *In re Pappas*, 277 B.R. 171 (E.D.N.Y. 2002, were both Chapter 7 cases.[9]  Consequently, the lawyers involved could not claim under 503(b)(3)(D) [substantial contribution].  Instead, they claimed under 503(b)(3)(B) [recovery of assets after court approval].  There had been no prior court approval, and they therefore could not qualify under 503(b)(3)(B).

Since the lawyers could not qualify under any subsection of 503(b)(3), they also could not qualify under 503(b)(4) [compensation of attorneys for creditors qualifying under 503(b)(3)].  Thus, the remarks of the court in *Pappas*, which was echoed by the court in *Gimelson*, concerning whether a creditor performing legal work *pro se* could be compensated, were dictum and not entitled to any weight as precedent.

The glib statement of the court in *Pappas,* to the effect that an attorney's own time is not an expense to him or her, is bad economics and worse law.  Abraham Lincoln is often quoted as saying that "a lawyer's time is his stock in trade."  The billable hour, as a unit of production, still must bear the costs of rent, employee salary, insurance, West Publishing and so forth.  Any lawyer in private practice who has practiced with a firm knows full well that the firm must be compensated in some fashion for the attorney's own time, not to mention the time of associates and paralegals.

---

[9] The U.S. Trustee also cites *In re Patriot Aviation Services, Inc.,* 2008 WL 506260 (S.D.FL 2008), involving calls to investors by an attorney/creditor.  Richardson excluded any such activities from his claim for compensation.

One of the best statements on the issue comes from three of the most eminent

jurists in the federal system (Edwards, Mikva and Silberman), in *Jones v. Lujan,* 883 F.2d

1031, 1034-5 (D.C. Cir. 1989), a case arising under the Equal Access to Justice Act.

> "We find the trial court's grant of attorney fees to Jones was
> entirely proper, and we thus affirm. Quite simply, we find that the
> literal language of EAJA covers an award of fees for services
> performed by Jones. EAJA explicitly provides for reimbursement
> of "fees" and "costs" incurred. The Government does not dispute
> that attorney fees would be due in this case if Jones had used an
> attorney other than himself. We can find no relevance to the fact
> that Jones was his own attorney. Therefore, because Jones was
> represented by an attorney and was the prevailing party, he is
> entitled to fees under EAJA.

> "Jones is an attorney. His time is worth money, so fees certainly
> may be "incurred" when he appears in his own behalf. There is no
> legitimate basis to deny Jones his legal entitlement to fees merely
> because he represented himself in this litigation. In this regard, no
> valid distinction can be drawn between costs and fees. Given
> Government counsel admitted at oral argument that if Jones were a
> printer by trade, he would be entitled to reimbursement under
> EAJA for the costs incurred in printing his own briefs in this
> litigation.

> "We reject the Government's argument that attorney fees may be
> recovered under EAJA only when the attorney and the party are
> two separate individuals. The statute simply does not say this, and
> the Government could cite no language in the statute or specific
> legislative history to support this proposition. Instead, the
> Government advances the rather strange argument that, even
> though the terms of the statute support an award of fees in this
> case, fees should be denied because it cannot be shown that
> Congress envisioned the scenario of a lawyer representing himself
> when it provided for recovery of attorney fees under EAJA. It
> would seem obvious that this court has no authority to speculate
> over hypothetical scenarios that Congress did and did not 'have in
> mind' in enacting EAJA. Indeed, it is a fanciful notion to even
> think that we might be able to surmise what Congress 'had in
> mind,' apart from the specific words of the statute. We can only
> enforce the statute as written; and, as written, Jones is entitled to
> fees under EAJA because he was represented by an attorney and he
> was the prevailing party."

This was the same reasoning employed by the Appellate Division of the New

York Supreme Court in *Gray v. Richardson*, 251 A.D.2d 268, 675 N.Y.S.2d 57 (1st Dept.

1998), leave to appeal den., 92 N.Y.2d 815, 706 N.E.2d 747, 683 N.Y.S.2d 759 (1998),

which held that Richardson was entitled to compensation for his own time in defending

suits brought against him by Summit Metals as successor to The Chariot Group.

This decision, it is submitted, is law of the case, and entitled to full faith and

credit pursuant to 28 U.S.C. §1738.  See, e.g., *In re 9281 Shore Road Owners Corp.*, 214

B.R. 676 (E.D. NY 1997)(bankruptcy court bound by prior state court rulings).  This

issue was not addressed by the Trustees.

Although the U.S. Trustee argues in conclusory fashion that the objectives of the

Delaware indemnification provisions and the provisions of the bankruptcy law related to

the reimbursement of creditors are different, the Trustee does not explain what those

differences might be.  As already noted, one of the goals of the bankruptcy provisions is

to encourage "meaningful creditor participation in the reorganization process." *Lebron,* at

944.  Both Section 145 of the Delaware General Corporation Law and Section 503 of the

Bankruptcy Code seek to make whole persons who have volunteered to engage in

publicly approved activities and have thereby incurred expenses.

The analogy of Richardson's claims under 503(b)(1)(A) to claims under the

EAJA is apt.  The EAJA compensates persons who have successfully defended claims of

the government, as Richardson did with claims of the Debtor.

C. That Richardson is not entitled to be compensated for the expenses of
attorneys employed by him under 503(b)(4)[10].

---

[10] 503(b)(4) refers to services for an "entity," which is defined under Section 102 to
include a "person," which in turn is defined to include an "individual."

If Richardson is entitled to be compensated under 503(b)(1)(A) or 503(b)(3)(D), then he is also entitled to be compensated for the reasonable expenses of attorneys employed in those endeavors under 503(b)(4), as follows:

| Attorney | Role | Amount |
| --- | --- | --- |
| Joseph Adams, Esq. | Represented stockholder in two actions in New York through preliminary injunction, until February, 1997. | $20,000.00 |
| Cooch and Taylor | Represented Richardson in preference action in Delaware | $3683.00 |
| Pelino & Lentz | Represented Richardson in Rule 1014(b) proceeding in Delaware | $48365.87 |
| Saul, Ewing, Remick & Saul | Represented Richardson as local counsel in Rule 1014(b) proceeding in DE. | $3534.20 |
| Baker, Donelson, Bearman & Caldwell | Represented Richardson in Rule 1014(b) proceeding in TN and in ESP adversary proceeding vs. DE Committee and Richardson | $9189.63 |
| Dinsmore & Shohl | Represented Richardson and Committee in efforts to defeat plan and in adversary proceeding. | $30,096.89 |
| MacLane, Graf | Represented Committee in NH | $14,179.00 |
| Total[11] | | $85,505.39 |

D. That Richardson's efforts in the TN proceeding did not substantially benefit the estate.

This error of law and fact was dealt with at length in Richardson's previous brief, and was not rebutted by the answering briefs.

---

[11] This does not include service of process, travel, filing fees, transcripts, overnight delivery, etc.

E.  That the settlement of the Debtor's proof of claim did not result in the Debtor's ownership of Rivco and Jenkins.

This error of law and fact was dealt with at length in Richardson's previous brief, and was not rebutted by the answering briefs.

G.  That the MO and CT criminal proceedings were not related to the business or property of the debtor.

This error of law and fact was dealt with at length in Richardson's previous brief, and was not rebutted by the answering briefs.  The issue of the criminal tax case against Gray has not been dealt with in any of the answering briefs or in the opinion of the Bankruptcy Court.

## CONCLUSION

In theory, a bankruptcy estate is not just a gravy train for bankruptcy insiders. Creditors are encouraged to meaningfully participate under Section 503, and when that occurs, their claims should be evaluated by the same standards as are applied to insiders. In other words, the claims should be evaluated based upon the evidence in the record, and not based upon assumptions about what might or should have occurred.

May 29, 2008

Respectfully submitted,

_A. M. Richardson_
A. M. Richardson
40 Wall Street, 35th Floor
New York, NY 10005
(212) 530-4771; Fax: (212) 267-2030

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 116880/95

------------------------------------X

BENJAMIN RICHARDSON, a stockholder
on behalf of Chariot Group, Inc.

             Plaintiff

   - against -

RICHARD E. GRAY, CHARIOT GROUP, INC.,
CHARIOT HOLDINGS, LTD., CHARIOT
PLASTICS, INC., AMV HOLDINGS, INC.
VDC RECOVERY, INC., CHARIOT BUILDING
PRODUCTS, INC., HOMESTAR, INC., and
HOULIHAN, LOKEY, HOWARD & ZUKIN.

             Defendants.

------------------------------------X

Plaintiff designates
New York County
as the place of trial

The basis of venue is
Defendants' residence

AMENDED SUPPLEMENTAL
SUMMONS

Plaintiff resides at
Dryden, New York

County of Tompkins

To the above named Defendants:

    You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  Nyack, New York
       August 3, 1995

                JOSEPH H. ADAMS, ESQ.
                Attorney for Plaintiff
                53 Burd Street
                Nyack, NY 10960
                (914) 353-2320

Defendants' addresses:

Houlihan, Lokey, Howard & Zukin
31 West 52nd Street
New York, New York 10019

All Other Defendants
45 Rockefeller Plaza
New York, New York 10020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                Index No. 116880/95
----------------------------------------x
                                    :
BENJAMIN RICHARDSON, a Stockholder, :
On Behalf of THE CHARIOT GROUP, INC.,:
                                    :
                Plaintiff,          :
                                    :
        v.                          :        AMENDED COMPLAINT
                                    :
RICHARD E. GRAY and THE CHARIOT     :
GROUP, INC, CHARIOT HOLDINGS, LTD.  :
CHARIOT PLASTICS, INC., AMV         :
HOLDINGS, INC., VDC RECOVERY, INC.  :
CHARIOT BUILDING PRODUCTS, INC.,    :
HOMESTAR, INC. and HOULIHAN, LOKEY, :
HOWARD & ZUKIN,                     :
                    Defendants.     :
                                    :
----------------------------------------x

        Plaintiff, by his undersigned attorney, for his amended

complaint in this action alleges:

                    PARTIES & JURISDICTION

        1. Plaintiff is a New York citizen residing in Tompkins

County, New York, is a stockholder of The Chariot Group, Inc.

("Chariot Group" or, alternatively, the "Corporation"), and was a

stockholder when the actions complained of herein occurred.

        2. Defendant Chariot Group is a Delaware corporation

having its principal place of business in New York, New York.

Chariot Group is a holding company, which owns and controls the

stock of certain Delaware corporations, Energy Savings Products,

Inc. and B.F. Rich, Inc., which are engaged in the manufacture of

windows and doors.

        3. Upon information and belief, defendant Richard E.

Gray ("Gray") is a Connecticut citizen, who regularly does

business in the State of New York, and has transacted business in New York, directly relating to the subject matter of this action, including, <u>inter alia</u>, the management and control of Chariot Group, as its sole director and chief executive officer and as the individual who owns or controls, directly and through corporations which he owns or controls, a majority, or 78%, of the common stock of the Corporation.

4.    Upon information and belief,  Defendant Chariot Holdings, Ltd. ("Chariot Holdings") is a Delaware corporation with its principal place of business in New York, whose stock is wholly owned by Gray.

5.    Upon information and belief, Chariot Plastics, Inc. ("Chariot Plastics") is a Delaware corporation, which is wholly owned by Chariot Holdings, and is the record owner of approximately 1.8 million shares of Chariot Group's common stock, or 78%, of the 2.5 million outstanding shares of common stock.

6.    Upon information and belief, AMW Holdings, Inc. is a Delaware corporation, which maintains its principal place of business in New York, New York, and is a holding company wholly owned by Gray.

7.    Upon information and belief, VDC Recovery, Inc. ("VDC Recovery") is a Delaware corporation, which maintains its principal place of business in New York, New York, and is a holding company, whose stock is wholly owned by AMW Holdings and controlled by Gray.

8.   Upon information and belief, Chariot Building Products, Inc. ("Chariot BP") is a Delaware corporation, which maintains it principal place of business in New York, New York, and is owned or controlled, directly or indirectly, by Gray.

9.   Upon information and belief, Homestar, Inc., is a Delaware or other foreign corporation, the stock of which is wholly owned by VDC Recovery, and which does business in New York, or transacts business in New York, relating to the subject of matter of this action, and is controlled by Gray.

10.  Upon information and belief, Houlihan, Lokey, Howard and Zukin ("Houlihan") is a New York corporation, partnership or other business entity, which maintains its principal place of business in New York, New York.

CORPORATE STRUCTURE: GRAY'S UNILATERAL CONTROL

11.  Upon information and belief, Gray exercises complete and unilateral over the affairs of Chariot Group as the chief executive officer and sole director of the Corporation, and by his ownership and/or control of Chariot Holdings and Chariot Plastics, which are holding companies by which Gray owns and controls a majority of the common stock of Chariot Group.

12.  Upon information and belief, the remaining common stock of Chariot Group is owned by approximately 400 different individual shareholders, all of whom are totally excluded from the affairs of Chariot Group, and have been denied any information about the operation and management of Chariot Group

3

since in or before 1991, when Gray deregistered the stock of Chariot Group and caused all other directors to be dismissed.

13. Although defendant Gray controls the affairs of Chariot Group, most or a substantial part of the capitalization of Chariot Group was made by the other shareholders of Chariot Group, or their predecessors, who purchased stock in an initial public offering done by Chariot Group, then known as Sandusky Plastics, Inc. in 1986. Through that public offering, the common stock, Chariot Group acquired most of its operating capital.

14. At the time of this public offering, and continuing thereafter, until approximately 1990, Chariot Group was listed as a stock trading on the American Stock Exchange and, as a listed company, was required to have, and did have, outside directors and was required to make, and did make, periodic reports of financial and other information as required by law.

15. During the period that Chariot Group was a listed and registered company, with independent directors, Gray was compensated as chief executive officer with an annual salary of approximately $200,000.00, but did not receive additional any additional compensation, management fees or additional remuneration, however described, either directly or through Chariot Holdings, Chariot Plastic, or through any other corporation which Gray owned or controlled.

16. In or about 1990, Gray caused Chariot Group to be delisted on the American Stock Exchange and to be deregistered under the Securities Exchange Act of 1934. Gray thereafter

4

removed all of the independent outside directors of Chariot
Group, made himself the sole director of Chariot Group, and
thereafter exercised complete and unilateral control over its
financial affairs.

17.  As an individual who simultaneously occupies the
position of chief executive officer and sole director of Chariot
Group,  and as the individual who, directly or indirectly,
controls the majority of common stock of Chariot Group, Gray has
fiduciary obligations to the Chariot Group shareholders.

18.  No demand has been made upon Board of Directors of
Chariot Group to prosecute the claims in this action, in
consideration of the fact that such a demand would be futile.
Gray has complete control over the operations of Chariot Group,
and Gray will not recognize, assert or prosecute these claims.

GRAY'S CONVERSION OF FUNDS, LOOTING & WASTE: 1991 TO 1994

19.  After Gray dismissed the other directors of
Chariot Group and thereby assumed complete and unilateral control
of Chariot Group in or about 1990, and continuing until the
present time, Gray has looted the monies and assets of Chariot
Group, wasted its assets, engaged in self-dealing transactions
for his exclusive financial benefit to the detriment of the
interests of the Corporation and its other shareholders,
wrongfully exploited corporate opportunities for the benefit of
himself and/or other corporations which Gray owns or controls,

5

thereby causing substantial financial injury to the Corporation and its shareholders, and thereby violating his fiduciary duties.

20. In 1991, Gray unilaterally caused to the Corporation to pay management fees in the amount of $359,000.00 to Chariot Holdings, which purported to be fees paid retroactively for alleged services previously rendered. Upon information and belief, no services other than those which Gray was required to perform as chief executive officer were rendered for these fees, and the payment of so-called management fees to Chariot Holdings was merely a conduit for the disbursement of monies to Gray, and their conversion of these monies to Gray's personal use and benefit.

21. In 1991, Gray unilaterally caused Chariot Group to forgive indebtedness of Chariot Holdings in the amount of $1,476,000.00 and also caused Chariot Group to forgive indebtedness of Gray, personally, in the amount of $67,000.00. Upon information and belief, the "indebtedness" forgiven in this manner arose from the advance of monies by Gray to Chariot Holdings and to himself, without consideration, and the forgiveness of this debt unjustly enriched Gray.

22. In 1991, no dividends were paid by Chariot Group.

23. In 1992, Gray unilaterally caused Chariot Group to pay management fees to Chariot Holdings in the amount of $3,064,000.00, and also caused Chariot Group to forgive indebtedness of Gray, personally, in the amount of $524,000.00.

6

Upon information and belief, the "indebtedness" forgiven in this manner arose from the advance of monies by Gray to himself, without consideration, and the forgiveness of this debt unjustly enriched Gray. Upon information and belief, no services were rendered for the payment of the so-called management fees to Chariot Holdings, and these payments were merely a conduit for the disbursement of monies of Gray, who is its sole employee.

24. In 1992, no dividends were paid by Chariot Group.

25. In 1993, Gray unilaterally caused Chariot Group to pay management fees to Chariot Holdings in the amount of $890,000.00. Upon information and belief, no services were rendered for the payment of the so-called management fees to Chariot Holdings, and these payments were merely a conduit for the disbursement of monies to Gray, who is its sole employee.

26. In 1993, no dividends were paid by Chariot Group.

27. In 1994, Gray unilaterally caused Chariot Group to pay management fees of Chariot Holdings in the amount of $659,000.00, and also paid alleged management fees in the amount of $168,000.00 to another corporation, VDC Recovery, Inc., which, directly or indirectly, Gray owns and/or controls. Upon information and belief, no services were rendered for the payment of the so-called management fees to Chariot Holdings and/or to VDC Recovery, Inc., and these payments were merely a conduit for the disbursement of monies to Gray, who is their sole employee.

28. In 1994, no dividends were paid by Chariot Group.

29. Upon information and belief, Gray has looted and wasted the monies and assets of the Corporation and has thereby unjustly enriched himself at the expense of the Corporation and its shareholders.  Upon information and belief, the monies that Gray has improperly paid to himself from Chariot Group have been converted to his personal benefit and have been used in whole or in part to support a lavish personal style of life, well beyond Gray's legitimate means as a highly-compensated chief executive officer, costing in excess of $2.0 million per year, including the maintenance of a Connecticut estate, a Park Avenue duplex coop in New York, a summer home in an exclusive club in the Adirondacks, servants, expensive automobiles, expensive furnishings, art and antiques, and extensive foreign travel, etc.

30. In the aggregate, from 1990 through 1994, while paying himself salary and direct compensation in excess of $1.0 million, Gray has converted, looted and embezzled monies in at least the amount of $7.2 million dollars from Chariot Group in the form of debt forgiveness and alleged payment of management fees to corporations which Gray wholly owns or controls.

31. During that same period of time from 1991 to 1994, Gray never authorized or permitted the payment of dividends.

8

CURRENT OR IMMINENT ATTEMPTS TO ENCUMBER THE REVENUES OR ASSETS

OF CHARIOT GROUP AND/OR TO CREATE A NEW STRUCTURE

TO EXERCISE CONTROL OVER THE REVENUES AND ASSETS OF CHARIOT GROUP

OR THOSE OF ITS OPERATING COMPANIES

32.   From approximately early 1980 until the present time, upon information and belief, Gray has not filed State and Federal tax returns for himself or for Chariot Holdings, although both Gray and Chariot Holdings earned substantial taxable income in those periods and had substantial tax liabilities which were required to be paid but were not paid.

33.   On or about November 22, 1994, acting as an officer of Chariot Holdings, his holding company, Gray entered into a consent judgment before the United States Tax Court, for tax deficiencies against Chariot Holdings for the years 1984, 1985 and 1986 in the amount of $ 1,969,960, and, at the same time, entered into a consent judgment, together with his wife, for the years 1984, 1985, 1986, and 1987 for personal tax deficiencies in the amount of $638,941.00.  Together, these two consent judgments, with the imposition of additional civil penalties and interest, result in the imposition of a tax liability for which Chariot Holdings and Gray are responsible for unpaid tax liabilities, of approximately $5.0 million.

34.   Upon information and belief, Gray has no personal assets capable of satisfying these judgments, or of paying additional tax liabilities which have accrued and not been paid

9

from 1986 and 1987 until the present time, and if these judgments are enforced against Gray's personal assets, Gray will be forced to alter his lavish live-style in a manner not acceptable to him.

35. Upon information and belief, Chariot Holding has no assets, other than its control of the majority stock of Chariot Group, which it holds through Chariot Plastics, and if the tax liabilities of either Chariot Holdings and/Gray are enforced against the stock interests that they control in Chariot Group, then Gray will lose his sole or primary financial support.

36. Upon information and belief, Gray is currently engaged in an attempt to sell or to encumber the revenues and assets of Chariot Group and/or the revenues, assets or stock of its operating subsidiaries to obtain monies to satisfy his personal tax liabilities, or, in the alternative, is attempting to transfer ownership and control of the revenues and assets of Chariot Group, and/or the revenues, assets or stock of its operating subsidiaries to another parallel set of holding companies, in order to immunize them from tax collection and enforcement activities, and/or to enable Gray to continue to loot the corporation and to enrich himself unjustly at the expense of the minority shareholders of Chariot Group, and in violation of their rights.

37. Upon information and belief, Gray is currently attempting to consummate, or may have recently consummated the transfer of the revenue or assets of Chariot Group, or the revenue, assets and/or stock of the operating companies of

10

Chariot Group, to another set of holding companies wholly owned or controlled by Gray, consisting of defendants AMW Holding and VDC Recovery, and Chariot BP,  and\or to the new corporation named Chariot BP, which is wholly owned or controlled by Gray, AMW Holding or VDC Recovery.

38.  Upon information and belief, as part of this attempted transaction, which violates the rights of the minority shareholders of Chariot Group, Gray is currently attempting to consummate, or has recently consummated a secured loan transaction or private stock placement, through the agency of defendant Houlihan, by which the stock, assets and/or future revenues of the operating companies controlled by the Chariot Group will be encumbered for the benefit of Gray, or his corporations.

39.  Upon information and belief, in consideration of the established pattern of Gray's wrongful conduct, monies obtained from the subject financing transaction will not be used for the benefit of Chariot Group or its shareholders, but will be used for the benefit and unjustment enrichment of Gray, and/or for the creation and maintenance of a new corporate structure excluding Chariot Group and/or its minority shareholders.

40.  Chariot Group will suffer irreparable injury if its assets and future revenues, or those of its operating companies, are encumbered and the monies are diverted for purposes not directly related to the business affairs of Chariot

Group, or its operating companies, but for the personal benefit
of Gray, or of the new holding companies Gray has created.

HOMESTAR PRODUCTS: DIVERSION OF CORPORATE OPPORTUNITY

41.  Upon information and belief, in or before 1994,
Gray caused one of his new holding companies, VDC Recovery,
wholly owned by AMW Holdings, to acquire another manufacturer of
home building products called Homestar, Inc. ("Homestar").

42.  Upon information and belief, Gray learned of the
availability of Homestar as a potential acquisition in his
capacity as the chief executive officer, director and controlling
shareholder of Chariot Group, but failed to inform Chariot Group
of the availability of Homestar as an acquisition, and also
failed to take any actions to secure the acquisition of Homestar
by Chariot Group, despite his obligation to do so.

43.  The potential purchase or acquisition of HomeStar
represented a corporate opportunity of Chariot Group, which Gray
wrongfully misappropriated for his benefit or for that of the
other, wholly-owned set of holding companies that Gray created.

44.  Upon information and belief, Gray diverted monies
from the revenues of Chariot Group, including but not limited to
the so-called management fees paid in 1994, to VDC Recovery,
which acquired the stock of Homestar, and these monies were
converted and used by Gray for the purpose of acquiring Homestar.

ACQUISITION OF REPUBLIC METAL PRODUCTS, INC.

CONCEALED SELF-DEALING & FRAUD

45.    In or about 1987, Gray caused Chariot Group to acquire a company known as Republic Metal Products, Inc. ("Republic") from another wholly-owned subsidiary of Chariot Holdings, the holding company whose stock is directly owned by Gray, that was called Chariot Metals Inc. ("Chariot Metals"), for a purchase price of approximately $2.6 million, which Gray represented was a fair and reasonable price for this corporation.

46.    In connection with the acquisition of Republic Metals, Gray fraudulently concealed from Chariot Group, and its shareholders and independent directors the substantial and material fact that Gray and/or Chariot Metals had acquired Republic in a transaction involving the payment of no money down for that corporation, and that Gray had looted the resources of that corporation prior to selling it to Chariot Group.

47.    In connection with the acquisition of Republic Metals by Chariot Group, Gray fraudulently represented that the purchase price $2.6 million was fair and reasonable and also fraudulently concealed that Gray, and/or his wholly-owned corporation, Chariot Metals, had acquired Republic Metal, without making any payment for the stock of Republic Metals, and that, as a result of the acquisition of Republic Metals by Chariot Group, Gray directly or indirectly, through his companies, earned a profit believed to be in excess of $2.5 million by self-dealing.

13

48. After Republic was acquired by Chariot Group, the company lost several million dollars, and the nature and the extent of these losses was concealed from the public shareholders of Chariot Group, _inter alia_, because the losses suffered by Republic were not separately reported on the financial statements of the Corporation, and there was no information made available to shareholders which could have enabled them to know that the acquisition of Republic Metals had caused serious financial injury to Chariot Group, while Gray had earned substantial profits by selling Republic Metals to Chariot Group.

49. Upon information and belief, Gray and Chariot Holdings knew or showed reckless disregard for the fact that the acquisition price for Republic was inflated, and fraudulently concealed this fact from Chariot Group and its shareholders, and thereafter concealed or distorted the information about the losses suffered by Chariot Group as a result of the acquisition of Republic Metals, by failing to report this information separately on the financial statements of the Corporation, for the wrongful and fraudulent purpose of continuing the concealment of this information from the shareholders of Chariot Group.

WASTE OF ASSETS: SYNALLOY SHORT SWING PROFITS

50. In the late 1980's, directly or through Chariot Holdings and Chariot Group, Gray acquired stock in a publicly-traded company known as Synalloy, and also became of member of the Board of Directors of that company, which automatically

14

rendered Gray, as a director, subject to the regulations on "short-swing" sales of Synalloy's publicly traded stock, under Section 16(b) of the Securities Exchange Act.

51.  Gray violated the provisions of Section 16(b) by improperly trading in the stock of Synalloy, by which Gray, Chariot Holdings and/or Chariot Group earned profits in excess of $100,000.00, and by then failing and refusing to pay these improperly earned profits to Synalloy as required by the provisions of Section 16(b), despite demand from Synalloy.

52.  Upon information and belief, Synalloy subsequently and successfully sued Gray, Chariot Holdings and/or Chariot Group for these clear-cut and indefensible violations of Section 16(b) and obtained and collected a judgment against Gray, Chariot Holdings and/or Chariot Group, which was paid by Chariot Group, as were the litigation expenses to defend that legal action.

53.  The conduct that resulted in the Section 16(b)-based judgments against Gray, Chariot Holdings and Chariot Group in connection with the sale of Synalloy stock was the responsibility of Gray, and Gray was solely responsible for any judgments or expenses incurred in connection therewith.

54.  Upon information and belief, Gray and/or the companies which he owns and controls have committed other acts in violation of Gray's fiduciary obligations as the sole director, chief executive officer and majority shareholder [directly or indirectly] of Chariot Group which are not now known to plaintiff, but which may become known to plaintiff in discovery.

15

FIRST CAUSE OF ACTION: DAMAGES

55.  Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

56.  The conduct of Gray, directly and through the holding companies which he controls, as described fully in the preceding paragraphs of this complaint, constitutes a violation of his fiduciary obligations as chief executive officer, sole director and as the individual who actually controls or directs the majority or controlling stock of Chariot Group.  As set forth in the preceding paragraphs, this conduct involves improper and unlawful self-dealing, fraud, misappropriation of monies and assets, embezzlement, conversion of corporate monies, and wrongful exploitation of corporate opportunities, by Gray, directly and through the corporations which Gray owns and controls, and has caused damages in a total amount not now known to plaintiff but reasonably believed to include the following:

a. in excess of $7.2 million in improper management fees and loan forgiveness to Gray and to the corporations which he controls, including Chariot Holdings and VDC Recovery, from 1991 to 1994,

b. in excess of $5.0 million arising from the acquisition of Republic and the subsequent operation and management of Republic at a loss after it was acquired,

16

c. in excess of $1.0 million arising from the theft and misappropriation of the Homestar acquisition as a corporate opportunity

d. in excess of $150,000.00 in judgments and expenses incurred in connection with the improper trading of Synalloy stock.

57. Chariot Holdings, Chariot Plastics, are wholly owned or controlled by Gray, and have aided and abetted Gray in the improper conduct that is the subject of the claims for, and/or have been used by Gray as an instrumentality and device to engage in the improper conduct that is the subject of this claim. Therefore, each of these wholly owned or controlled corporations should be liable for any liability imposed against Gray.

58. AMW Holdings and VDC Recovery are wholly owned or controlled by Gray, and have aided and abetted Gray, together with Chariot Holdings and Chariot Plastics in the improper conduct that is the subject of the claim for the theft and misappropriation of a corporate opportunity in the acquisition of Homestar. Therefore, AMW Holdings and VDC Recovery should be liable for any liability imposed against Gray for that conduct.

59. By reason of the foregoing, plaintiff, as a shareholder of Chariot Group suing on behalf of the Corporation is entitled to obtain a judgment against Gray, Chariot Holdings, Chariot Plastics, for compensatory damages in an amount to be determined by this Court but reasonably believed to be in excess of $10,000,000.00, together with punitive damages in an amount to

17

be determined but properly in excess of $30,000,000.00, and is further entitled to a judgment against AMW Holdings and VDC Recovery for compensatory damages in an amount to be determined by the Court but reasonably believed to be in excess of $1,000,000.00, together with punitive damages in an amount to be determined but properly to be in excess of $3,000,000.00.

## SECOND CAUSE OF ACTION: ACCOUNTING
## CONVERSION OF FUNDS, WASTE OF ASSETS, SELF-DEALING
## DISBURSEMENTS 1991 TO 1994

60.  Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

61.  The conduct described in this complaint, specifically that relating to the payment of so-called management fees and the forgiveness of loans to Gray and to Chariot Holdings was undertaken by Gray when he was the sole director of Chariot Group, and involved violations by Gray of his fiduciary obligations as a director of Chariot Group, and caused financial losses and damages to Chariot Group in excess of $7.2 million.

62.  Pursuant to the provisions of Section 720 (a)(1)(A) & (B), BCL, Gray is required to account for all of his conduct in improperly causing these disbursements to be made, and to pay damages to Chariot Group in an amount to be determined but in excess of $7.2 million on such an accounting.

63.   By reason of the foregoing, plaintiff, as a shareholder of Chariot Group suing on behalf of the Corporation is entitled to obtain a judgment against Gray, pursuant to subsections (a)(1)(A) & (B) of Section 720, BCL, requiring Gray to account for an amount to be determined but in excess of $7.2 million and to pay such an amount to Chariot Group on such an accounting.

THIRD CAUSE OF ACTION: ACCOUNTING

SELF-DEALING, FRAUD AND WASTE OF ASSETS

REPUBLIC METAL ACQUISITION

64.   Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

65.   The acquisition of Republic Metals by Chariot Group, from Chariot Metals, and the fraud, self-dealing and waste of corporate assets arising directly and indirectly from that transaction violated Gray's obligations as director of Chariot, requiring Gray to account to Chariot Group for the losses incurred in that transaction, in an amount to be determined but believed to be in excess of $5.0 million.

66.   Pursuant to the provisions of Section 720 (a)(1)(A) & (B), BCL, Gray is required to account for all of his conduct in improperly authorizing and causing this transaction to occur, and to pay damages to Chariot Group in an amount to be determined but in excess of $5.0 million on such an accounting.

19

67.  By reason of the foregoing, plaintiff, as a shareholder of Chariot Group suing on behalf of the Corporation is entitled to obtain a judgment against Gray, pursuant to subsections (a)(1)(A) & (B) of Section 720, BCL, requiring Gray to account for an amount to be determined but in excess of $5.0 million and to pay the amount determined on the accounting to Chariot Group.

FOURTH CAUSE OF ACTION: ACCOUNTING

SELF-DEALING, THEFT OF CORPORATE OPPORTUNITY, AND WASTE OF ASSETS

HOMESTAR PRODUCTS ACQUISITION

68.  Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

69.  The acquisition of Homestar by VDC Recovery, a wholly owned subsidiary of AMW Holdings, whose stock is wholly-owned by Gray, constituted the theft and misappropriation of a corporate opportunity of Chariot Group, the impropriety of which is aggravated by the fact that revenues of Chariot Group, including but not limited to certain alleged management fees paid to VDC Recovery in or about 1994, directly or indirectly by Gray, upon information and belief, to assist VDC Recovery to acquire Homestar, involved self-dealing and waste of corporate assets by Gray.  This transaction violated Gray's obligations as director of Chariot, requiring Gray to account to Chariot Group for the

losses incurred in that transaction, in an amount to be determined but believed to be in excess of $1.0 million.

70. Pursuant to the provisions of Section 720 (a)(1)(A) & (B), BCL, Gray is required to account for all of his conduct in improperly authorizing and causing this transaction to occur, and to pay damages to Chariot Group in an amount to be determined but in excess of $1.0 million on such an accounting.

71. By reason of the foregoing, plaintiff, as a shareholder of Chariot Group suing on behalf of the Corporation is entitled to obtain a judgment against Gray, pursuant to subsections (a)(1)(A) & (B) of Section 720, BCL, requiring Gray to account for an amount to be determined but in excess of $1.0 million and to pay the amount determined on the accounting to Chariot Group.

FIFTH CAUSE OF ACTION: ACCOUNTING

UNLAWFUL CONDUCT, SELF-DEALING, WASTE OF ASSETS

SYNALLOY SECTION 16(b) VIOLATIONS

72. Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

73. The unlawful trading by Gray of Synalloy stock, nominally held in the name of Chariot Holdings and/or Chariot Group, and the subsequent refusal by Gray to pay the "short-swing" profits thereby earned to Synalloy, as required by law, together with the conversion of these profits to Gray's personal

21

account or benefit, and the use of Chariot Group monies to satisfy the judgment in favor of Synalloy and the expenses of litigation incurred to defend the legal action brought by Synalloy, violated Gray's fiduciary obligations as director of Chariot Group, and represented a waste of corporate revenues, requiring Gray to account to Chariot Group for the losses incurred in connection therewith, in an amount to be determined but believed to be in excess of $150,000.00.

74. Pursuant to the provisions of Section 720 (a)(1)(A) & (B), BCL, Gray is required to account for all of his conduct in improperly authorizing and causing this transaction to occur, and to pay damages to Chariot Group in an amount to be determined but in excess of $150,000.00 on such an accounting.

75. By reason of the foregoing, plaintiff, as a shareholder of Chariot Group suing on behalf of the Corporation is entitled to obtain a judgment against Gray, pursuant to subsections (a)(1)(A) & (B) of Section 720, BCL, requiring Gray to account for an amount to be determined but in excess of $150,000.00 and to pay the amount determined on the accounting to Chariot Group.

SIXTH CAUSE OF ACTION: INJUNCTION

FUTURE DISBURSEMENT OF MONIES

76. Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

22

77.  The facts set forth in the preceding paragraphs of this complaint establish a pattern of fraud, deceit, conversion of funds, looting and waste of assets and self-dealing by Gray and by his wholly owned or controlled holding companies, Chariot Holding, and Chariot Plastics, pursuant to which Gray has caused millions of dollars to be paid to himself or to his corporations, while, as chief executive officer and sole director, Gray has refused to pay dividends to shareholders of Chariot Group.

78.  At the present time, when Gray and Chariot Holdings are subject to federal tax liabilities in excess of $5.0 million that have been reduced to judgment, these facts further establish that there is a real and imminent risk that Gray will take additional actions to make unlawful and improper disbursements of the monies of Chariot Group to himself or to his corporations, or to engage in self-dealing transactions for his exclusive benefit at the expense of the legitimate interests of Chariot Group, and its shareholders, to pay his outstanding tax liabilities or to take other actions adverse to Chariot Group.

79.  Chariot Group will suffer irreparable injury if such additional improper and unlawful disbursements are made by Gray to himself or to any of the corporations he controls, or if Gray is permitted to engage in extraordinary transactions for the improper purpose of enabling himself to make such disbursements.

80.  Chariot Group has no adequate remedy at law to protect itself.

23

81.   Chariot Group is entitled to a preliminary and permanent injunction restraining and enjoining Gray, Chariot Holdings, or Chariot Plastics or any corporation owned or controlled by Gray, from disbursing or authorizing the disbursement of monies or the transfer of assets from Chariot Group or its operating subsidiaries, to Gray, Chariot Holdings, Chariot Plastics, AMW Holdings, VDC Recovery, or another corporation which Gray owns or controls, and is further entitled to a preliminary injunction, enjoining Gray from engaging in any extraordinary corporate transactions, other than those done regularly and in the ordinary course of business, which, directly or indirectly, provide the opportunity for self-dealing, fraud, conversion, looting or waste of the assets and revenues of Chariot Group by Gray or any corporation he owns or controls.

82.   By reason of the foregoing, plaintiff, as a shareholder suing on behalf of Chariot Group, is entitled to a preliminary and permanent injunction.

SEVENTH CAUSE OF ACTION: INJUNCTION

PROHIBITING USE OF PARALLEL SET OF HOLDING COMPANIES

TO ENCUMBER THE ASSETS OF THE OPERATING COMPANIES

TO ELIMINATE THE EQUITY INTERESTS OF CHARIOT GROUP

OR TO TRANSFER DIRECT CONTROL OF THE OPERATING COMPANIES

83.  Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

84.  Upon information and belief, commencing in or before 1995, Gray created, or began to create, a parallel set of wholly owned and controlled holding companies.  The first of these holding companies is called AMW Holding and is wholly owned by Gray.  The second is VDC Recovery, which is wholly-owned by AMW Holdings.  Both corporations are controlled by Gray.

85.  Upon information and belief, Gray has also created another corporation named Chariot BP, which he controls although the nominal ownership of the stock of that corporation is not now known to plaintiff.  Upon information and belief, through Chariot BP, Gray seeks to obtain financing in the form of loans, by encumbering the assets of the operating companies owned by Chariot Group, and/or in connection with such a transaction, Gray intends to acquire, or has acquired, the stock of the operating companies, now owned or controlled by Chariot Group.

86.  Upon information and belief, Gray has used or intends to use this parallel set of holding companies, including Chariot BP, to extract monies from the operating companies, either by encumbering the assets and revenues of these companies to secure a loan to Chariot BP, and/or by transferring ownership and control of the operating companies from Chariot Group to Chariot BP, or some other company owned or controlled by Gray, directly or indirectly, thereby purporting to eliminate the equity interests of the minority shareholders of Chariot Group, and to secure for his exclusive use and benefit, or that of his other corporations, any monies that may be obtained by a secured loan transaction or other transaction secured or collateralized by assets and revenues of the operating companies owned or controlled by Chariot Group.

87.  The creation by Gray and the current or future use of such a parallel set of holding companies, including Chariot BP, constitutes a substantial violation of Gray's fiduciary obligations as the sole director, and chief executive officer of Chariot Group, and as the individual who directly or through his holding companies owns and controls the majority and controlling block of stock in Chariot Group.

88.  Upon information and belief, Houlihan has aided and abetted, and continues to aid and abet, Gray and his parallel set of holding companies, including Chariot BP, in certain secured loan or financing transactions, the exact details of which are not now known to plaintiff, but which, upon information

26

and belief, are reflected in a certain Confidential Financing
Memorandum, dated May 5, 1995, which, _inter alia_, provides for
use of the assets and revenues of the operating companies
currently owned or controlled by Chariot Group to finance the
borrowing of substantial monies by Chariot BP, or one or more of
the other companies owned or controlled by Gray, directly or
through the new parallel set of holding companies created by Gray
for the purpose enabling Gray to secure exclusive personal
control over assets and revenues that are properly owned and
controlled only by Chariot Group, a corporation with minority
shareholders other than Gray, whose rights are thereby violated.

89.    Upon information and belief, Houlihan has
knowledge of the fact that proposed financing transactions
violate the rights of the minority shareholders of Chariot Group,
but has acted in concert with Gray, and his corporations, to
close this financing transaction, despite such knowledge.

90.    Any proposed financing transaction by which the
stock or assets of Chariot Group, or of its operating companies
is sold, transferred, assigned, encumbered or otherwise disposed
of, for the benefit of Gray or his other companies, including
Chariot BP, violates the legal and equitable rights of the
minority shareholders and is subject to prior restraint and to
retroactive recision pursuant to Section 720(a)(2)&(3), BCL, and
pursuant to the general principles of equity jurisprudence.

91.    Chariot Group will suffer irreparable injury if,
aided and abetted by Houlihan, Gray is permitted to use the

27

parallel set of holding companies, including Chariot BP, AMW
Holding and/or VDC Recovery, to encumber the stock, assets and
revenues of the operating companies of Chariot Group, or if these
corporations are used as vehicle for the transfer of the stock,
assets or revenues of these operating companies to Gray or his
new holding companies, directly or otherwise.

92.    Chariot Group has no adequate remedy of law.

93.    Plaintiff is entitled, on behalf of the
Corporation, to a preliminary and permanent injunction, pursuant
to Section 720 (a)(3), B.C.L., restraining and enjoining Gray,
Houlihan, and any corporation which Gray owns or controls,
including but not limited to Chariot Holdings, Chariot Plastics,
Chariot BP, AMW Holdings, and VDC Recovery, from taking any
actions:

     a. to incumber the assets and revenues of the
        Chariot Group, or any of the companies
        which it owns and controls,

     b. to transfer the stock of the operating
        companies owned or controlled by the
        Chariot Group,

     c.  to undertake any extraordinary transactions
        outside the ordinary course of business
        which adversely affects, or might adversely
        affect the interests of Chariot Group or
        its shareholders, or its operating companies,

28

94.   In the event that any such transactions have been concluded, plaintiff is entitled to have them set aside as unlawful conveyances, pursuant to Section 720 (a)(2), B.C.L.

95. By reason of the foregoing, plaintiff, on behalf of Chariot Group, is entitled to obtain a preliminary and permanent injunction against Gray, Houlihan and all of the other corporate defendants, or, in the alternative, is entitled to a final judgment setting any and all such unlawful transactions.

## EIGHTH CAUSE OF ACTION: CONSTRUCTIVE TRUST
### HOMESTAR PRODUCTS

96.   Plaintiff repeats and alleges each and every allegation set forth in the preceding paragraphs of this paragraph, with the same force and effect as if set forth herein.

97.   The acquisition of Homestar by VDC Recovery constituted a theft of a corporate opportunity by Gray, in violation of Grey's fiduciary obligations to Chariot Group.

98.   Upon information and belief, the monies of Chariot Group, after being diverted to Gray and to VDC Recovery were used to consummate the acquisition of Homestar by VDC Recovery.

99.   In his capacity as the chief executive officer, sole director and controlling shareholder of Chariot Group, Gray has explicitly and impliedly promised, and was obligated, to act on behalf of Chariot Group and not for his own account.

100.   Chariot Group, as a corporation and its shareholders have reasonably relied upon Gray's performance of

these promises and obligations, and have been injured as a result of such reliance, namely by the loss of Homestar as a corporate opportunity.

101. By reason of the foregoing, plaintiff, on behalf of Chariot Group, is entitled to judgment imposing a constructive trust on Homestar to operate that corporation for the benefit of Chariot Group.

WHEREFORE, plaintiff Benjamin Richardson, suing in his capacity as a shareholder on behalf of Chariot Group, Inc. for the benefit of that corporation, demands that this Court enter judgment in favor of Chariot Group, Inc., as follows:

(1) on the first cause of action for damages, compensatory damages against Gray, Chariot Holdings, and Chariot Plastics, in an amount to be determined but believed to be in excess of $10.0 million, and punitive damages in an amount in excess of $30.0 million, and compensatory damages against Gray, Chariot Holdings, Chariot Plastics, AMW Holding, and VDC Recovery in an amount to be determined but believed to be in excess of $1.0 million, and punitive damages in an amount in excess of $3.0 million,

(2) on the second cause of action for an accounting of monies improperly paid to Chariot Holdings and Gray and for alleged loans advanced and forgiven, and for monies improperly paid to Chariot Holdings, Gray, and VDC Recovery as

damages in an amount to be determined but believed to be in excess $7.2 million,

(3) on the third cause of action for an accounting for self-dealing in connection with the acquisition of Republic Metals, damages in an amount to be determined but believed to be in excess of $5.0 million,

(4)   on the fourth cause of action for an accounting for theft or misappropriation of the corporate opportunity consisting of the acquisition of Homestar, and with conversion of funds to the account of VDC Recovery in connection with the acquisition of Homestar, damages in an amount to be determined but believed to be in excess of $1.0 million,

(5) on the fifth cause of action for an accounting for waste of corporate assets in connection with violations of Section 16(b) of the Securities Act arising from the improper short-swing sale of Synalloy stock, damages in an amount to be determined but believed to be in excess of $150,000.00,

(6) on the sixth cause of action, a preliminary and permanent injunction, restraining and enjoining Gray, Chariot Holdings, Chariot Plastics, or any corporation owned or controlled by Gray, and any employee, agent, officer or representatives, however described, of Gray or such companies, from the following acts:

a. the payment of monies from Chariot Group, or any of its operating companies, directly or indirectly,

31

to Gray, Chariot Holdings, Chariot Plastics, or any corporation
owned or controlled by Gray for alleged management fees,
forgiveness of loans, or for any other purpose except reasonable
compensation to Gray, and

      b.  the disbursement of monies from Chariot Group,
or its operating companies, to any third party other than in the
ordinary course of business for obligations due in the ordinary
course of business,

      (7) on the seventh cause of action, a
preliminary and permanent injunction, restraining and enjoining
Gray, Houlihan, Chariot Holdings, Chariot Plastics, Chariot BP,
AMW Holding, VDC Recovery, or any other corporation which Gray
owns or controls, their agents, employees, officers and
representatives, however described, of the following acts:

      a. to incumber the assets and revenues of the
        Chariot Group, or any of the companies
        which it owns and controls,

      b.  to transfer the stock of the operating
        companies owned or controlled by the
        Chariot Group,

      c.  to undertake any extraordinary transactions
        outside the ordinary course of business
        which adversely affects, or might adversely
        affect the interests of Chariot Group or
        its shareholders, or its operating companies,

or, in the alternative, in the event that any such transactions
have been concluded, a judgment setting aside any such
transactions, as unlawful conveyances, pursuant to Section 720
(a)(2), B.C.L.

        (8) on the eighth cause of action, a
constructive trust upon the stock, assets, revenues and
operations of Homestar for the benefit of Chariot Group,


    TOGETHER with such other or further relief, including an
award of costs, disbursements and reasonable attorneys fees, as
this Court may deem just and proper.

Dated: Nyack, New York
      August 3, 1995

                              JOSEPH H. ADAMS, ESQ.
                              Attorney for Plaintiff
                              53 Burd Street
                              Nyack, New York 10960
                              (914) 353-2320

At IAS Part *14*, of the
Supreme Court, State of
New York, County of New
York, at the New York
County Courthouse on this
*9* day of August,
1995

PRESENT: HON. WALTER M. SCHACKMAN Index No. 116880/95

------------------------------------------------x
                                                :
BENJAMIN RICHARDSON, a Stockholder,             :
On Behalf of THE CHARIOT GROUP, INC.,           :
                                                :
                        Plaintiff,              :
                                                :
            v.                                  :        ORDER TO SHOW CAUSE
                                                :
RICHARD E. GRAY and THE CHARIOT                 :
GROUP, INC, CHARIOT HOLDINGS, LTD.              :
CHARIOT PLASTICS, INC., AMV                     :
HOLDINGS, INC., VDC RECOVERY, INC.              +
CHARIOT BUILDING PRODUCTS, INC.,                :
HOMESTAR, INC., and HOULIHAN, LOKEY,            :
HOWARD & ZUKIN,                                 :
                        Defendants.             :
                                                :
------------------------------------------------x

        Upon the affidavit Stuart J. Benton, sworn to

August 3, 1995, the affirmation of Joseph H. Adams, dated August

4, 1995, the exhibits annexed thereto, and the amended summons

and amended complaint, dated August 3, 1995, and good cause

having been alleged therefore, it is


        ORDERED that defendants show cause before this

Court at IAS Part *14*, New York County Courthouse, ~~60 Centre~~ *71 Thomas*

Street, New York, New York, on August *17*, 1995, at 9:30 a.m. or

as soon thereafter as counsel can be heard why an order should

not be granted in this action, on the application of plaintiff,

CONSULT LAW JOURNAL
ON DAY BEFORE RETURN DAY
FOR PRECISE ADJOURNMENT

for the following relief:

A.(1)  an order restraining and enjoining defendant Gray, directly or through any of the defendant corporations herein, from paying or otherwise disbursing monies to Gray, or to any of the corporate defendants herein, or any other corporation owned or controlled by Gray, directly or indirectly in the form of loans, fees, or any other type of payment, other than reasonable executive compensation to be paid to Gray in the ordinary course of business, in an amount to be determined by the Court,

A.(2)  an order restraining and enjoining defendant Richard E. Gray ("Gray"), directly or through any of the corporate defendants herein, from engaging in any extraordinary transaction, not regularly done in the ordinary course of business, by Chariot Group, Inc., or any of the other corporate defendants, including but not limited to:

1. selling, assigning, transferring, encumbering or otherwise disposing of the stock or assets of Chariot Group, Inc. or any of the stock or assets of any operating companies owned or controlled by Chariot Group, Inc, including but not limited to B.F. Rich Company, and Energy Savings Products, Inc., to any third party, including to any corporation named as a defendant herein,

2. negotiating or consummating any loan or other financial transaction, through the agency of Houlihan, Lokey, Howard & Zukin or otherwise, which might encumber, directly or indirectly, the stock or assets of Chariot Group, Inc., or the stock, assets or revenues of the operating companies, owned or controlled by Chariot Group, Inc., namely, B.F. Rich Company, and

Energy Savings Products Corp.,

       3.  entering any agreements pursuant to which the stock or the assets of the operating companies owned or controlled by Chariot Group, Inc. or the stock or assets of Chariot Group, Inc., are in the future to be sold, assigned, transferred, encumbered or otherwise disposed of to any third party, including but not limited to the corporate defendants herein, and

      B. an order restraining and enjoining defendant Houlihan, Lokey, Howard & Zukin, from taking any action to consummate any financial transaction, including but not limited to any secured loan or any other type of financing transaction, pursuant to which any of the following items are sold, assigned, transferred, encumbered or otherwise disposed of:

      1. the stock or assets of Chariot Group, Inc.

      2. the stock or assets of the operating companies, Energy Savings Products, Corp. or B.F. Rich Company, that are owned or controlled by Chariot Group, Inc.

      C. an order scheduling expedited discovery within two weeks of the return date of this application, from defendants Richard E. Gray, and the other corporate defendants that are owned and/or controlled by him, and from Houlihan, Lokey, Howard & Zukin, pursuant to deposition notices and document demands annexed as exhibits to the affirmation of Joseph H. Adams, and it is further

      ORDERED, that pending the hearing ~~and determination~~ of this action, defendants shall be and hereby are restrained and

enjoined from selling, assigning, transferring, encumbering or otherwise disposing of the stock and assets of Chariot Group, Inc., or its operating companies, Energy Savings Products, Corp., and B.F. Rich Company, and defendants shall be and hereby are further restrained and enjoined from disbursing any monies from Chariot Group, Inc., to Richard E. Gray, or any of the other corporate defendants, directly or indirectly, other than for payments of monies due and payable regularly and in the ordinary course of business, and it is further

ORDERED that, on or before the return date of this order to show cause, defendants shall produce to plaintiff's counsel the following documents:

a. the "Confidential Financing Memorandum, dated May 1995 for Chariot Building Products, Inc. any modified, revised or later versions, or any other memorandum describing the pending financial or corporate restructuring transaction,

b. a sworn statement from Gray, with appropriate documentary support for any facts stated therein, describing the financial and corporate restructuring transactions.

ORDERED that service of a copy of this order and the papers on which it is granted upon the defendants as follows:

Richard E. Gray, individually and as an officer or director and/or as the controlling party of Chariot Holdings, Inc., Chariot Plastics, Inc., Chariot Building Products, Inc., AMW Holdings, Inc., VDC Recovery, Inc., Homestar, Inc., 45 Rockefeller Plaza, New York, New York, and

Houlihan Lokey Howard & Zukin, 31 West 52nd Street, New York, New York

by on or before August // , 1995, shall be good and sufficient service hereof.

ENTER: _____        WALTER M. SCHACKMAN

CONSULT LAW JOURNAL
ON DAY BEFORE RETURN DATE
FOR PRECISE ARGUMENT TIME

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                    Index No. 116880/95
---------------------------------------x
                                       :
BENJAMIN RICHARDSON, a Stockholder,    :
On Behalf of THE CHARIOT GROUP, INC.,  :
                                       :
              Plaintiff,               :
                                       :
      v.                               :     AFFIRMATION
                                       :
RICHARD E. GRAY and THE CHARIOT        :
GROUP, INC, CHARIOT HOLDINGS, LTD.     :
CHARIOT PLASTICS, INC., AMV            :
HOLDINGS, INC., VC RECOVERY, INC.      :
CHARIOT BUILDING PRODUCTS, INC.,       :
HOMESTAR, INC., and HOULIHAN, LOKEY,   :
HOWARD & ZUKIN,                        :
                     Defendants.       :
                                       :
---------------------------------------x

        JOSEPH H. ADAMS, being duly admitted to practice law in
the State of New York, affirms under penalty of perjury:

        1.  I am counsel for plaintiff Benjamin Richardson, in
this shareholder derivative action brought on behalf of the
Delaware corporation, Chariot Group, Inc., ("Chariot Group").  I am
familiar with the facts and circumstances set forth herein, except
to the extent that this affirmation makes statements about the
underlying transactions, in which case I rely on information
contained in the amended complaint (Exhibit A) filed herewith, and
in the accompanying affidavit of Stuart J. Benton (Exhibit 1),
formerly a director of Chariot Group.  The purpose of this
affirmation is to provide a brief, introductory synopsis of the
claims and of the reasons for this application for preliminary
relief, including expedited discovery and restraining orders.

INTRODUCTION TO APPLICATION

2.  Although the corporate architecture underlying these claims is moderately elaborate, as is the pleading of the claims which must embrace that architecture, the essence of the claims is quite simple.  Defendant Richard E. Gray ("Gray") controls all the financial affairs of corporations in the "Chariot" set of holding corporations, and has wantonly looted the only corporation in that set of companies with assets, Chariot Group (Amended Complaint, pars. 2 to 5, 11).  Based upon our limited knowledge of a new funding transaction that is imminent, or may even be completed, it also now appears that Gray is seeking to create a parallel set of corporations to take over, by means not yet established, the operating corporations owned or controlled by Chariot Group -- all engaged principally in the manufacture of doors and windows, and other building products -- either to encumber their assets to borrow money for his personal use and benefit or, more radically, to "delete" Chariot Group and its minority shareholders from the sequence of holding companies that control the operating companies, and thereby eliminate the equity interests of minority shareholders in Chariot Group.

3.  This future pending (or imminently to be completed) funding [and/or transfer of equity] transaction, which is the primary focus of the requests for expedited discovery and injunctive relief on this application, cannot conceivably be a proper transaction.  That is true whether the transaction is

2

characterized as a self-dealing one designed to benefit Gray and "his" companies at the expense of the minority shareholders of Chariot Group -- in which case it would involve a blatant [and continuing] violation of Gray's fiduciary obligations as officer, director and controlling shareholder of Chariot Group; or whether the transaction is characterized as a fraudulent conveyance under the Debtor and Creditor Law as to the claims of the Corporation and/or the minority shareholders asserting monetary damages and BCL accounting demands on behalf of Chariot Group.

4.    The Catch-22 on this application is that, although Chariot is a publicly held company, Gray denies any and all information to shareholders, who therefore can provide only limited information to describe the imminent transactions -- unless there is assistance from the Court in terms of expedited discovery. Chariot Group was [cleverly, and perhaps lawfully] delisted and deregistered by Gray in 1990. From that date, no information has been available concerning Gray's past and ongoing "looting" activities -- until there was forced disclosure of certain financial statements in a related Delaware action. From the very limited information available to Chariot Group's minority shareholders, it is now clear that, in the past four to five years, there have been gross improprieties of corporate management -- almost unimaginable in their brazenness. Against the background of this past self-dealing conduct, it is virtually a moral certainty that the pending financing transaction -- coupled with the probable transfer of Chariot Group's assets, however that may be done --

3

will irreparably and irretrievably deprive Chariot Group, i.e. a publicly held corporation with minority shareholders, of its equity interests in the only assets of the Corporation, which are the operating companies, called B. F. Rich Company, and Energy Savings Products, Inc., their stock, assets or future revenues.

5.    This urgent application is two-fold.    First, it seeks an immediate TRO, blocking any extraordinary finanical transaction, for as brief a period as the Court directs for the return date.  The application also seeks expedited discovery as to all relevant subjects, including prior looting and prior self-dealing transactions, as described below.    Primarily, however, this application for expedited discovery seeks essential information as to the pending financing transactions, and any related corporate restructuring transactions by which the assets of Chariot Group -- namely, the operating companies, their stock or revenues and assets -- may be transferred to another Gray-controlled company.

6.    Indeed, to expedite discovery as to this essential transaction to the maximum extent possible, the order to show cause has been drafted to include an additional "TRO-type" of expedited discovery, namely an order that defendants produce on the return date two essential documents: (i) copies of a "Confidential Financing Memorandum" dated May, 1995, or any similar documents, prepared by defendant Houlihan, Lokey, Howard & Zukin ("Houlihan"), an investment firm, for Gray, which we believe describes the pending transaction, and (ii) a sworn statement from Gray as to the

details of any pending financial transaction involving Chariot Group or its operating companies. If forced to be immediately disclosed, these documents will enable the issues raised on this application to be reviewed based on detailed information. To date, all such information has been systematiclly denied to shareholders.

7. In this manner, this Court, and plaintiff, will be able to insure that, on the return date of this application for injunctive relief, defendants will not be able to appear behind a stone wall protecting the Catch-22 position that plaintiff does not have sufficient detailed information about the future financing transactions -- which have been kept strictly secret by defendants, despite demand -- to obtain injunctive relief. Instead, the argument on the return date will be able to focus on the information that will reveal to this Court, and to the minority shareholders who have a clear right to know, exactly what Gray is doing with Chariot Group, to which he owes fiduciary obligations, and with the operating companies that are the Corporation's assets.

8. The following is a summary of what is known.

LOOTING THE EASY WAY: BY WRITING CHECKS

9. The basic factual allegations against Gray can be broken discretely into two sets of allegations. First, since 1990 to at least 1994, while Gray was the sole director and chief executive officer of Chariot Group, he looted the corporation to the tune of at least $7.2 million. The looting is not subtle in form or style. After Gray delisted and deregistered Chariot Group

5

in 1990 -- unfortunately possible [and arguably lawful] because much of the stock of the 400 or so other shareholders was held collectively in the "street name" of brokerage houses, thereby reducing the number of public shareholders below a presecribed minimum -- Gray proceeded to pay "management fees" to his other wholly-owned holding companies [each with one employee, Gray] and to "lend" and then forgive loans to himself and these companies. By this unsubtle means, at least $7.2 million was paid by Gray to Gray for Gray's exclusive use.  This information, summarized in the accompanying affidavit of Stuart Benton, was only recently obtained, after disclosure of financial statements was compelled in shareholder litigation in the Chancery Court of Delaware.

10.  Gray was paid $200,000.00 per year before and after 1990, which, for purposes of argument only,  considering his problematic integrity and the fact, as I am advised, that he plays virtually no active role in the management of the operating companies, constitutes more than fair and generous compensation. Any and all amounts in excess of that annual $200,000.00 salary, plaintiff claims, have been converted, misappropriated, embezzled, etc. and must be repaid and "accounted" for under Section 720, B.C.L., by Gray's  reimbursement of monies to Chariot Group.

FUTURE LOOTING: ENCUMBER THE ASSETS USING ANOTHER "CHARIOT" CO.

TAXES: ONLY LITTLE PEOPLE PAY TAXES!!

11.    Two recent critical events have prompted the current applications to the court.  First, in November, 1994, Gray confessed or entered a consent judgment with the Internal Revenue Service ("IRS"), in an action alleging civil tax fraud, on behalf of himself and his principal holding company, Chariot Holdings, Inc. ("Chariot Holdings") for a total sum that, with penalties and interest, exceeds $5.0 million.  Copies of these tax judgments are annexed as exhibits to the Benton affidavit.  I am advised, by persons with knowledge (Benton Af't., par. 12), that Gray for years has intentionally not filed and/or paid taxes and boasts of not doing so.   I am advised, that Gray has not filed any state tax returns from at least 1984, and has paid virtually no taxes, state or federal, since 1984 (Benton Af't. par. 12).  In any event, the IRS has begun to catch up with Gray, and, at an absolute minimum, as a result of these tax judgments, Gray is faced with enforceable IRS judgments for millions of dollars which, unless Gray is able again to loot the revenues of Chariot Group, he can not now pay.

12.    Secondly, although the details of the financing transactions are not now known, it is known that Gray is currently engaged in attempt to raise monies, apparently by borrowing money secured by the assets or revenues of the operating companies, whose stock and assets are owned or controlled by Chariot Group.  As part of that refinancing effort, Gray may also be involved in creating

7

a "parallel" set of wholly-owned holding companies to eliminate the equity interests of the minority shareholders. As set forth in the accompanying affidavit of Benton, this separate set of corporations has been set up, including a "newco" called Chariot Building Products, Inc. ("Chariot BP"), which is apparently to be funded, using the Chariot Group assets as collateral, pursuant to a certain "Confidential Financing Memorandum", dated May 1995 (Benton Af't., Ex. F), the contents of which are not completely known to plaintiff. Thus, there is an imminent risk of a financing transaction involving a "Chariot" company, using the assets or stock of the operating companies owned by Chariot Group. No "Chariot" company other than Chariot Group has any interest in these operating companies. Gray has no substantial source of revenues other than Chariot Group (Benton Af't., pars. 12 to 14).

13. Neither Gray nor Chariot Holdings has sufficient assets, independent of the revenues of Chariot Group or its operating companies, to honor these judgments. That means one of two equally improper transactions is likely: either Gray will seek to encumber the assets of Chariot Group, to obtain monies to pay his tax liabilities; or, in the alternative, Gray will seek to impede the enforcement of the tax judgments against him and Chariot Holdings, by transferring the assets of Chariot Group outside the existing chain of holding companies, starting with Chariot Holdings and ending with Chariot Group, so that Gray can continue the control of operating company revenues while continuing to avoid payment of his tax judgments. Whichever alternate scenario Gray

8

may pursue, the transactions that would bring it to fruition cannot conceivably concluded in a manner consistent with Gray's fiduciary obligations to the shareholders of Chariot Group.

## FIRST ALTERNATIVE: UNLAWFUL ENCUMBRANCE TO PAY TAXES

14.   The first scenario is that Gray will encumber the assets of the Chariot Group's operating companies, and then use the monies to pay off his tax liabilities, and those of his holding company, Chariot Holdings.   If this scenario is followed, after looting the company's current revenues to the amount of at least $7.2 million -- at this stage, I am refraining from describing the other more complicated means by which Gray has taken additional millions, see, discussion, _infra_. -- Gray will have succeeded in tying up even the future revenues of the operating companies, so that these companies will be burdened with debt for the next five to ten years, or longer, while they seek to generate revenues to cover the cost of Gray's personal and corporate tax delinquency. The use of Chariot Group's monies for this purpose is improper; it involves looting, waste, self-dealing and constitutes an unlawful disbursement to a shareholder done properly only by dividend.

## SECOND ALTERNATIVE: UNLAWFUL ENCUMBRANCE AND CREATION OF NEWCOS TO ELIMINATE THE MINORITY SHAREHOLDERS ONCE AND FOR ALL

15.   The second scenario is that Gray will not merely borrow money to compromise the financial interests of the Chariot Group shareholders, and move the highly leveraged operating

9

companies to a new "set" of holding companies to break the direct chain of Gray's ownership -- traceable by a diligent creditor like the IRS -- from Chariot Holdings [to Chariot Plastics, Inc.] to Chariot Group (Amended Complaint, pars. 2 to 5, 11).    Such a transaction would enable Gray to continue his lavish life-style, and to avoid payment of his taxes. As an incidental but necessary component, it would also require Gray to implement a corporate restructuring to prevent the IRS from tracing his only equity down through the chain of "Chariot" holding companies to seize his majority stock ownership of Chariot Group. Such a restructuring could also incidentally, but necessarily, eliminate the interests of the minority shareholders in Chariot Group, by fraudulently transferring the operating companies to some "new" Chariot company, presumably the Chariot BP, identified in the Confidential Financing Memorandum, dated May, 1995 (Benton Affidavit, Exhibit F), prepared by defendant Houlihan. As referenced in the accompanying affidavit of Stuart Benton, our pre-action investigation has disclosed that Gray has set up an alternate or "parallel" set of holding companies, including Chariot BP, so the new corporate architecture is ready and waiting for the improper, self-dealing infusion by Gray and Houlihan of the assets of Chariot Group to a "newco."

16.  The use of this "parallel" set of holding companies has only two probably inseparable objectives, neither of which could be lawfully realized without defrauding or violating the rights of the minority shareholders of the Chariot Group.   The first is to immunize Gray and Chariot Holdings from the IRS tax

liability, by transferring ownership or control of the operating companies to the new AMW/VDC set of holding companies -- a conveyance that would be fraudulent under the Debtor and Creditor Law as to Chariot Group, and to its current claims to recoup looted monies.

17.   If that is the intended use of the "parallel" set of holding companies, i.e. a fraudulent conveyance to evade debt, the use of these corporations violates the rights of Chariot Group's shareholders, as well as those of the IRS, as a creditor. Chariot Group has claims against Gray and Chariot Holdings for an amount in excess of $10.0 million, twice the liability of the IRS judgments, and such a transfer of the Chariot Group assets out of Chariot Group, would render Gray or Chariot Holdings, as the parties controlling the majority stock of Chariot Group, insolvent, because the Chariot Grop stock would then be worthless.

18.   The second improper objective of creating this "parallel" set of holding companies is to eliminate the interests of the minority shareholders of Chariot Group, by transferring the operating companies, or their stock or assets, to the new "Chariot" company, which Gray would own without the inconvenience or nuisance created by the legal rights of minority shareholders.   No such transaction could take place without violating the rights of the Chariot Group minority shareholders, nor could it be done without violating Gray's fiduciary obligations to those shareholders.   The ownership and control of these operating companies is the only asset of Chariot Group, and any self-dealing transaction to put

11

ownership of the operating companies into a new "Chariot" corporation in which they have no interest would be a flagrant violation of fiduciary duty.

19.    Gray's long track record of self-dealing and looting -- to the tune of millions of dollars in the four years since he deregistered and delisted the Corporation -- shows that the mandate of fiduciary obligations does not restrain or influence him.   Therefore, application is being made to this Court for a TRO to enjoin the pending financing transaction that is being done for the "new" Chariot corporation, Chariot BP, and for related discovery, so that the precise nature of the new set of Gray's self-dealing transactions can be shown to the Court, and made the subject of a preliminary and then a permanent injunction.

PRIOR ATTEMPTS AT OBTAINING INFORMATION: HOULIHAN

20.    Prior to initiating this application, I have attempted to obtain information concerning the "Confidential Financing Memorandum" prepared by Houlihan and the transaction involving Chariot BP.   I wrote directly to Houlihan (Exhibit B), the investment firm handling that transaction (Benton Af't. par. 20,21; Ex. F), identified myself as the attorney in this action, and requested information about the pending transaction.   In this way, I also simultaneously put Houlihan on notice that the proposed transaction might violate the rights of the shareholders of Chariot Group.   Despite numerous telephone calls, none of which were returned, and my explicit request in the letter for information --

12

<u>as well as for cooperation by this investment firm in assuring that</u> <u>the rights of the minority shareholders were protected in the</u> <u>pending transaction</u> -- I have received no information from Houlihan.  It is clear that Houlihan will provide no cooperation.

21.    I interpret this refusal to communicate as a confirmation of the allegations made in this action and in that letter, and as a clear demonstration that Houlihan will do Gray's bidding, without regard to the rights and interests of the minority shareholders of Chariot Group.  By letter dated August 3, 1995 (Exhibit C ), I advised Houlihan that, in light of their failure to respond to my reasonable inquiries, it was necessary to join them as defendants in this action, which has been done in the amended complaint (Exhibit A to this affirmation)[1].  Unlike the related Delaware shareholder action, discussed <u>infra.</u>, that newly amended complaint focusses in large part on the Houlihan funding transaction for Chariot BP, as does this application for a TRO, expedited discovery and preliminary injunctive relief.

RELIEF NOW SOUGHT: TRO AND EXPEDITED DISCOVERY

CRITICAL DOCUMENTS TO BE PRODUCED ON RETURN DATE

22.    The relief sought is simple, straight-forward and essential to enable the minority shareholders to challenge Gray before improper and potentially irrevocable transactions take place.  By seeking a TRO only long enough to obtain disclosure of

---

[1]    Exhibits identified by letters are also attached to the supporting affidavit of Benton, attached hereto as Exhibit 1.

13

the nature of the planned financing transaction and then to make or to continue further applications for a preliminary injunction based on those disclosures, the relief does not permanently alter any significant right of defendants and protects against a potentially irrevocable transfer.  The need for truly expedited discovery, to break the barrier of secrecy that Gray and Houlihan seek to enforce as to the pending Chariot BP financing transactions or asset transfers, is critical. Although Chariot Group is a publicly held corporation, it has no officers or directors other than Gray -- since 1990, when the looting began in earnest.  No information is available except by court order, and there are no independent directors or other parties to protect the interests of the minority shareholders.   Gray's historical record of rapine of this corporation is firmly established -- and that only after financial statements were produced in related actions pending in the Chancery Court of Delaware, see discussion _infra._  Therefore, the risk of imminent and irreparable injury is neither feigned nor imagined.

23.  Gray and all of his companies must be enjoined from concluding any extraordinary transactions, such as the pending, imminent refinancing by Gray and Houlihan of the so-called "Chariot BP" with the assets of the operating companies owned and/or controlled by Chariot Group.  If such pending transactions are not enjoined, Chariot Group could become an assetless shell with litigation as its sole business.  Its minority shareholders will be irreparably injured, particularly if any third party, be it buyer or lender, becomes involved and it becomes necessary for the Court

14

to "unscramble the eggs" of a presumptively invalid transaction.

24. The second request is for expedited discovery, and has been structured in two different parts. On an expedited basis, i.e. within two to four weeks from the return date of the order to show cause, both the deposition of Gray, and the production of documents from his companies, pursuant to the discovery notices annexed hereto as Exhibits D and E, should be completed. In addition, the immediate deposition of Houlihan, Gray's investment firm should be ordered. However, more is needed.

25. To expedite these proceedings even more, to put plaintiff on an equal footing Gray and Houlihan, and to prevent defendants from using Catch 22 tactics in opposition to this application by refusing to disclose information exclusively in their possession, by an additional TRO, I seek to compel the production of certain critical documents and information by defendants <u>on or before the return date of this order to show cause</u>. This Court is requested to include as part of the TRO an order that directs Gray and Houlihan to produce in court on that date, the following:

> a. the "Confidential Financing Memorandum, dated May 1995 for Chariot Building Products, Inc. any modified, revised or later versions, or any other memorandum describing the pending financial or corporate restructuring transaction,

> b. a sworn statement from Gray, with appropriate documentary support for any facts stated therein, describing the financial and corporate restructuring transactions

26. Such a court-ordered requirement to produce essential information about the pending financing transaction will

15

enable plaintiff -- perhaps after a brief recess, if it is not produced voluntarily before the argument -- to know the details of this transaction on the return date, as only defendants now do. This special production request will prevent defendants from defending this application on a Catch-22 basis, viz: by arguing that plaintiff may not be able to produce detailed information of the pending transactions, while at the same time withholding that information from the Court.

27.    Indeed, the imposition of this disclosure on TRO basis will provide a valuable measure of the good faith of Gray and Houlihan in connection with this transaction.    If there is nothing problematic or improper about the pending transaction, then there should be no objection -- and prompt compliance -- with the Court's order.   If defendants are given this unique, expedited opportunity to demonstrate that there is nothing wrong with the pending transaction, then -- in addition to possible contempt applications, which I foresee -- this Court would certainly be entitled to draw adverse inferences from the refusal of defendants to produce information, and to continue a TRO or a preliminary injunction in place, while discovery by deposition and document production, take place on an expedited basis under a court-ordered schedule.


OTHER IMPROPER CONDUCT: LOOTING BY COMPLEX TRANSACTIONS TOO

28.    The purpose of this summary affirmation is only to outline the basic nature of the charges against Gray and his

16

companies, and to show the need and the right for injunctive relief and discovery.    To that end, I have emphasized the "simple", unsubtle means used by Gray to loot this company, viz. the outright payment of management fees, the forgiveness of millions of dollars in "loans", and, most importantly, the future-directed effort -- imminently capable of realization with the assistance of Houlihan - - to borrow against the future earnings of the operating companies, so that Gray does not have to wait <u>in futuro</u> for revenues to be earned before he converts them to his personal use.    This last transaction, as noted, may also include an attempt by Gray to go all the way and simply "steal" the operating companies to put them into a new "Chariot" company, associated by name only with the corporation, Chariot Group, that owns them.

      29.    The Court should be aware that there is more complex and involuted self-dealing that has also taken place.    As alleged in the complaint, Gray has not limited himself to simple acts of [past and future] misappropriation of monies.    Gray has also cheated the Corporation by selling it a company for $2.6 million that he bought for no money down, and which, lost additional millions after it was acquired, i.e. the Republic Metals acquisition (Amended Complaint, pars. 45 to 49, 64 to 67)(Benton Af't., par. 15).    Gray has recently caused his new set of holding companies to acquire a building products company, Homestar, Inc., which was clearly a corporate opportunity for Chariot Group, even to the extent of diverting monies from Chariot Group to the acquiring company, which were disguised as "management fees".

17

(Amended Complaint, pars. 41 to 44, 68 to 71)(Benton Af't., par. 19).    Gray has even engaged in illegal "short-swing" profit-taking, pocketed the profits, and caused Chariot Group to pay for the inevitable judgment and the fees of attorneys.    See the allegations as to "short-swing" trading in Synalloy stock (Amended Complaint, pars. 50 to 54, 72 to 75)(Benton Af't., pars,17-18).

        30.    Thus, once discovery is done and all of these issues are presented to the Court, it will be evident that complex and well as simple wrong-doing has taken place by Gray and at his direction.    On this application, the simple but enormous theft of monies and the future threat of a diversion of imminent borrowings and the possible outright fraudulent elimination of the Chariot Group's interests in its operating companies have been emphasized so that the Court sees clearly and quickly how dangerous Gray is.


                GRAY'S DISHONESTY: AN ILLUMINATING ANECDOTE

        31.    One of the obvious indices of Gray's theft is that he enjoys a life-style that reportedly consumes up to $2.0 million per year, although his salary as CEO is only $200,000.00, and, I am advised, Gray has no financial resources other than Chariot Group. The array of his lavish life-style, includes a Connecticut estate, a Park Avenue duplex, cars, servants, etc.    At one point during an IRS audit, questions were raised about Gray's deduction of all expenses relating to his Park Avenue apartment as an "office" expense.    When the IRS came to audit, the apartment was filled with office furniture and activity.    However, a few months later, the

18

same apartment figured as the cover story in House and Garden, with a full color photograph of the [strictly residential] apartment appearing on the cover of the magazine. I am advised of this anecdote by an individual with knowledge of that event.

32.  An individual -- and a lawyer, need it be said -- who is capable of such conduct is a difficult target for a legal action of this nature or for any attempt to enforce legal rights in court. As a closing to this presentation, I specifically request that the Court assist plaintiff to the maximum extent possible to bring Gray to justice and to an accounting. That means that all the "wiggle" room for a demonstrably dishonest defendant must be cut off. All the orders restraining him must be tight as a steel animal traps, and absolutely no tolerance should be shown -- subject to future contempt applications if necessary -- if Gray avoids discovery or seeks to evade the preliminary injunction.


NO PRIOR APPLICATIONS: RELATED PROCEEDINGS

33.  No prior application for this relief has been made in this action, or in any other court by this plaintiff. I advise the Court that another shareholder action, relating to some or all of the same transactions has been commenced in the Chancery Court in Delaware, and that there was an application, pending early last month, for expedited discovery in that action, and also a pending request, without application for a TRO, for a preliminary injunction _inter alia_ framed broadly and without reference to the pending Gray/Houlihan transaction against disbursement of monies

19

and extraordinary transactions.  Copies of those applications are part of my correspondence with Houlihan, annexed as Exhibit B.

34.  This New York action was filed prior to the Delaware action, and the principal place of business of Gray and his companies is located in New York, New York and certain parties, specifically Houlihan, which is handling the disputed financing transaction, that is sought to be restrained, may not be subject to the jurisdiction of the Delaware Courts.  Moreover, as set forth in the amended complaint, this action focusses on the current attempts to extinguish or prejudice the rights of the minority shareholders of Chariot Group, in the pending financial transactions which, if permitted to go forward, may either encumber the future revenues of the operating companies, and/or totally remove them from ownership or control of Chariot Group.  None of these critical, time-sensitive issues were pleaded or presented to the Delaware court.

35.  This application for preliminary injunctive relief has been reserved until the outcome of the pending applications in Delaware, which were never submitted for determination.  Instead, they were resolved by a stipulation, that provides no protection as to the future pending events, and does not even provide the shareholders of Chariot Group with access to essential information that would enable them to learn the details of the future pending Gray/Houlihan/Chariot BP transaction which carries such enormous risk to the interests of Chariot Group, as a separate corporation, and for its minority shareholders.  That stipulation "limits" Gray to income equal to his 1994 income, and otherwise withdraws all

20

applications for injunctive relief, and for expedited discovery.

36.    A copy of that stipulation is annexed hereto as Exhibit F.  That stipulation demonstrates that all of the pending applications before that Court have been withdrawn, without being resolved or submitted to judicial determination.  Therefore, there is no chance of inconsistent verdicts or conflicting rulings. Moreover, since that Delaware action focussed exclusively on the prior 1991 to 1994 looting and not the pending financial transactions, the subject matter of these actions is not identical. Indeed, in the Delaware Chancery Court action, issues relating to the Chariot Building Products financing transaction are not pleaded and therefore could not have been addressed and determined in the applications for preliminary relief.

37. Whatever may be the rationale or justification for such a stipulation in an action focussed primarily on money damage issues relating to claims of looting in 1991 to 1994, the stipulation has no impact on this litigation, and neither addresses nor resolves the time-sensitive issues relating to the future pending Gray/Houlihan transactions.  The fact that the past pending applications in the Delaware action were withdrawn and not submitted for determination establishes that those applications should neither preclude or restrain this court from hearing this application.    That is so particularly since the stipulation fails to address or to provide any protection to the minority shareholders of Chariot Group from the pending Gray/Houlihan/Chariot BP transaction, and also fails to provide

21

essential information about that very important transaction.

CONCLUSION

38.    The TRO preliminary injunctive relief, and expedited discovery, including that sought in the "TRO", should be granted in its entirety.

Dated: August, 1995

JOSEPH H. ADAMS

22

EXHIBITS TO THE ADAMS AFFIRMATION


A. Amended Summons & Complaint

B. Letter dated July 24, 1995, to Houlihan and attachments

C. Letter dated August 3, 1995, to Houlihan

D. Proposed Deposition Notice

E. Proposed Document Demand

F. Stipulation in Delaware action


1. Affidavit of Stuart J. Benton, and exhibits A to F

23

At IAS Part 14 of
Supreme Court of the
State of New York,
County of New York,
August 17, 1995

PRESENT: HON. WALTER M. SCHACKMAN
-------------------------------------X
Benjamin Richardson,

                    Plaintiff,              No. 120269/95

          v.

Richard E. Gray et al.

                    Defendants
-------------------------------------X
Benjamin Richardson

                    Plaintiff,

          v.                                No. 116880/95

Richard E. Gray et al.,

                    Defendants.
-------------------------------------X

          WHEREAS plaintiff in these actions has brought on
orders

to show cause dated August 9, 1995 in action No. 116880/95, and

dated August 16, 1995 in action No. 120269, both of which were

originally returnable on August 17, 1995, seeking a temporary

restraining order and preliminary injunction, the parties agree,

and the Court orders, the following:

          1. The return date of these motions is adjourned to

September 7, 1995.  Defendants will serve their papers in

opposition to these motions by hand on on plaintiff's counsel by no later than 5:00 P.M. September 1, 1995, and plaintiff will serve his reply papers on the return date of this motion.

2. Pending the hearing of these motions, defendants, and all corporations or other entities controlled by them, shall be restrained and enjoined from consummating the sale, assignment, transfer, encumbrance or other disposition of the stock and/or assets of Chariot Group, Inc. or the operating companies, Energy Savings Products Corp. and B.F. Rich Company (the "Operating Companies"), and from disbursing any monies to Richard Gray or any of the other corporate defendants, directly or indirectly, from the Operating Companies or any other companies controlled by defendants, and/or from any loan or other financing transaction secured by the stock or assets of the Operating Companies or the Chariot Group, Inc., other than for payments of monies due and payable regularly and in the ordinary course of business.

3. Pending the hearing of these motions, defendants Houlihan, Summit, and Gray, directly or indirectly, or through any corporation owned or controlled by Gray, shall be restrained and enjoined from consummating any loan or financing transaction in the name of Summit Metals or any other corporation which Gray owns or controls, or in which Gray has an interest, which loan or financing transaction is secured or collateralized, directly or

indirectly, or in any way by the stock, assets or revenues of the Operating Companies.

4. With their responsive papers, defendants shall produce the following documents:

a. current or most recent financial statements for Summit Metals Inc., Homestar Acquisitions, Inc. and Halloway Industries, Inc., and representations or documents disclosing the ownership structure of these corporations.

b. memorandum describing the proposed financing transaction collateralized, directly or indirectly, by the stock or assets of the Operating Companies, and the planned disposition of the proceeds of such financing transaction.

Joseph H. Adams
Nyack, N.Y.
Counsel for Plaintiff
(914) 353-2320

Herzfeld & Rubin, P.C.
Herzfeld & Rubin
40 Wall Street
New York, N.Y. 10005
Attorneys for defendants
(212) 344-5500

Howard, Darby & Levin
1330 Avenue of the Americas
New York, N.Y. 10019
Attorneys for Defendant
Houlihan, Lokey, Howard &
Zukin
(212) 841-1000

SO ORDERED:  August 17, 1995

Hon. Walter M. Schackman

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                    Index No. 116880/95
---------------------------------------x

BENJAMIN RICHARDSON, a Stockholder,  :
On Behalf of THE CHARIOT GROUP, INC.,:
                                     :
                    Plaintiff,       :
                                     :
        v.                           :
                                     :
RICHARD E. GRAY and THE CHARIOT      :
GROUP, INC, CHARIOT HOLDINGS, LTD.   :
CHARIOT PLASTICS, INC., AMV          :
HOLDING, INC., VDC RECOVERY, INC.    :
CHARIOT BUILDING PRODUCTS, INC.,     :
HOMESTAR, INC., and HOULIHAN, LOKEY, :
HOWARD & ZUKIN,                      :
                    Defendants.      :
                                     :
---------------------------------------x
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                    Index No. 120269/95
---------------------------------------x
                                     :
BENJAMIN RICHARDSON, individually    :
and as a member of the class of      :
persons consisting of all of the     :
minority stockholders of common stock:
of THE CHARIOT GROUP, INC.,          :
                                     :
                    Plaintiff,       :
                                     :
        v.                           :
                                     :
RICHARD E. GRAY and THE CHARIOT      :
GROUP, INC, CHARIOT HOLDINGS, LTD.   :
CHARIOT PLASTICS, INC., AMV          :
HOLDINGS, INC., VDC RECOVERY, INC.   :
CHARIOT BUILDING PRODUCTS, INC.,     :
HOMESTAR, INC., and HOULIHAN, LOKEY, :
HOWARD & ZUKIN, SUMMIT METALS, INC., :
HALLOWELL INDUSTRIES, INC., HOMESTAR :
ACQUISITION CORP., AND JOHN DOE      :
CORPORATIONS NOS. 1 TO 5.            :
                                     :
                                     :
                    Defendants.      :
                                     :
---------------------------------------x

PLAINTIFF'S REPLY MEMORANDUM

1

This memorandum is submitted on behalf of Ben Richardson --
as plaintiff asserting claims on behalf of Chariot Group, Inc.
("Chariot Group"), on a shareholder derivative basis in Action No.
1, and on behalf of the minority shareholders of Chariot Group, in
Action No. 2, a class action, seeking inter alia, the recision of
a fraudulent, sham "cashout" merger described below -- in support
of the pending applications for preliminary injunctive relief, and
expedited discovery, and for the appointment of a temporary
receiver. The memorandum is also submitted in opposition to the
motions to dismiss the complaints in each action. In lieu of a full
statement of facts, this Court is respectfully referred to the
accompanying reply affidavit of Stuart Benton, the exhibits annexed
thereto, the reply affirmation of Joseph Adams, and the affidavits
of Ambrose Richardson and Ben Richardson, and the affirmation of H.
Adam Prussin, together with all of the submissions originally made
on the orders to show cause.

INTRODUCTION: SUMMARY OF FACTS & PROCEDURAL BACKGROUND

This dual set of actions represents the attempt, on
behalf of minority shareholders, to hold defendant Richard E. Gray
("Gray"), and his corporations, liable for the waste and looting of
over $12.0 million dollars from Chariot Group, based on claims
that, if enforced, would give the Corporation a judgment against
Gray and his various holding companies that would equal or exceed
the value of Gray's majority interest in Chariot Group. The second

2

action in the set, a class action which incorporates in haec verba the original pleadings of the shareholder action, seeks, inter alia, to rescind and to declare void, as a matter of equitable relief, a sham "cashout" merger, purportedly consummated on August 7, 1995, of Chariot Group into Summit Metals, Inc. ("Summit") and thereby to permit the minority shareholders to proceed, in their representative capacity for the Corporation, to assert their claims against Gray and his many corporations.    The class action also asserts fraudulent conveyance claims based on the sham merger.

Granting the preliminary relief requested is necessary to preserve the status quo in this dispute, to preserve the rights of the minority shareholders to assert claims for the Corporation, and to prevent Gray, and his many "alter ego" companies, from causing irreparable injury to the Corporation and its minority shareholders.    The cashout merger, when used lawfully, is bona fide means of transforming the interests of minority shareholders to consideration -- normally "cash" in a cashout merger -- equivalent to the full value of their stock ownership, and is subject to stringent safeguards, arising from the fiduciary duties of the majority or controlling shareholder, imposed by Delaware law.    The "cashout" merger of Chariot Group to Summit merely imitates the legal form of such a merger, and, to an astonishing degree -- lacks all of the "entire fairness" requirements of a valid merger and, as a transaction done solely by self-interested parties, engaged in self-dealing, without the intervention of any independent party, is voidable or subject to recision by this Court

3

sitting in equity.

The likelihood of success on the ultimate relief of recision is so great that any additional steps to consummate the merger should be enjoined. To date, the consummation of the merger reflects nothing more than the unilateral creation of a self-serving corporate restructuring that affects only companies owned or controlled by Gray. No act involving a third party has taken place. Of greatest importance, the new financing available through defendant Houlihan, Lokey, Howard and Zukin ("Houlihan") must be enjoined -- or the proceeds of such financing given to the control and supervision of a temporary receiver.

Once such financing is obtained, the risk of irreparable injury is certain and imminent. Continuing his past established pattern of conduct, Gray may continue to loot the proceeds of this new financing, which is secured by the assets of the operating companies of Chariot Group [including those of the recently acquired Homestar, Inc. ("Homestar") which was a Chariot Group business opportunity [1]]. An equally great risk exists that, once the minority shareholders are eliminated, and the Houlihan financing close, the "liquidity" of both the operating companies and Gray's 100% stock holdings will be so enhanced that Gray may sell his stock or the companies for premium prices and make enormous profits. The urgent demand by Gray, in his opposition

---

[1] The trade journal announcement of the acquisition of Homestar, submitted as an exhibit to the Benton reply affidavit, literally quotes Gray as saying that Homestar was acquired by Chariot Group, not the unidentified "Newco" implied in the answering affidavit of Gray, which contradicts Gray's former statements to the trade journal, denying that Chariot Group bought or even had the monies to buy Homestar.

4

papers, to retain the authority to sell the operating companies and to remove Homestar as a party confirms this risk.

The Chariot Group/Summit merger is a transparent sham[2], which accomplishes no objective except to give Gray complete control over the operating companies he has looted for four years [or longer], without requiring him to give any real or enforceable consideration to minority shareholders for their minority stock. The Chariot Group/Summit merger involves blatant self-dealing, which is not denied by defendants. The transparent use of the merger to immunize all of the defendants from liability on the shareholder claims equal to or greater than Gray's equity interest in Chariot Group, while purporting to restrain the minority shareholders to an appraisal remedy against Summit, an assetless Gray-controlled "Newco", with no financial statements or operating history, constitutes gross overreaching, relying as it does on a final act of self-dealing to prevent the Corporation, through its shareholders, from recovering millions of dollars as a remedy for prior self-dealing by Gray.[3]

There is fraud in this merger in the structuring of the transaction to deprive the minority shareholders of meaningful

---

[2] The term "sham" can be recklessly used in commercial litigation, but this term is literally an accurate description of the unilaterally enacted set of paper transactions by which Gray purports to seize complete control of all the Chariot operating companies, including the recently acquired Homestar, and to leave the minority shareholders with no consideration for their stock, other than the worthless notes given by another Gray "Newco", Summit, whose sole asset is the unsecured $15.0 million note allegedly given by Hallowell Industries, Inc. ("Hallowell"), another Gray "Newco" used in the merger. The apparent namesake for this corporation is a Pennsylvania corporation, in bankruptcy, as to which the presiding bankruptcy judge has made a written determination that Gray violated his fiduciary obligations (Adams Reply Af't. Ex.L).

[3] The amount of the claims against Gray is so great that it is more than theoretically possible that, if the minority shareholders enforced their claims against Gray's stock ownership, they might be capable of divesting him of his controlling interest.

consideration, i.e. meaningless notes.  There is also fraud in the transaction arising from the failure of Gray to disclose any relevant information about the merger, the parties to the merger, or the existence of the Houlihan financing or the recent acquisition of Homestar, all of which are material and relevant. Under controlling Delaware law, and general principles of equity, such fraudulent, self-dealing transactions may be enjoined and voided.  As pleaded, in Action No. 2, the merger constitutes a fraudulent conveyance under the Debtor Creditor law and is thereby independently subject to injunction and recision.

The seemingly complex procedural posture in which these issues are presented to the Court reflects an <u>ad hoc</u> mechanism necessary to protect the interests of the minority shareholders in the face of this sham merger.  The shareholder derivative action is ostensibly terminated by the cashout merger. The relief of recision of that merger, sought in the class action, if granted, will reinstate the minority shareholders status as shareholders, and permit them to continue with the shareholder derivative claims, for the benefit of the Corporation.

The cross-motions to dismiss must be denied.  On these motions, the facts pleaded by plaintiff must be deemed to be true. These facts, which demonstrate that the proposed merger fails to satisfy the "entire fairness" test mandated by Delaware law, and is fraudulent, are legally sufficient to support claims for all the relief requested.  In the context of a motion to dismiss, in which plaintiff's pleadings must be deemed to be true and must be

interpreted in the most favorable manner for plaintiff, the cross-motion by defendants to dismiss both complaints is frivolous. As noted, even the shareholder derivative claims can be interpreted, under controlling Delaware law, to assert individual claims, which, as a matter of law, would not be impaired by the cashout merger.

Ad hominem attacks are addressed in the affirmations and the affidavits submitted herewith, not in this memorandum.

ARGUMENT

POINT I

PLAINTIFF HAS ESTABLISHED LIKELIHOOD OF SUCCESS AND RISK OF IRREPARABLE INJURY, WHICH ENTITLE HIM TO OBTAIN PRELIMINARY RELIEF

The standards entitling plaintiff to interim equitable relief, likelihood of success on the merits and irreparable injury, coupled with a balancing of the equities, are established in these transactions, which reflect fraud and a truly outrageous pattern of self-dealing -- both in the merger and prior to the merger -- both as to the sham consideration to be paid to minority shareholders and as to the enormous amount of critical information not disclosed to them. As the Delaware Court of Chancery noted, in imposing a preliminary injunction to block a merger challenged as unfair under the Weinberger fairness standards, discussed infra., in Kumar v. Racing Corporation of America, Inc., 1991 WL 67088, 17 Del. J.

7

Corp. L. 274 [not reported in A.2d], at p. 7[4]:

> ..[P]laintiffs argue that injunctive relief is
> appropriate where a showing has been made that
> the proposed merger violates defendants'
> fiduciary duties.  In <u>Philips v. Instuform of
> North America</u> [citation omitted], for example
> the Chancellor noted:

> 'Given the great difficulty, and perhaps
> practical impossibility, of returning a merged
> corporation to its original constituent
> corporations, a preliminary injunction is the
> conventional remedy when a shareholder
> establishes that a proposed merger is likely
> to be found to be in violation of law or of
> the board's fiduciary obligations.'

In the <u>Kumar</u> opinion, the Chancellor also noted that, because

plaintiff had made a very strong showing on the merits -- as will

be done here, see discussion <u>infra.</u> -- it remains appropriate to

grant a preliminary injunction even if there is "limited showing"

of irreparable injury than might be required otherwise:

> Plaintiffs' entire fairness and due care
> claims appear to be very strong and our
> Supreme Court has noted that 'a strong showing
> of success on the merits may compensate for a
> weak showing of irreparable harm.' [citation
> omitted]. I am satisfied that such a balancing
> is appropriate here and that, given the
> fundamental breaches of fiduciary duty that
> have been preliminarily established,
> injunctive relief is appropriate
> notwithstanding the limited showing of
> irreparable harm.

<u>Id.</u> at p. 7.    In <u>Kumar</u>, the Court noted that the risk of having

unenforceable judgments would be a form of irreparable injury, <u>Id.</u>

at p. 6, and further that the "balancing of the equities" where

plaintiffs had made a strong showing on the merits of their "entire

---

[4]  Copies of Delaware opinions cited in this memorandum will be provide in a separate appendix for the
Court.

fairness" claims, required imposition of an injunction. <u>Accord</u>, <u>Sealy Matress Company of New Jersey, Inc. v. Sealy, Inc.</u>, 532 A.2d 1324, 1335, Del. Ch. 1987 (enjoining a cashout merger where, as here, the underlying transactions reflected "a textbook study on how one might violate as many fiduciary precepts as possible..")

The merits of plaintiff's claims are set forth below. Particularly on the issues of "entire fairness", plaintiff has not only shown likelihood of success, he has described -- for the benefit of the Corporation and the class members he represents -- a set of merger transactions that is a literal paradigm of self-dealing, overreaching and inherent fraud, not inherent fairness.

Irreparable injury is shown by the fact that Gray intends to leave the minority shareholders with claims against one of his own companies, Summit, which as a practical matter are unenforceable either on an appraisal or on the future payment of the unsecured notes. Irreparable injury is shown by the fact that the merger, if consummated, permits Gray to liquidate his 100% stock interests in the operating companies, or to transfer these interests through a theoretically endless series of "Newcos" which could fatally impair the ability of the minority shareholders to enforce their claims. Irreparable injury is shown by the impairment of the minority shareholders right to exercise their statutory appraisal rights, or to make the decision to enforce other legal remedies by the incomplete, misleading and fraudulent disclosures, or lack thereof, of material information by Gray. Irreparable injury is shown also by the loss of the ability to

9

enforce the millions of dollars in claims by the Corporation against Gray, which might enable it to divest Gray as owner.

The substantive arguments on the merits of the "fairness" and fraud claims, and the need to fashion equitable relief appropriate to this sham merger and the magnitude of Gray's misconduct is set forth in the following portions of this brief.

## POINT II

### THE CHARIOT GROUP/SUMMIT MERGER DOES NOT SATISFY THE "ENTIRE FAIRNESS" STANDARD OF REVIEW

The Chariot Group/Summit merger, together with the prior transfer of the operating company assets of Chariot Group to Gray, or one of his wholly-owned or controlled "Newcos", does not satisfy the "entire fairness" test mandated under Delaware law, Weinberger v. UOP, Inc., supra.; Rabkin v. Philip A. Hunt Chemical Corp., 498 A.2d 1099 ( 1985); Cede & Co. v. Technicolor, Inc., 542 A.2d 1182 (1988); In re Tri-Star Pictures, Inc., 634 A.2d 319 (1993)[5]; Kahn v. Lynch Communications Systems, Inc., 638 A.2d 1110 (1994); Sealy Mattress Company of New Jersey, Inc. v. Seally, supra.. The extraordinary circumstances in which these issues are raised in this action -- namely, the hasty consummation, in the midst of pending shareholder derivative litigation, by Gray as the sole director and officer of Chariot Group, of a transaction

---

[5] In Tri-Star, the Supreme Court of Delaware addressed the issues as to whether a disputed cash-out merger satisfied the fairness test, in the unusual setting of a pre-trial motion to dismiss, and concluded that "given the rigorous scope and standard of review" required by Weinberger, the denial of any motion to dismiss -- in which the plaintiff's allegations must be deemed to be true for purposes of judicial review -- was "foreordained and mandated". Defendants' motions to dismiss are discussed infra.

imitating the mechanics of a so-called "cashout" merger, involving the unilateral manipulation of several "Newco" corporations wholly-owned or controlled by Gray, without the intervention or participation of any independent party to determine fairness, for the sole purpose of giving Gray exclusive ownership and control of three valuable operating companies, in exchange for worthless or bogus "cash" consideration to the minority shareholders consisting of unsecured promissory notes, with _de minimis_ current market value, payable in the next millennium by a Gray-controlled company, the future value of which is totally contingent on Gray's future discretionary acts; and in which the Merger Notice, _inter alia_, fails to disclose the imminence of a pending refinancing from Houlihan, the recent acquisition of another operating company, Homestar -- each event being a business opportunity being misappropriated from the Corporation -- and in which the Merger Notice fails to disclose the critical fact that all of the companies involved in the merger, other than Chariot Group, are wholly-owned or controlled by Gray -- which makes the Chariot Group/Summit merger literally a paradigm of the type of self-dealing, grossly overreaching and fraudulent transaction that does not pass scrutiny under the controlling test of "entire fairness" imposed by Delaware law.

    The test of "entire fairness" is stated succinctly by the Delaware Supreme Court in its _Weinberger_ opinion, which has been interpreted in a number of cases -- few, if any, involving facts as unconscionable as those in the present action -- so that

the stringent and uncompromising application of this "test of careful scrutiny" is clear. The controlling test is described as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. ...[citations omitted]... However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

Weinberger v. UOP, Inc., supra., 457 A.2d at 710.

Review of the manner in which the Delaware courts have applied this test, in the context of a cashout merger, demonstrates how demanding the test can be, and further demonstrates how much difference exists between the type of arguably bona fide transactions presented for such strict scrutiny under that test, with very different details of the sham Chariot Group/Summit merger. For instance, in Weinberger, the Court addressed a situation in which the acquiring corporation, Signal, was a publicly trading company engaged in diversified technical industries through it subsidiaries. After the sale of one of its subsidiaries, creating a cash surplus, Signal ultimately acquired all of the stock of UOP, Inc., ("UOP"). Signal first acquired 50.5% of the stock of UOP in a tender offer at price of $21 per

12

share that was negotiated at arms' length between UOP and Signal.

Later -- and it was this transaction that the Court scrutinized in its _Weinberger_ opinion -- Signal did a cashout merger to acquire the remaining 49.5% of the UOP stock, at the price of $21.00, i.e. the same price as the negotiated tender offer. Prior to initiating negotiations on the terms of a cashout merger, Signal management made an internal "feasibility study" and determined that purchase of the remaining UOP stock at $24 per share would be a good investment, but did not disclose this fact.

Signal's failure to disclose its early feasibility study to either the UOP board or its shareholders, despite the intervening events of the Lehman Bros. fairness opinion, and the approval by the independent members of the UOP Board, rendered this merger unfair, in the opinion of the Supreme Court of Delaware. Compare, _Kahn v. Lynch Communications Systems, Inc._, _supra._, (merger terms resulting from appointment and use of independent committee to negotiate with dominating shareholder owning less than 50% of stock not sufficient, _per se_, to establish "entire fairness"), and _Rabkin v. Philip A. Hunt Chemical Corp._, _supra._, (presence of fairness of opinion from Morgan Lewis, and review and approval of price by a committee of outside directors of acquired corporation insufficient to establish "fairness" of merger).

The presence of _bona fide_ independent parties to the merger, the use of committees of independent directors and fairness opinions for investment firms, present in each of the foregoing disputes in which transactions did not survive scrutiny under the

13

"fairness" test, are totally absent in the Chariot Group/Summit merger.  Instead, what this Court is confronted with is a classic example of the opposite extreme in which there are absolutely no safeguards to the interests of minority shareholders, and Gray, as an individual with a long history of self-dealing and dishonest conduct (see, the affidavit and reply affidavit of Stuart Benton), has constructed a self-dealing transactions to give 100% ownership and control of all valuable assets, while relegating the minority shareholders to a position where the [sham] consideration for their stock is <u>totally</u> subject to the discretionary control Gray.

The absence of any independent review, or the participation of any independent party, is highly significant under Delaware law.  The accepted procedure in Delaware, to insure that transactions involving self-dealing satisfy the condition of fairness mandated by <u>Weinberger et al.</u>, is prescribed in <u>Zapata Corporation v. Maldonado</u>, 430 A.2d 779 (1981), which requires that a self-dealing transaction, such as the termination of a shareholder litigation in <u>Maldonado</u>, be subjected to the critical review of some independent agency.  The failure to obtain such independent by the self-interested corporate directors has the important impact of rendering the disputed transaction void or voidable, Sections 141, 144 of the Delaware Corporation Law.

As the Court of Chancery concluded in <u>Merritt v. Colonial Foods, Inc.</u>, 505 A.2d 757, 765, Del.J.Ch. 313 (1986), where a cashout merger was used to terminate shareholder litigation, the failure to structure such an independent review

into the transaction can be fatal:

> Under the Maldonado procedure, the exercise of judgment by a body of truly disinterested directors, when made after due consideration and in good faith, supplies such a basis [for approving the transaction]. This case provides no similar or analogous basis; that is it affords no ground upon which the defendants could or a reviewing court may dependably conclude that the termination of the derivative litigation sought by the merger was in the best interest of the corporation and was not simply in the interest of the directors and controlling shareholders who had been charged with wrongdoing. Without the guidance of a truly independent judgment, self-interested directors cannot with confidence know the right course in order to pursue it. In all events, the law, sensitive to the weakness of human nature and alert to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefit him [citation omitted].

> Fair dealing in these circumstances required not reliance on such frail support as the defendants' own evaluation of their innocence of wrongdoing and of the fairness of their unilaterally determined cash-out price. Rather, at a minimum, what was required was a disinterested judgment that litigation of the claims asserted derivatively was not in Colonial's best interests and an unbiased and expert view of the value of those claims. Such a requirement should come as no surprise to any director who earnestly asked himself what, given his own intense and apparent conflict of interest, fairness required.

Needless to say, Gray did not implement any procedure to permit independent review of the cash-out merger before it was consummated, and showed scant regard for the dictates of fairness.

A. Considerations of Fair Dealing Establish Lack of Fairness

          Each of the factors identified by the Court in
Weinberger requires a negative determination as to fairness in this
merger. For instance, on the component of fair dealing, Weinberger
notes that "part of fair dealing is the obvious duty of candor",
because "one possessing superior knowledge may not mislead any
stockholder by use of corporate information to which the latter is
not privy", supra., at 711.  In this transaction, the valuable
information used by Gray, which was not available to minority
shareholders and certainly not disclosed in the Merger Notice, is
outrageous[6], and includes the following:

        A. the failure to disclose the pending shareholder
litigation and their aggregate claims for in excess of $12.0
million against Gray or the recent discovery by shareholders of the
millions of dollars of fees and forgiven loans paid to Gray or his
companies

        B. the failure to disclose the pending financing
transactions available through Houlihan, which were the raison
d'etre for the merger and had been in progress for eight months

        C. the failure to disclose the corporate opportunity of
Homestar or the "joinder" of Homestar as a "sister company" to ESP

        D. the failure to disclose that all of the corporations
mentioned in the merger notice, as well as those not mentioned but
which are allegedly involved, are owned or controlled by Gray

        E. the failure to disclose that all of the Gray "Newcos"
holding financial obligations for the minority shareholders "have
only recently commenced operations" (Appendix A), and their ability
to pay monies, or to earn revenues is totally discretionary to Gray

---

[6]
    The minority shareholders of Chariot Group may not have the right to vote to approve or disapprove
the merger, but they do have the right to exercise their appraisal rights knowledgeably under Section 262 of
the Delaware Corporation Law, and the failure of Gray to disclose essential information in the Merger Notice,
in addition to demonstrating that the merger is not fair, also supports a claim the merger was a fraud, based,
inter alia, on non-disclosure of material and relevant information. To the extent that the existing complaints
may not explicitly allege fraud in disclosure contained in the Merger Notice, as opposed to inherent fraud in
the merger, plaintiffs would have the opportunity to amend their pleadings after discovery or before trial.

Thus, there has been total, fraudulent failure of disclosure, which far exceeds any failure of disclosure that could be considered as the violation of the more stringent fiduciary duty of candor.

The amount of relevant information not disclosed to shareholders, who may not have the right to vote on the merger, but who can vote to exercise appraisal rights or other judicial remedies, Sealy Mattress Company of New Jersey, Inc. v. Sealy, Inc., supra., 532 A.2d at 1340, have an enforceable right to exercise an "informed" vote. Supra., 457 A.2d at 712. "In Delaware, existing law and policy have evolved into a virtual per se rule of damages for breach of the fiduciary duty of disclosure", In re Tri-Star Pictures, Inc., supra., 634 A.2d at 333.

The other factors noted by Weinberger on the issue of fair dealing also require a negative conclusion as to fairness. On the issue of timing, the record of Gray's conduct is totally unfair. The merger was timed to take place within days after two shareholder actions had been commenced, and only when, after nearly four years of a total information blackout by Gray, court-ordered disclosure of financial statements of Chariot Group revealed the means and the extent of Gray's looting. The merger also appears to have been timed to take place after Gray had authorized a temporary restraining order, by stipulation, in the Delaware action, which purported to maintain the status quo solely by limiting the monies that Gray could take from Chariot Group during the action. Although the use of cash-out merger to terminate shareholder litigation may not constitute a per se violation of fiduciary duty,

17

the use of the merger for that obvious purpose, as the Court noted in <u>Merritt v. Colonial Foods, Inc.</u>, <u>supra.</u>, must be independently justified under the fairness standards of <u>Weinberger</u>.

Unique particulars of the timing of the merger indicate that the merger was done in a rush to avoid a direct attack on the future pending Houlihan financing transaction. On August 4, 1995, the last business day before the merger, Houlihan was served in its New York offices with the amended complaint in the New York shareholder derivative action, thereby putting Gray and Houlihan on notice that the limited stipulated TRO in the Delaware action could not protect them, and that a direct assault was being prepared against the pending corporate restructuring and the Houlihan financing. (Adams Reply Af't., par. 7; Ex. A: Rodriguez Af't)

The Merger Notice, which was filed in Delaware the following business day, Monday, August 7, 1994, at 4:00 p.m., retains the computer date and time notations of Stephen Hermann, a Delaware attorney, which chronicles that the various parts of the merger notice, were entered into the computer on a sequential time basis on August 7, 1995, as follows:

|   |   |
|---|---|
| A. Notice of Action | 9:57 a.m. |
| B. Notice of Appraisal Rights | 9:55 a.m. |
| C. Summary of Appraisal Rights | 9:55 a.m. |
| D. Appraisal Rights | 3:36 p.m. |
| E. Plan & Agreement of Merger[7] | 2:26 p.m. |

---

[7] This plan and agreement of merger was not available to shareholders until after the deadline for the exercise of appraisal rights. Despite attempts by independent parties, no copy of the merger agreement was produced until September 6, 1995, when a copy was sent directly by Gray to the offices of plaintiff's counsel

F. Filing and effective time                    4:00 p.m.

Thus, the Chariot Group/Summit merger was obviously timed by Gray for the principal self-serving purpose of avoiding enormous personal liability in the shareholder derivative actions, a potential liability equal to or greater than Gray's equity interest as the controlling majority shareholder of Chariot Group. The sequential date-stamping of these merger documents suggests great haste.  It is to be noted that, in the imminent discovery proceedings in either the New York or the Delaware shareholder derivative actions, the details of the proposed Houlihan financing, as well as the recent acquisition of Homestar would have been uncovered, and Gray, as the fiduciary controlling shareholder and sole director would have been required to account for his conduct, past and future.   As noted in the original submissions, for approximately two weeks prior to the merger, demands had been made to Houlihan for information about the proposed financing.

The other variables noted by <u>Weinberger</u> as relevant to fair dealing -- how [the deal] was initiated, structured, negotiated, <u>etc.</u> -- provide the strongest facts to rebut "fairness".  All aspects of this transaction were initiated and structured exclusively by Gray for Gray's benefit.  No third party was ever involved in any of these aspects of the transaction that are essential to fairness.  No third party has an interest in the transactions. There has never been any arms-length negotiation of

_____

(Adams Reply Af't.; Ex. J).  The effective time of the merger as 4:00 p.m. is set forth in the Certificate of Merger, filed in the Secretary of State's Office on August 7, 1995.

any term.  The Gray affidavit, submitted in opposition, contain
references to "we" and the "management of Chariot Group", but it is
unrebutted that either Gray or those he controls are the sole
decision makers.

The structure of these transactions, only minimally
disclosed even in opposition to this application, reflects Gray's
total control and greed.  All of the assets go to Gray "Newcos",
in which the minority shareholders have no interest, even as
creditors.  Only different Gray "Newcos", with no direct ownership
of the operating company assets, have either direct or indirect
obligations to the minority shareholders -- all unsecured -- and
their ability to honor these obligations exists only if Gray elects
in the future to permit these companies to have revenues or monies.

The structure of these transactions, which give no
meaningful or enforceable rights to the minority shareholders, and
which give Gray total unilateral ownership of all assets, with
total, unilateral control of the payment of consideration for these
assets, cannot stand the test of "fair dealing" under Delaware law.


B. Considerations of Fair Price Establish Lack of Fairness

The factors relating to price also conclusively
disprove that the terms of the Chariot Group/Summit merger are
fair.  First, no independent party has made any determination as to
fairness of price.  The sole defense of the price offered on the
merger comes in the undocumented, self-serving affidavit of Gray,
who states that the price is higher than [undocumented] pink slip

quotes, and that the entire merger transaction will enhance the "liquidity" of the minority shares. This type of self-serving defense does not even approach the demonstration of "utmost good faith and the most scrupulous inherent fairness of the bargain", Rabkin v. Philip A. Hunt Chemical Corp., 498 A.2d at 1106, when a party, like Gray, occupies "both sides of a transaction", Id., and had the "burden of establishing [the] entire fairness", Id. of the transaction. In addition, the argument that the cashout merger gives liquidity to minority shareholders is fundamentally misleading and untrue. Compared to the enhanced liquidity of Gray's position as majority controlling stockholder, the $4.0 promissory notes given to shareholders have zero liquidity.

The list of variables which the Court in Weinberger mandated for consideration on the issue of price, on which Gray has the burden, are not even discussed by Gray in his affidavit or, in the Merger Notice, disclosed by Gray. Quoting from its own opinion in Tri-Continental Corp. v. Battye, 74 A.2d 71, 74 (1950), the Supreme Court in Weinberger stated that, in determining fairness, a court:

> ... must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and <u>any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interests, but must be considered by the agency fixing value.</u>

(Emphasis added in part, original in part).

21

On all of these essential variables, Gray <u>et.al.</u> have failed to provide a justification for the price. In commenting on the current low market price for the stock, Gray does not disclose that the current depressed value of the minority stock is a function, jointly, of the total blackout on financial information, and on the fact that the financial condition of Chariot Group has suffered enormously as a result of the improper conduct described in the shareholder derivative action, e.g. looting, payment of excessive fees, forgiveness of loans, Section 16b liability, and the recently discovered -- by shareholders at least -- of the gross overvaluation of the acquisition price for Republic Metals.

On the issue of price, Gray <u>et.al.</u> have failed to provide any information as to the "asset values" of the operating companies, although such information is, of necessity, known to him.[8] No information is presented as to the earning prospects of the newly reorganized set of subsidiaries, particularly as this may be enhanced by the Houlihan financing package, even though the current market value of the minority stock of Chariot Group should reflect the enhanced value [and liquidity] of the operating companies after they have received an infusion of cash financing.

Gray's disclosure as to the "future prospects" for the

---

[8]    The refusal or failure of Gray to produce financial information, which it required to produce to satisfy its burden of establishing fairness, is so flagrant that defendants complied with those parts of the stipulated TRO, which directed defendants to disclose financial information and ownership structure, by merely submitting a half-page typed, unsworn statement, describing alleged corporate relationships, without any confirming documentation and without any disclosure of the mechanism by which Gray ultimately controls these corporations. In lieu of financial statements of the "Newco" holding companies, Gray's in-house counsel merely states that there are none because they only recently "commenced operations". This is profoundly misleading, because, as defendants' counsel acknowledged in court on August 17, 1995, the only relevant financials are those of the operating companies, none of which have only recently commenced operations. To illustrate how cavalier defendants are in ignoring their <u>fiduciary obligation to produce information</u>, a copy of the "disclosure statement" made by defendants, the week following service of their motion papers, is attached as Appendix A.

merger corporations is also seriously deficient in that it does not explain the future use or the destination of the Houlihan financing.    Although Gray opines that the financing will enhance liquidity, there is no demonstration of this alleged fact, nor is there any discussion of how any party, other than Gray, will benefit from the financing.    As noted, the Weinberg court stated that this type of information must be considered, and Gray has not come forward to present it, which he has an obligation to do.

On the issue of price, the $4.0 per share "price" is fundamentally unfair, because it does not represent either the value of the shareholder derivative claims, nor does it reflect what might be described as a "control premium" which the minority shareholders have a reasonable prospect of possessing, if a future judgment against Gray is enforced against his stock. Cf., Rapid-American Corp. v. Harris, 603 A.2d 796 (1992)(requiring consideration of "control premium", as opposed to simple market value, to value corporation which owned 100% of subsidiaries).

As in Tri-Star Pictures, the differential impact of this merger on the "liquidity" of the minority stock as opposed to the liquidity that will be enjoyed by Gray -- or whichever "Newco" he designates, or has designated, to be the "majority shareholder" makes the price unfair.    The $4.0 unsecured Summit notes that the minority shareholders are to receive will be totally worthless as a negotiable instrument in any market.    Absent contrary proof, the uncertainty as to payment or as to the bona fides of the merger transaction in general, means that these notes have no liquidity

23

[or value].

By contrast, Gray or the "majority shareholder" now has perfectly liquid securities, reflecting the elimination of the minority shareholders and the existence of valuable financing. Under these circumstances, the minority shareholders have suffered gross "cash value dilution" of their stock vis a vis Gray's stock. "[T]he practical effect of cash-value dilution is to increase the value of the controlling shareholder's interest at the sole expense of the minority", In re Tri-Star Productions, Inc., supra., 634 A.2d at 319. Only Gray gets enhanced liquidity in this merger.

The final consideration on fairness of price is the most compelling one and leads directly to the conclusion that this merger is a fraudulent one that properly should be rescinded by this Court, acting as a court in equity, exercising its authority to enforce the "fundamental principle that inequitable conduct will not be protected merely because it is legal", Id. at 332. Schnell v. Chris-Chraft Industries, Inc., 285 A.2d 437, 439 (1971). That consideration is the following: the alleged "price" of $4.0 per share is a totally meaningless price because these notes are issued by Gray -- through his Summit "Newco" -- to complete the long-run, long-standing and, to date, highly lucrative fraud upon his minority shareholders. The payment is a worthless Summit note.

The individual who has manipulated the financial affairs of Chariot Group from at least 1991 to the present -- and before, as to the undisclosed defects in the Republic Metals acquisition -- for his own personal benefit, will not permit the

24

Hallowell and the Summit "Newcos" to honor their paper obligations. This is not a matter of adversarial conjecture. In light of the prior judicially determined instances in which Gray has engaged in gross violations of his fiduciary obligations, when the opportunity for self-dealing arose, see Exhibits K and L to the Adams reply affidavit, Gray's future unethical conduct is a moral certainty.

C. Gray et al. Have Failed to Meet Their Burden of Fairness.

Under the standard of "entire fairness" in Weinberger, it is an essential part of Delaware law that the majority shareholder consummating such a transaction has the burden of establishing the fairness of any such "cashout" merger, Id. at 703. Thus, it is not plaintiffs who must prove unfairness, even in the context of application for preliminary injunctive relief, in which plaintiff's likelihood of success turns, in part on the anticipated ability of defendants to meet their burden of proof, Sealy Mattress Company of New Jersey, Inc., supra., 532 A.2d at 1335.

Further, in a situation in which allegations of self-dealing, overreaching and fraud by interested directors are made, as here, and where, as is indisputably the case here in which all of the corporate participants are owned or controlled by Gray, the defendant stands on both sides of a transaction, Delaware imposes an evidentiary burden, sometimes described as a higher standard of showing "intrinsic fairness", Marciano v. Nakash, 535 A.2d 400, 404, (1987) that requires defendants "to demonstrate their utmost

25

good faith and the most scrupulous inherent fairness of the bargain", Id. at 710. As the Supreme Court of Delaware continued in Weinberger, to emphasize its point:

> The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.

Id. at 710 (citations omitted).

In reviewing this application for preliminary injunctive relief, this Court should recognize that defendants have totally failed to satisfy any part of their evidentiary burden to establish the "entire fairness" of the Chariot Group/Summit merger,[9]. In opposition to the plaintiff's applications for preliminary injunctive relief and expedited discovery in each of these actions, defendants have submitted only the self-serving affidavit of Richard E. Gray, with no supporting documentation, or third-party evidence, relating to the disputed transactions.

Given the undenied fact that all of the corporations involved in all of these transactions are either Gray-owned or controlled, there is no question that there is self-dealing, with Gray is on both sides of the transaction, Gray has not come forward with a single document to substantiate the terms of the disputed transactions, the bona fides of the different corporations, the financial ability of any of the parties to the

---

[9] ...or of the related but, previously concluded, corporate "restructuring" that transferred both of the Chariot Group operating companies, ESP and BF Rich, to a "Newco" controlled by Gray, together with a third company, called Homestar, which was a corporate opportunity for Chariot Group [which had actually been described in the trade press by Gray, at the time of acquisition, as a Chariot Group acquisition].

transactions. There are no stock certificates or stock registers produced to confirm the consummation of the alleged corporate "restructuring" by which Gray moved all of the valuable assets -- the operating companies -- to one corporation wholly-controlled by him from Chariot Group.  There is no documentation to confirm the availability of revenues to Hallowell, the company allegedly liable for the $15.0 million purchase price -- not even a copy of that note, dated and signed by an officer [inevitably Gray] is produced.

Except for a self-serving and undocumented rendition of the history of Chariot Group and the inaccurate, malicious and misguided ad hominem attack on Ambrose Richardson, Gray's former law partner, the affidavit of Gray provides virtually no information about the merger other than what appears in the August 7, 1995 notice of merger (Cross-Motion Exhibit B) ("Merger Notice").  The affidavit informs the Court that Halowell, described only as an "affiliate" of Homestar Acquisition in the Merger Notice is really the "parent" of the "parent" of Homestar Acquisition, the company taking over the assets, which is actually a "newly formed" subsidiary of Chariot Realty, Inc., which was not mentioned in the Merger Notice, and appears to be a new "Newco".  In addition, in transactions that are not described, Gray advises only that the newly acquired Homestar is now a "sister company" with ESP [which owns BF Rich], because both are owned 100% by Chariot Realty.

Not one piece of documentation is presented to confirm the existence of these Gray "Newcos", or to establish any of the agreements or stock ownership relationships between them.   Of

27

further importance, not once does Gray disclose or admit to the
ultimate fact that he, personally, owns or controls all of these
other corporations.    Not once does he disclose the ownership
structure that would enable this Court -- or the shareholders
receiving the Merger Notice who were required to make a decision to
elect appraisal rights -- to understand, with finality, the
ownership structure of Gray's corporations.[10]

The admission that none of the Gray "Newcos" have no
financial statements to show, because they "have only recently
commenced operations" (Appendix A), does not excuse or justify the
failure to provide this essential information.    Instead, it
constitutes an admission that Gray [et.al.] cannot meet their
evidentiary burdens.    Without financial information about the
corporations who are supposed to pay shareholders, directly or
indirectly, this Court can only reach a negative conclusion that
the "entire fairness" of this merger is established by defendants. [11]

The extent to which defendants have come forward only
with Gray's conclusory and self-serving statements, unsupported by
third party evidence[12] or documentation, is stunning.    Thus, the

---

[10]
    During the court colloquy on August 17, 1995, in which I sought to have Mr. Quinn, Gray's in-house
counsel, simply admit that Gray owned all these corporations, Mr. Quinn acknowledged the general proposition,
but then made a series of hand gestures reminiscent of the children's game of "the eensy weensy spider went up
the water spout" to indicate the structure of ownership. In the submissions to this Court, the "eensy weensy
spider" has only taken a few steps and has not yet told us how to get to Gray.

[11]
    This statement is more than arguably false. Corporate filings in Delaware show that Homestar
Acquisitions was merged out of existence in a "downstream" merger after the ESP acquisition, so that the
surviving company is ESP. ESP is an operating company and has financial statements, which, reflecting the only
value center of the operating companies, should have been disclosed.

[12]
    The only third party evidence submitted to justify the merger is the one-half page affidavit of
Stephen E. Hermann, an attorney with Richards Layton & Finger, Gray's Delaware counsel. This affidavit attests
only to the fact that Chariot Group "was merged" into Summit on August 7, 1995, and that a Certificate of Merger
was filed. (Hermann Af't. pars. 4,5).    The bare recitation of these facts do not show, as Gray alleges, that

28

Homestar acquisition was not a theft of corporate opportunity because "it cannot be questioned" that Chariot Group did not have "near enough cash" and "was not even able to obtain bank financing" (Gray Af't. par. 30). No documented or detailed explanation is given about how the Gray "Newco" -- Chariot Realty -- succeeded.

The only response by Gray to the allegation that millions of dollars were paid out by him from 1991 to 1994, when Chariot Group reported losses and paid no dividends, is that he believed that they were fair or that they were "small" compared to sales (Gray Af't. par. 24-25). Gray's claim that the Synalloy Section 16b violations were "technical and inadvertent" contradicts the federal judge in that action, who found Gray's conduct showed "lack of candor", and a "continuing display of obstructive behavior and questionable faith." ( Adams Reply Af't. Ex. K).

The Gray Affidavit also contains inherently contradictory statements, relating to the Houlihan recommendation, noting for instance that the consolidation of all the operating companies, including Homestar, was done to aid in the refinancing (Gray Af't. par. 9), but claiming that the [then] prospective acquisition of Homestar would not generate "value or liquidity" for shareholders (Gray Af't. par. 7), and not even the refinancing of Chariot Group would improve the "liquidity" of minority shareholders (Gray Af't. par. 8), while at the same time stating that "the objective from the beginning of our discussions [with

---

the merger complied in every particular with the Delaware law as it applied to such mergers" (Gray Af't. par. 11) or was "duly consummated" under Delaware law (Gray Af't. par.26).

Houlihan] was shareholder liquidity" (Gray Af't. par. 9)[13]

Remarkably, Gray's affirmative allegations conclusively disprove the fairness of the merger. The one set of affirmative statements contained in the Gray affidavit establish new facts showing that the merger itself was fraudulent and conducted in bad faith. The ineptly candid disclosure about the acquisition of Homestar -- "unwilling to let the opportunity to acquire Homestar pass, ... I arranged for its purchase..." (Gray Af't. par. 7), coupled with the disclosure of a nearly year long effort to obtain refinancing -- through Houlihan -- of Chariot Group's operating companies [together with Homestar] reveals essential information that could and should have been disclosed to minority shareholders in the Merger Notice, because it is essential to evaluate the fairness of the proposed terms of the merger.

In sum, the submissions made by Gray in opposition to the pending applications fail to satisfy the substantial burden placed on Gray to establish the "entire fairness" of the Chariot Group/Summit merger, and actually contribute evidence to require a contrary finding. The total lack of documentary evidence, coupled with the self-serving statements of Gray satisfy no evidentiary burdens, and the total failure by Gray to disclose -- either in the Merger Notice or, for that matter, in his affidavit -- that, by this merger Gray successfully retained all the assets, while

---

[13] The reference to the December 22 1994, Houlihan letter referring to "the contemplated shareholder liquidity initiative for you -- addressing Gray - and ESP" (Cross-Motion, Ex. A) does not obviously refer to the liquidity of minority shareholders, but only to that of ESP (owning BF Rich stock) and Gray (owning ESP). The failure by Gray to submit the Houlihan "formal proposal" attached to that letter is unacceptable, and is another illustration of Gray et. al. failing to satisfy their burden as to fairness.

retaining complete discretionary control over the future payment of consideration to the minority shareholders, requires a conclusion that Gray has not satisfied -- and will not at trial satisfy -- his evidentiary burden to justify this merger as fair.

So complete is the failure to provide competent documentation that it is virtually as if Gray had defaulted in opposition to this application.    On the positive side, the disclosure of long-standing plans for refinancing and for the acquisition of Homestar aggravates that default by providing new information which conclusively impugns the fairness of the merger.

POINT III

PLAINTIFF'S PROPER REMEDY IN THE CHARIOT GROUP\SUMMIT MERGER IS NOT STATUTORY APPRAISAL BUT THE RECISION OF THE MERGER, AS RELIEF IN THE CLASS ACTION, THEREBY REINSTATING THE SHAREHOLDER DERIVATIVE PARTS OF THAT ACTION, TOGETHER WITH THE INDIVIDUAL SHAREHOLDER CLAIMS THAT WOULD REMAIN VIABLE DESPITE THE MERGER

Defendants' position that August 7, 1995, "cashout" merger, even if that fraudulent, self-dealing transaction is later determined to be invalid under the "entire fairness" test of Weinberger, mandates that the sole relief available to minority shareholders is the assertion of "appraisal rights" against Summit, is erroneous.   The inequitable self-dealing conduct of Gray deserves the full force of equitable relief available from this Court, which is rescission or a judgment voiding the merger.  Faced with an equally egregious attempted cashout merger transaction, albeit one where the defendants at least offered actual cash to the minority shareholders, the Court of Chancery determined that the

only appropriate relief was an injunction against the merger, after applying the standards of Weinberger carefully and determining, as here, that defendants conduct was a "textbook study on how one might violate as many fiduciary precepts as possible", Sealy Mattress Company of New Jersey, Inc. v. Sealy, Inc., supra., 532 A.2d at 1324. The decision of the Court in Sealy, one day before a scheduled shareholder vote on the merger, is applicable with equal force here, where, the injunction is sought -- because of the TRO -- as of only two days after a sham, self-dealing paper merger, conducting unilaterally by Gray, involving no third parties, making the status quo equally subject to equitable injunctive relief.

In Sealy, the application for injunctive relief was made in a situation in which the majority shareholders of defendant Sealy, Inc., were engaged in prolonged corporate warfare, the sole objective of which was for Sealy Inc. to eliminate the one single remaining other shareholder ("Sealy-NJ"). As has been done in this memorandum, the court engaged in an exhaustive review of the details of the history of the parties, and the merger transaction itself, and concluded that on all of these variables, the merger could not satisfy the "entire fairness" standard of Weinberger, and ordered an injunction. To the argument of defendant Sealy, Inc., repeated here by Gray, that no matter how improperly the merger was done, its mere consummation immunized defendants from any relief other than appraisal or "rescissory damages", the Court ruled against defendants, denying the benefit of their own inequitable conduct:

32

In short, defendants appear to be arguing that as a result of Weinberger and its progeny, <u>injunctive relief has been judicially eliminated as a remedy in all but the most "extremely unusual" parent-subsidiary cases.</u>

To that argument, I would respond as follows: To say that this Court has the power to condemn the egregious conduct involved here (as it preliminarily has done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of that conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State. Given the nature of the conduct involved in this case and the harm that will likely result from it, only a clear, positive declaration by the Delaware Supreme Court proscribing injunctive relief would cause this Court to stay its hand. The defendants have cited no case which mandates that result. Indeed, in Rabkin v. Philip A. Hunt Chemical Corp., the Supreme Court held that an appraisal is not an exclusive remedy in cases involving a breach of the duty of fair dealing, of which this case is one.

******

In this case, misrepresentation, self-dealing, and gross and palpable overreaching have been alleged and preliminarily established. Damages, in these circumstances, would not be an adequate remedy. Therefore, I find that the injunctive relief is the appropriate remedy and that the plaintiffs are preliminarily entitled to it.

<u>Supra.</u>, 532 A.2d at 1341-2. In defending its decision, the Court in <u>Sealy</u> noted that the Supreme Court in <u>Weinberger</u> had specifically declared that its opinion was not intended to limit the "historic powers" of the Chancellor to give equitable relief:

[W]hile a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation

> on the historic powers of the Chancellor to
> grant such other relief as the facts of a
> particular case may dictate. The appraisal
> remedy we approve may not be adequate in
> certain cases, particularly where fraud,
> misrepresentation, self-dealing, deliberate
> waste of corporate assets, or gross and
> palpable overreaching are involved.

Id., at 1342, quoting Weinberger v. UOP, Inc., 457 A.2d at 714, and

Rabkin v. Philip A. Hunt Chemical Corp., 498 A.2d at 1104.

The same conclusion is required in this action. The

Chariot Group/Summit merger is a sham merger, consummated only with

a filing with Secretary of State in Delaware, and the "closing" of

a myriad of paper transactions taking place only unilaterally by

the "Newco" companies owned and controlled by Gray. No third party

is involved. No substantial rights are prejudiced. Unlike in

Sealy, in which the majority stock owner had at least purported to

provide a procedural safeguard in the form of a shareholder vote,

with advance notice, in the Chariot Group transaction, Gray

purports to have concluded the merger, without notice, without any

procedural safeguards. Plaintiff has moved promptly to execute its

rights, before any intervening third-party interest or irrevocable

transaction has taken place -- such as the sale of an operating

company. For all practical purposes, the status quo here is the

same as in Sealy one day before the noticed shareholder vote.

Defendants' strategic objective, which it is this

Court's equitable obligation to thwart, is to succeed in immunizing

themselves from effective redress for past misconduct -- the

looting of millions and the damages caused by other, discrete,

self-dealing transactions -- as well as any substantive relief that

34

might be imposed on the basis of the demonstrably unfair Chariot Group/Summit merger, by limiting shareholders -- those limited ones who receive the notice of merger, and timely respond with an appraisal demand[14] -- to the assertion of appraisal rights against only one party to this action, the Summit "Newco" that Gray created to be the payor on the [presumptively worthless] shareholder notes.

Monetary damages, whether in appraisal or otherwise, provide no meaningful remedy.    Appraisal rights, which are assertable only against Summit, are utterly meaningless.    More importantly, by splintering the available monetary claims into the individual claims of shareholders, the fraudulent cashout merger strategy of Gray causes irreparable injury to the real and separate interests of the Corporation, because of the size of the potential damage award against Gray in the shareholder derivative action. The substantial potential for the Corporation to divest Gray, by enforcing its derivative judgment against the majority stock, is a corporate opportunity; although not imminent, it is a real and potentially important one.   The interests of the Corporation, qua corporation, to divest itself of Gray as a shareholder and director is one that the equitable authority of this Court should preserve.

This strategic objective of leaving plaintiffs with meaningless monetary remedies, is specifically denied to Gray et. al. by controlling Delaware law, articulating with unreserved

---

[14] As an additional component of the inherent unfairness of the merger, this court should take note of the fact that much of this Chariot Group minority stock is held in the street name of brokerage firms, and therefore the Merger Notice will not go directly to the shareholders, raising an important practical problem whether individual shareholders will receive the Merger Notice in time to exercise their appraisal rights. In addition, the fact that shareholders have received no communications from Chariot Group since 1990, or thereabouts, makes the 20-day notice period for the exercise of appraisal rights unconscionable here.

force, from <u>Weinberger</u> to <u>Rabkin</u> to <u>Cede</u> to <u>Tri-Star</u>, which state
that the availability to the appraisal remedy shall not be deemed
to limit the rights of shareholder plaintiffs to appropriate
equitable relief. It is to be noted that this same line of cases,
beginning particularly with <u>Cede & Co. v. Technicolor</u>, <u>supra.</u>, 542
A.2d 1182, recognizes the right of a minority shareholder to pursue
rescissory damages for fraud <u>etc.</u>, at the same time as appraisal
proceedings, such that the shareholder is not required to elect its
remedies until the time of trial. Thus, where plaintiffs had
discovered fraud, during the appraisal proceeding, they were not
foreclosed to pursue individual claims for fraud. "If the merger
was not lawfully effected, Cinerama should be entitled to recover
rescissory damages, rendering the appraisal action moot." <u>Id.</u>, at
20.

In <u>Cede</u>, as in most real non-sham mergers, the subject
merger had been consummated, many third party interests had become
involved, and the transaction could not be effectively undone.
Thus, unlike in <u>Sealy</u> and here, actual recision and an injunction
was not feasible. As the court noted in <u>Tri-Star Pictures, Inc.</u>,
<u>supra.</u>, 634 at 319, such a fraud claim could include a claim for
the "cash-value dilution" of minority stock, where "the practical
effect of cash-value dilution is to increase the value of the
controlling stockholder's interest at the sole expense of the
minority," <u>Id.</u>, at 330. Thus, even if preliminary injunctive
relief could not be granted herein, which it can and should be,
plaintiff would nonetheless continue to have the right to prosecute

36

the entire subject matter of the shareholder derivative action as a fraud claim, under the doctrine of <u>Cede</u>, <u>Tri-Star</u>, <u>et al.</u>

However, as noted, the prosecution of monetary damages against Gray <u>et al.</u> is not a meaningful remedy. Gray's opportunistic use of the legal mechanism of the cashout merger should not be permitted to deny plaintiff equitable relief. The controlling principle, common to all courts of equity, but asserted with particular vigor by the higher courts in the context of shareholder/corporate litigation that comes so frequently to the courts of Delaware, is succinctly stated by the Supreme Court of Delaware, in an action not directly involving shareholder claims in cashout mergers, in <u>Farahpour v. DCX, Inc.</u>, 636 A.2d 984, 900-901 (1994):

> Strict adherence to the procedures authorized by particular provisions of the GCL [General Corporation Law] does not insure that the result will receive judicial approval in litigation initiated at the behest of disgruntled members or shareholders. The use of the corporate machinery, even in full compliance with Delaware law, does not insulate coporate management or directors from claims of inequitable conduct. Schnell v. Chris-Craft Industries, Inc., 285 A.2d 437 (1971). Where fiduciary duties arising from management control are implicated, judicial scrutiny may expend to the purpose of which an otherwise lawful course was undertaken and the result achieved. Condec Corp. v. Lunkenheimer Co., Del. Ch., 43 Del. Ch. 353, 230 A.2d 769, 776 (1967). Where inequitable conduct is established, a court will act to correct the inequity. Rabkin v. Philip A. Hunt Chem. Corp., Del. Supr., 498 A.2d 1099 (1985).

Plaintiffs are entitled to the injunctive relief requested herein, and it should be ordered by the Court.

## POINT IV

**APPOINTMENT OF A TEMPORARY RECEIVER IS ESSENTIAL
TO PRESERVE STATUS QUO OF HOLDING COMPANIES IN DISPUTE,
PERMITTING OPERATING COMPANIES TO CONTINUE UNDER CURRENT MANAGEMENT**

A temporary receiver should be appointed to control the affairs of Chariot Group. All of the day-to-day operations of the subsidiaries can be handled by their respective managements. The sole role of such a receiver would be to supervise and maintain the <u>status quo</u> of stock ownership, and to prevent looting and waste of monies that are taken out of the operating companies. If the financing transaction must go forward for the benefit of the subsidiaries, such a trustee would act to insure these monies are transferred to, and used by, only the operating companies for legitimate business purposes. The prior record of Gray's dishonesty and self-dealing at the expense of the Corporation require that such relief be granted and that Gray not remain in control of any significant corporate activity during the action.

## POINT V

**THE STATUTE OF LIMITATIONS DEFENSE AS TO CLAIMS
INVOLVING REPUBLIC METALS RAISES QUESTIONS OF FACT
AS TO DISCOVERY OF FRAUD <u>BY SHAREHOLDERS</u>
AND THE TOLLING OF THE STATUTE BY CONCEALMENT**

The affidavit of Ben Richardson, and the other

submissions to this Court, raise a question of fact -- at a minimum -- as to whether there was proper disclosure or concealment of relevant information about the Republic Metals acquisition.  Thus, plaintiff is entitled to the two-year addition to the fraud statute of limitations, set forth in Sections 213(8) and 203(g), CPLR.  In this action, the New York limitations periods apply. <u>Lowengard v. Sante Fe Industries, Inc.</u>, 70 N.Y.2d 262, 519 N.Y.S.2d 801 (1987).

## POINT VI

### HOMESTAR SHOULD NOT BE DISMISSED AS A PARTY

Homestar is not named as a wrong-doer in any cause of action, but it remains a necessary party to this action.  Homestar is named as a corporate opportunity wrongfully misappropriated by Gray, and is directly involved in the corporate restructuring and refinancing transactions that are the subject of this action.  Thus, Homestar is a necessary party who must be joined "if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action, Section 1001, CPLR.

## POINT VII

### RICHARDSON IS A QUALIFIED REPRESENTATIVE IN BOTH ACTIONS

The <u>ad hominem</u> attacks on Ben and Ambrose Richardson have been shown to be unfounded, as a matter of fact, in the other submissions on this application.  More fundamentally, the unfounded and self-serving accusation of an alleged personal vendetta of

Richardson's father is legally irrelevant on this issue, because it is well-established law that the motivation of a representative plaintiff is irrelevant, <u>Meredith v. Camp Hill Estates, Inc.</u>, 77 A.2d 549, 430 N.Y.S.2d 383 (2nd Dept. 1980).

## POINT VIII

### THE CROSS-MOTION SHOULD BE DISMISSED

The cross-motions to dismiss are frivolous.  On a motion to dismiss, it is essential for this Court to treat all of the plaintiff's allegations as true, and to interpret them in the light most favorable to plaintiff.  Under these controlling standards, neither of the complaints is subject to dismissal.  As the Supreme Court of Delaware, noted in <u>In re Tri-Star Pictures, Inc.</u>, <u>supra.</u>, 634 A.2d at 321, fn.1:

> [P]laintiffs' well-pleaded averments are taken as true. Thus, given the outcome of Cede and Weinberger on appeal, where a more rigorous scope and standard of review applied, a reversal here [of a decision granting a motion to dismiss], applying the fairness doctrine is both foreordained and mandated.

For this reason, the cross-motion to dismiss must be denied.

## POINT IX

### NEW YORK SUPREME COURT HAS PROPER JURISDICTION
### OF ALL PARTIES AND IS A PROPER FORUM TO DETERMINE THE DISPUTE

Chariot Group is a New York-based Delaware corporation, whose principal place of business and all of its activities, as holding company owning the stock of corporations located outside of New York (or Delaware), is conducted in New

York, making the New York Supreme Court selected by plaintiff a
proper forum, <u>Broida v. Bancroft</u>, 103 A.D.2d 88,  478 N.Y.S.2d 333
(2nd Dept. 1984); <u>In re Edward A. Dohring for the Dissolution of
CVC Products, Inc.</u>, 142 Misc.2d 429, 537 N.Y.S.2d 767 (Supreme
Court, Monroe County 1989). The principal individual defendant
maintains at least one residence in New York, and none in Delaware,
and all of the remaining Gray-owned corporations, i.e. all except
Houlihan, which has a New York office, also "operate" out of the
New York offices of Gray and Chariot Group, now allegedly Summit,
at Rockefeller Center.[15]   No objection has been raised by
defendants to this New York forum in their opposition papers.

The sole connection of Chariot Group -- or the myriad
of other Gray companies used in these transactions to provide the
superficial appearance of <u>bona fide</u> corporate transactions -- is
the filing of those corporations' certificates of incorporation in
Delaware.  Under these circumstances, unless there are factors --
absent here -- requiring dismissal on <u>forum non conveniens</u> grounds,
plaintiff's selection of this forum should be honored. As the
Second Department noted in <u>Broida v. Bancroft</u>:

> Plaintiffs, as New York residents, are
> presumptively entitled to utilize their
> judicial system for dispute resolution
> [citations omitted]. In fact, New York has a
> special responsibility to protect its citizens
> from questionable corporate acts when a

---

[15] Defendants may have intentions to leave New York, but they are here now. After defendants' counsel signed a stipulated TRO requiring them, <u>inter alia</u>, not to sell, assign or otherwise dispose of any assets of Chariot Group, signed by this Court on August 17, 1995, plaintiff's counsel discovered, on August 18, 1995, that defendants intended to sign a sublease giving up their only New York offices at Rockefeller Center by August 31, 1995.  The lease signing was scheduled for August 21, 1995, only ten days before the vacatur date, and the attorneys for the prospective tenant had not been advised of the alleged Summit merger, and had expected to take a sublease from Chariot Group on August 21, 1995.

41

> corporation, though having a foreign charter, has substantial contacts with this State

Id., 103 A.D.2d at 92, 478 N.Y.S.2d at 336.

Delaware law also recognizes the propriety of courts in other jurisdictions determining disputed matters relating to the internal governance of Delaware corporations.  As the Supreme Court of Delaware, noted in <u>Draper v. Gardner Defined Plan Trust</u>, 625 A.2d 859, 869 (1993):

> It would be a jurisprudence of arrogance for this Court to hold that it is impermissible for trial court of this state to allow a court of a sister state to proceed with litigation involving the internal affairs of a Delaware corporation ....

Therefore, this court may hear and determine this entire dispute.

## CONCLUSION

Plaintiff's applications for preliminary injunction, expedited discovery and the appointment of a receiver should be granted, and the cross-motions to dismiss the complaints denied.

Dated: September 12, 1995

                    JOSEPH H. ADAMS, ESQ.
                    Attorney for Plaintiff
                    53 Burd Street
                    Nyack, New York 10960
                    (914 353 2330

APPENDIX A

43

HERZFELD & RUBIN P.C.
ATTORNEYS AT LAW
40 WALL STREET
NEW YORK, NEW YORK 10005
Telephone (212) 344-5500
Telefax (212) 344-3333

## FACSIMILE COVER SHEET

The information contained in this facsimile message is intended only for the use of
the individual or entity named below. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to the
intended recipient, you are hereby notified that any dissemination, distribution or
copying of this communication is strictly prohibited. If you have received this
communication in error, please immediately notify us by telephone, and return the
original message to us at the above address via the U.S. Postal Service. Receipt by
anyone other than the intended recipient is not a waiver of any attorney-client or
work-product privilege.

ADDRESSEE: _Joseph Adams, Esq._

ADDRESSEE FACSIMILE TELEPHONE NUMBER: _(914)353-0109_

NAME OF COMPANY: _____

COMPANY TELEPHONE NUMBER: _(914)353-2320_

CITY AND STATE: _Nyack, N.Y._

DATE TRANSMITTED: _9 / 5 /1995_    TIME TRANSMITTED: _____

SENDER/ATTORNEY NAME: _JOHN M. SCHWARTZ_    EMPL. #: _026_

OPERATOR: _____    EMPL. #: _____

CLIENT/MATTER NAME: _Richardson v. Grey_

CLIENT/MATTER NUMBER: _41392.0003_

NUMBER OF PAGES Including Cover Sheet: _2_

MESSAGE: _The enclosed disclosure was provided me
by Mr. Quinn on Friday but didn't get into the
package your messenger picked up._

___✓___ Original will NOT follow    _____ Original WILL follow

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BEVERLY, (212) 344-5500, EXT. 456.

As Summit Metals, Inc., HSAC and Hallowell Industries, Inc. have only recently commenced operations, no financial statements have been pepared or are available.

Summit was, until the August 7, 1995 merger, a wholly-owned subsidiary of Chariot Group, which was a majority owned subsidiary of Chariot Plastics, Inc.  On August 7, 1995, Chariot Group was merged into Summit in a "cash out" merger pursuant to Delaware law, and its minority stockholdings were extinguished. Accordingly, as of August 7, 1995, Chariot Group ceased to exist and Chariot Plastics owned 100% of the issued and outstanding stock of Summit.

On June 30, 1995, HSAC, a wholly-owned subsidiary of Chariot Realty, Inc. (which is a wholly-owned subsidiary of Hallowell), acquired a majority interest in Energy Saving Products, Inc. from Chariot Group.  ESP owns 100% of the issued and outstanding stock of B.F. Rich Co., Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) CHAPTER 11 |
| SUMMIT METALS, INC., | ) CASE NO. 1:08-cv-0005 (SLR) |
| Debtor. | ) |
| AMBROSE M. RICHARDSON, III | ) |
| Appellant, | ) |
| v. | ) |
| U.S. TRUSTEE KELLY BEAUDIN STAPLETON, | ) |
| Appellee. | ) |

**CERTIFICATE OF SERVICE**


    I, Ambrose M. Richardson, hereby certify that on this 29th day of May, 2008, I
caused a copy Appellant's Reply Memorandum of Law to be sent by facsimile
transmission to the attached service list.

**Service List**

Francis A. Monaco, Jr.
Womble Carlyle et al.
222 Delaware Avenue, 15th Floor
Wilmington, DE 19801
Fax No. 302 661-7729

Office of the U.S. Trustee
844 King Street, Suite 2207
Wilmington, DE 19801
302 573-6497